IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CYRUS II, LP, | § | CASE NO. 05-39857-H1-7 |
| | § | |
| BAHAR DEVELOPMENT, INC. | § | (Jointly Administered) |
| and | § | |
| MONDONA RAFIZADEH | § | |
| | § | (CHAPTER 7) |
| DEBTORS. | § | |

## MOTION FOR LEAVE TO APPEAL

To:    The United States District Court for the Southern District of Texas

Pursuant to 28 U.S.C. § 158(a), United Rafizadeh Family L.L.P.; Schumann Rafizadeh; Rafizadeh LLC; B.G. Real Estate Services, Inc.; Flash Vos, Inc.; MBA Services, LLC; MBA Systems Automation, Inc.; Keyld, L.P.; Keyut L.P.; Coob, L.P.; Hoapt, L.P. and Baha Towers, L.P., Atob, L.P., Haapt, L.P.; Okob, L.P.; Nopk, L.P.; Hoob II, L.P.; Hoob I, L.P.; Keob, L.P.; Metapt I, L.P.; Metapt II, L.P., collectively "United Rafizadeh," by the undersigned attorney, moves for leave to appeal from the Order Regarding Discovery Dispute ("Discovery Order") [Docket No. 80], which was entered in this bankruptcy case by the Honorable Marvin Isgur on September 7, 2005 and for which reconsideration was sought on September 14, 2005 [Docket No. 94] and denied, without a hearing, on October 4, 2005 [Docket No. 141].

### INTRODUCTION

1.    Attached is a copy of the Order complained of, as well as the related Motion to Reconsider and Order denying such reconsideration. These documents are marked as Exhibits A, B and C, respectively.

2.    The relevant facts giving rise to this Motion for Leave to Appeal are as follows:

3. On August 4, 2005, United Rafizadeh served upon Orix[1] a Notice of Examination Under Fed. R. Bankr. P. 2004 and 7030 with Subpoena Duces Tecum for Document Production and a Notice of Service of Discovery. Central to this notice and subpoena were issues related to: (1) whether Orix, as part of its claim in the above-entitled bankruptcy proceeding, was asserting a right to recover from the bankruptcy estate and United Rafizadeh amounts previously recovered from another entity in another proceeding and (2) whether allocation of those amounts previously recovered should be allocated to reduce Orix's claim in this proceeding, particularly as to the attorneys' fees portion of such claim.

4. On August 9, 2005, the eve before the above referenced examination was to take place, Orix served the undersigned counsel with its Objections to Subpoena Duces Tecum for Document Production, indicating that its corporate representative would not appear and that documents would not be produced as requested in the subpoena duces tecum.

5. On August 11, 2005, United Rafizadeh filed its Emergency Motion to Compel Production of Documents and Examination of Orix Capital Markets, L.L.C. Under Fed. R. Bankr. P. 2004 and 7030, which the Bankruptcy Court heard on August 12, 2005.

6. In connection with the Bankruptcy Court's ruling on United Rafizdeh's Motion to Compel, the Court ordered the parties to brief it regarding the relevance of certain documents related to a settlement reached in connection with *LaSalle Bank, National Association and Orix Capital Markets, L.L.C. v. UBS Warburg Real Estate Securities, Inc. et al.,* Cause No. 02-02899, brought in the District Court for Dallas County Texas, 134th Judicial District (the "UBS

---

[1] For purposes of this Brief the term "Orix" will be used to describe both Orix itself and Wells Fargo, for whom Orix is acting as its special servicer and agent.

Warburg Litigation"[2]).  This litigation related to a suit brought by Orix to recover damages related to the loan that gives rise to Orix's claim in these bankruptcy proceedings.

7.      Following the review of such briefs, and certain documents submitted by Orix *in camera,* the Court ultimately concluded that United Rafizadeh would not be allowed to proceed with its discovery related to its contention that Orix's claim in these proceedings was at least partially satisfied by recovery of amounts from UBS Warburg.[3]  As a result of this ruling, United Rafizadeh, and indeed the Debtors as well, have been foreclosed from pursuing discovery on this matter, and as a result, have also been foreclosed from pursuing this defense on the merits.

8.      As will be discussed more fully below, the Bankruptcy Code and applicable case law articulate a strong policy against the payment of more than one recovery based upon the same set of damages; therefore, to the extent the discovery in question may lead to or demonstrate Orix has been paid by any party in relation to the claims it is asserting in these proceedings, those documents are relevant evidence and discovery should be permitted in connection with those documents and the ultimate question of whether Orix's claim should be reduced by the amounts it has received from third parties.

9.      Because United Rafizadeh maintains that the Bankruptcy Court's ruling denying such discovery was in error, and because of the pendency of the claims objection hearings on Orix's claim, United Rafizadeh respectfully requests leave to appeal that ruling.

## FACTUAL BACKGROUND

10.     On July 6, 1999, Cyrus II Partnership (one of the Debtors in these proceedings) borrowed $6,400,000.00 from an entity known as Love Funding Corporation.  The indebtedness

---

[2] The documents related to this litigation will be referenced herein as the UBS Warburg Documents.
[3] The Court should be aware that Orix has sought to hold United Rafizadeh liable for the claim it is asserting against the Debtors' bankruptcy estate based upon a theory of single business enterprise.  Therefore, the issues raised here do not only impact the Debtors' rights, but also the substantive rights of the entities comprising United Rafizadeh.

was established by a bearer note executed in the lender's favor and secured by a mortgage on what have become known in these proceedings as the "Arlington Apartments." Love Funding originated the loan for PaineWebber Real Estate Securities, who sold and assigned the note and related mortgage and guaranty to a trust in which Wells Fargo Bank Minnesota, N.A. was the trustee and Orix Capital Markets, LLC was the special servicer and agent of Wells Fargo. The note was sold along with a pool of other secured obligations as part of a commercial mortgage-backed security transaction.

11. In March of 2002, Orix sued Cyrus II in Louisiana, seeking to foreclose on the Arlington Apartments.[4] In addition, Orix sued a company known as UBS Warburg in Texas based upon allegations of misrepresentation and breach of warranty arising from the original underwriting of the loans held by the Wells Fargo trust and referenced above. Included in these loans was the loan related to the Arlington Apartments.

12. Trial in the Louisiana litigation took place between July 26, 2004 and July 29, 2004. At the conclusion of the trial and the close of evidence, the court took the case under advisement and ultimately rendered its judgment on December 23, 2004. On information and belief, Orix contends that the value of this judgment, inclusive of attorneys' fees and interest, is now approximately $14.7 million.[5] This is approximately $8 million in excess of the original amount of the Arlington Apartments loan.

---

[4] The foreclosure was based on an asserted default caused when Cyrus II refused to pay, as demanded by Orix, an increase in its repair escrow from approximately $8,000 per month to $280,000 per month. It was Cyrus II's position that the repair escrow was to be capped at $310,000, per the loan agreement. Up until the point of this asserted default, Cyrus II had never missed a payment. Moreover, the Arlington Apartments had an appraised value, and ultimately sold for, in excess of the outstanding amount of the original loan in question.

[5] This amount is grossly inflated over the original loan amount by items such as excessive default interest, pre-payment penalties and over $2 million in other fees claims by Orix. All of these items are subject to review by the Bankruptcy Court.

13. After evidence was closed in the Louisiana litigation, a settlement was reached in the UBS Warburg Litigation, in which the Wells Fargo trust received a lump-sum payment of $19.4 million.

14. Of the loans forming the basis of the UBS Warburg Litigation, it is believed that the Wells Fargo trust only incurred potential damages, if any, with respect to the loans related to the Arlington Apartments and another set of properties known as the "Lee Hall Properties." However, on information and belief, the settlement did not allocate the $19.4 million between these two sets of properties.

15. As part of a carve-out, UBS Warburg assigned its rights against the originator of the Arlington Apartments loan, Love Funding, to the Wells Fargo trust, hence allowing Orix a third opportunity to litigate and potentially recover with respect to the Arlington Apartments loan. This litigation is ongoing in the United States District Court for the Southern District of New York, Case No. 04- CV-9890.

16. In short, Orix has received a payment of $19.4 million allocated entirely to the no more than $13 million of potential damages Orix alleges it has incurred in connection with the Lee Hall Properties, while applying no portion of this settlement to the Arlington Apartments loan.

17. It is without question that up until the very end of its case in the UBS Warburg Litigation, Orix was seeking damages from UBS Warburg on the Arlington Apartments loan. Indeed, Orix's own reports to their certificate holders, suggest that the amounts paid by UBS Warburg may have included amounts attributable to the Arlington Apartments loan and was also seeking recovery of other fees expended in the Louisiana litigation. Moreover, Orix's own filings with respect to this matter admit that the fraud claims alleged in the Louisiana litigation

and the UBS Warburg Litigation were the same, but that there simply were also other causes of action, which they maintain precluded their need to allocate proceeds.[6] (*See* Orix Resp. to Mot. to Reconsider, Doc. No. 114, at ¶ 6).

18. On information and belief, the other loans, which were subject of the UBS Warburg Litigation, have never appeared on any of the delinquency reports provided to the Wells Fargo Trust's certificate holders. Based upon the foregoing, United Rafizadeh reasonably believes that a portion of the UBS Warburg settlement should have been applied to the Arlington Apartments loan and wishes to conduct discovery in that regard.

19. Moreover, a significant portion of the $19.4 million that was received was allocated to attorneys' fees, which possibly included amounts that Orix is attempting to recover in these proceedings as well. Because the Bankruptcy Court did not allow for discovery to proceed in that regard, it was necessary for United Rafizadeh to file this Motion for Leave to Appeal to answer this basic and fundamental question.

20. Under applicable law, a non-settling defendant need only show that the plaintiff has previously settled with a different party on a claim upon which the non-settling defendants are liable in order to establish a preliminary entitlement to a credit for such settlement. *See In re Performance Nutrition, Inc.,* 239 B.R. 93, 117 (Bankr. N.D. Tex. 1999). At that point, the burden shifts to the plaintiff to show he has not received a double recovery. *Id.* Further on this point, the court in *McDermott, Inc. v. Clyde Iron,* 979 F.2d 1068, 1080 (5th Cir. 1993), *rev'd in part on other grounds sub nom., McDermott, Inc. v. AmClyde,* 511 U.S. 202 (1994), noted: "A

---

[6] The Bankruptcy Court held that the Debtors were not solidarily liable under Louisiana law with UBS Warburg. While this is not the standard, as discussed below, a party may be solidarily liable on some aspects of a claim and not on others. The fact that the same fraud was alleged against Debtors and UBS Warburg is sufficient to establish solidarity under Louisiana law, even in the presence of other potential causes of action. As noted in *Rizer v. American Surety and Fidelity Ins. Co.,* 669 So.2d 387, 389 (La. 1996), **the sources of the obligations are irrelevant so long as the obligors are obligated to repair the same damage."** *Id.* (emphasis added). "Consequently, different sources of liability w[ill] not preclude an in solido obligation to the extent that each is liable for certain damages sustained by plaintiff." *Id.* at 389 (internal quotations omitted).

plaintiff should not be able to wait for the jury's verdict to allocate the settlement in a way that reduces the remaining defendants' credit." As the case law cited herein holds, the issues raised in this Motion are issues that are well within the power of the Bankruptcy Court to resolve and, thus, discovery should be permitted with respect to such matters. United Rafizadeh should, at a minimum, be afforded ample opportunity to conduct discovery reasonably calculated to lead to evidence relevant to the resolution of the issues raised herein; issues where are central to these bankruptcy proceedings.

21. This result is further dictated by the Bankruptcy Code's strong policy for paying a creditor only once for damages sustained. United Rafizadeh believes that if there is a potential that Orix has been paid on their loan, that should be explored in order to reduce the amount of that claim on the Debtor's bankruptcy estate. Moreover, United Rafizadeh believes that Orix has no rights, or only limited rights, in these proceedings, pursuant to § 509 of the Bankruptcy Code by virtue of the $19.4 million settlement it received, at least a part of which should have been allocated to payment of the Arlington Apartments loan.

22. As will be demonstrated below, it is well established that a party is not permitted, especially in a bankruptcy proceeding, to receive a double recovery with respect to contractual damages arising out of a single transaction. Therefore, the bankruptcy estate would be well served by allowing United Rafizadeh's pursuit of evidence bearing on this central issue.

## ISSUES ON APPEAL

23. The issues raised in this appeal are as follows:

> a. Did the Court err in denying United Rafizadeh the opportunity to conduct discovery with respect to the issue of whether United Rafizadeh and the Debtors are entitled to a credit of all or a portion of a $19.4 million settlement entered into between Orix Capital Markets, L.L.C. and UBS Warburg in connection with a transaction involving the same loan that gave rise to Orix's claim in this bankruptcy proceeding and upon which

>    Orix is attempting to hold the Debtors and United Rafizadeh responsible for paying?
>
> b.  Did the Court further err by ruling on the merits of the issue discussed above, without providing United Rafizadeh the opportunity to conduct discovery?
>
> c.  Should discovery have been permitted to obtain information reasonably calculated to show that the attorneys' fees portion of Orix's claim against Debtors' was satisfied or should be reduced by allocation because the benefit of the attorneys' work underlying the fees was received by Orix in connection with related litigation?

## BASIS JUSTIFYING APPEAL BEING GRANTED

24. It is well established that a party potentially liable for a cause of action has a right to seek credit for a settlement reached between a plaintiff and a third-party defendant, where the settlement in question should arguably be applied to satisfy the obligation of other potentially liable parties. *See National Tea Co. v. Plymouth Rubber Co., Inc.,* 663 So.2d 801, 811 (La.App. 5 Cir. 1995) (discussed in more detail below).

25. In *In re Performance Nutrition, Inc.,* 239 B.R. 93, 117 (Bankr. N.D. Tex. 1999) stated as follows:

> The parties claiming credit for a settlement have the burden to show that the damages assessed against it have already been covered by such settlement. When the nonsettling defendants were not parties to the settlement negotiations…the nonsettling defendants need show **only** that the plaintiff has previously settled with a different party the claim on which the nonsettling defendants are liable. **The burden then shifts to the plaintiff to show that the settlement does not provide him with double recovery**. If the plaintiff carries his burden, the burden then shifts back to the defendants to show the applicability of the settlement.

(emphasis added); *See also In re Texas General Petroleum Corp.,* 52 F.3d 1330, 1340 (5th Cir. 1995) (stating: "The best way for a plaintiff to satisfy his burden is to offer as proof the written settlement, which should specifically stipulate the allocation of damages to each cause of action.").

26. In *McDermott, Inc. v. Clyde Iron,* 979 F.2d 1068 (5th Cir. 1993), *rev'd in part on other grounds sub nom., McDermott, Inc. v. AmClyde,* 511 U.S. 202 (1994), the court was called

upon to determine the proper allocation of settlement dollars to a judgment rendered against a non-settling defendant. Specifically, on the eve of trial, McDermott settled with three defendants for $1 million for damages incurred in the dropping of a platform deck, which fell from a crane when hook and slings broke. *Id.* at 1070. The settlement documents relating to this transaction, however, were not executed until after the jury returned its verdict. *Id.* at 1070. "That detail disclosed that the settlement agreement attributed one half of the total settlement to crane damages and one half to deck damages." *Id.* at 1070-71.

27. After the jury verdict was rendered, a non-settling defendant by the name of River Don requested a $1 million credit against the verdict, which the court denied. *Id.* at 1071. On appeal, River Don "contend[ed] that any judgment rendered against it must be offset by the $1 million settlement between McDermott and the sling defendants." *McDermott, Inc.,* 979 F.2d at 1079. In analyzing this question, the Fifth Circuit noted that, while McDermott had reached a post-trial "revelation that half of the settlement was allocated to the crane and half to the deck," which would have limited River Don's credit due to its liability being solely related to the deck, the court rejected this allocation "because it was made after the trial," among other reasons. *Id.* at 1080. The court noted: "**A plaintiff should not be able to wait for the jury's verdict to allocate the settlement in a way that reduces the remaining defendants' credit**." *Id.* at 1080 (emphasis added).

28. In so noting, the court rejected McDermott's ½ allocation to the crane and ½ to the deck and determined that the full amount of McDermott's settlement should be credited to River Don. *Id.* at 1180. "It was McDermott's burden to demonstrate that its jury award did not exceed its right to full compensation for a particular injury. McDermott [did] not me[e]t its burden of demonstrating that the proceeds of the settlement with the sling defendants were for

damage to the crane and not the deck. [Therefore, the court held] that the entire $1 million should be included in calculating any credit due River Don." *Id.* at 1180-81. On appeal to the Supreme Court, the court agreed with the Fifth Circuit that indeed a non-settling defendants' liability should be reduced by virtue of a settlement with another defendant, but found that the amount of such credit should be proportionate to the settling defendant's liability, not a dollar for dollar credit. *McDermott, Inc. v. AmClyde,* 511 U.S. 202 (1994).

29.   In *In re Lenz*, 80 B.R. 528 (D. Col. 1987), the court was called upon to determine the credit a debtor should receive for payments made to its mortgage holder under a loan insurance policy relating to the debtor's mortgage. The debtor owned an apartment building that was foreclosed upon by the mortgage holder and then purchased by the mortgage holder for $700,000 at public sale. *Id.* at 529. This left a deficiency on the debtor's loan of $110,336.83. *Id.* at 529. Later, the mortgage holder sold the property for $225,000 and collected $125,000 on a loan insurance policy relating to the debtor's loan. *Id.* at 529. Despite receiving these payments, the mortgage holder asserted a general unsecured claim in the amount of the $110,336.83, arguing that the debtor should not receive the benefit of the payments the mortgage holder received from collateral sources. *Id.* at 530. The court, however, rejected this argument and held that the collateral source rule shouldn't apply because the loan insurance policy was indirectly paid by the debtor through a higher interest rate applied to the debtor's loan. *Id.* at 530. Moreover, the court reached this conclusion based, in part, on "the goal [of bankruptcy] to compensate each creditor as much as possible for its losses, and yet give the debtor a fresh start." *Id.* at 530. Given this policy, "allowing [a] creditor a "double" recovery is inappropriate, especially when the beneficiaries of this "collateral source" are not wrongdoers, but in all probability, other creditors of the estate." *Id.* at 530. "If [the mortgage holder] were allowed to

share as other unsecured creditors in the estate to the extent of its $110,336.83 claim after having already received the $700,000 value of the property plus the $125,000 insurance proceeds, it would be receiving "double" benefits to the detriment of other unsecured creditors." *Id.* at 530. As a result, the court not only held that the $110,336.83 claim had to be disallowed, it further held that the excess $14,633.17 received by the mortgage holder on its debt was property of the estate. *Id.* at 530.

30. Likewise, § 509 of the Bankruptcy Code suggests that a debtor receive the benefit of payments from co-liable parties. It provides: … "an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment." By virtue of this language regarding subrogation, it would appear that this statutory text contemplates a divesting of the rights of the initial creditor upon payment of a co-debtor. The clear purpose of this provision is to avoid duplicative payments of claims within a bankruptcy proceeding. This intent is not only found in this single provision of the code, but is a recurring theme within the bankruptcy system. As noted in *In re Lenz*, the bankruptcy system, as a whole, should be read to avoid creditors receiving multiple payments upon a single debt, to the detriment of other creditors.

31. Further, the Bankruptcy Code recognizes that no creditor is entitled to more than one recovery on a claim. Even where multiple creditors may have a basis for the same claim, either as co-liable parties or via subrogation rights, only one recovery may be had. § 509, cited above, makes this point clear. Further, the case law cited below demonstrates that a plaintiff is not entitled to double recovery for both breaches of contract and warranty claims arising out of the same transaction. This is consistent with the bankruptcy scheme's general policy prohibiting a creditor from obtaining a double recovery on a claim at the expense of other creditors. As the

court in *In re Lenz*, 80 B.R. 528, 530 (D. Col. 1987) noted, "allowing [a] creditor a "double" recover is inappropriate, especially when … it would be receiving "double" benefits to the detriment of other unsecured creditors."

32. Collier's advises that "Section 509 operates as an equitable safety net for a broad category of individuals or businesses who have either paid claims on which they are liable with the debtor, or have secured an obligation of the debtor, whether as sureties, guarantors, comakers or by reason of joint and several liability in tort. Section 509 operates to subrogate the paying codebtor to the claim of the primary creditor through whom its claim derives." *Colliers on Bankruptcy* at ¶ 5.09.01. "If the codebtor has paid the original claimant, **the codebtor** has a choice of whether to proceed as a claimant under section 502(e)(2) or to seek a right of subrogation under section 509." *Id.* at ¶ 5.09.02[3]. Moreover, an "argument can be made that section 509(a) does not apply at all when the codebtor has paid all of the debt prior to bankruptcy. Under this view, a total subrogation would have occurred so that the codebtor is the only creditor having rights, if any, as of the petition date and should, accordingly, proceed in the codebtors' own name and right under section 502." *Id.* at ¶ 5.09.02[3]. Indeed, some courts find an "implied assignment rather than a subrogation when the "codebtor" was never technically liable on the same debt as the debtor." *Id.* at ¶ 5.09.02[3].

33. Both § 509 and § 502 have been applied in order to reduce a creditor's recovery with respect to breach of warranty and breach of contract claims.

34. In *In re Isaac,* 1990 WL 68875 (E.D. Pa.), a debtor constructed a series of new homes subject to a warranty issued by a company by the name of HBW. During the pendancy of the debtor's bankruptcy proceedings, several homeowners filed state actions against the debtor and its principal based upon negligence in the construction of their houses. *Id.* at *1. Further,

HBW filed a proof of claim based upon its obligations under the warranties it had issued. In its claim, HBW "asserted both a subrogation claim for any payments to homeowners pursuant to Section 509 of the Code and a direct contingent unliquidated claim for its obligations pursuant to Section 502 of the Code. In both instances, HBW asserted that Debtor was jointly and severally liable for damages." *Id.* at *1. The debtor objected to this claim on the ground that both the direct claim against the debtor and the subrogation claim were based upon the same damages in violation of Sections 502 and 509. *Id.* at *1. The court sustained this objection on the ground that the direct claim against the debtor was a claim for reimbursement as that term is used in Section 502(e) of the Code and that HBW's claims were contingent and unliquidated. Further, the court noted: "In determining whether an entity is liable with the Debtor as used in that Section, the proper standard is whether the causes of action in the underlying action assert claims upon which, if proven, the Debtor **could be** held liable but for the automatic stay." *Id.* at *2 (emphasis added).

35. Ultimately, the court noted that HBW's "direct claim [fell] squarely within the scope of Section 502(e)(1)(B) of the Code," but that HBW's claims "elect[ing] treatment under 509 of the Code," which consisted of the claims of the homeowners subject to HBW's warranty, "[were] not disallowed." *Id.* at *2. This demonstrates a situation where a payor upon a warranty claim was subrogated to the rights of the claimant. Applying this reasoning to our case, it seems reasonable to assume that, to the extent United Rafizadeh is correct in its position that a portion of the UBS settlement should have been applied to the Arlington Apartments loan, which was based upon UBS Warburg's payment of a warranty claim in connection with such loan, UBS Warburg was subrogated to Orix's rights, hence divesting Orix of any standing to raise that

claim, leaving only UBS Warburg to assert subrogation rights pursuant to Section 509 or reimbursement and indemnity rights pursuant to Section 502(e).

36.     Therefore, United Rafizadeh would submit that it should be permitted to conduct discovery related to whether or not any portion of the UBS Warburg settlement should have been applied to the Arlington Apartment loan in order to determine whether Orix has any right to seek lifting of the stay, or indeed has any right to participate in these proceedings at all.

37.     Absent such discovery, the Debtors' creditors may be forced to accept less than they would have otherwise been entitled to in order to subsidize Orix's double recovery.

38.     It is United Rafizadeh's position that Orix is entitled to only one recovery with respect to the breach of contract and breach of warranty claims it has asserted in three separate litigations, as well as in this Court, with respect to the Arlington Apartments loan.

39.     Under Texas law: "A party is entitled to sue and seek damages on alternative theories but is not entitled to recover on both theories; to do so is considered equivalent to a double recovery. In this context, a double recovery exists when a plaintiff obtains more than one recovery for the same injury. The prohibition against double recovery is a corollary of the rule that a party is entitled to but one satisfaction for the injuries sustained by him." (internal citations and quotations omitted). *JHC Ventures, L.P. v. Fast Trucking, Inc.,* 94 S.W.3d 762, 774-75 (Tex.App. – San Antonio 2002, no pet.).

40.     Citing *Foley v. Parlier,* 68 S.W.3d 870 (Tex.App. – Fort Worth 2002, no pet), the court in *JHC Ventures* stated: "damages found for breach of contract and fraud are based upon *alternative* remedies…[and] [e]ven though the amounts and elements found under each theory of recovery appear different… awarding damages for either theory makes [the plaintiff] whole, and awarding both would constitute two recoveries for the same injury, i.e., a prohibited double

recovery." *Id.* at 775 (emphasis in original); *see also Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1 (Tex.).  This is consistent with authority taken from various other states.

41.     In *National Tea Co. v. Plymouth Rubber Co., Inc.,* 663 So.2d 801, 811 (La.App. 5 Cir. 1995), the court stated: "Double recovery is sometimes allowed in a tort situation in an attempt to balance the risk taken by a plaintiff in settling with a defendant when that defendant's percentage of fault has not yet been determined.  However, **the allowance of a double recovery in a contractual situation, in which the damages are fixed, is inappropriate**."  The court further held: "No one is allowed to enrich himself unjustly at the expense of another.  **Credits are routinely given by courts in order to eliminate this type of double recovery**."  *Id.*

42.     In *National Tea Co.*, the court was called on, in part, to determine the proper allocation of several settlement payments received by the plaintiff from various co-defendants spread between various litigations.  *National Tea Co.* involved a plaintiff suing a contractor who installed an allegedly defective roof, the supplier of roofing materials, the supplier's insurer, and the contractor's surety.  The plaintiff in that action sought to recover the cost of replacing his roof.  Prior to the completion of trial on the merits, one of the defendants settled its claims with the plaintiff.  *Id.* at 803.  After the trial on the merits, the court rendered judgment in favor of the plaintiff and against two of the defendants.  *Id.* at 803.  On appeal, the court was called upon to determine the proper allocation of this settlement, in addition to other settlements that had been reached with additional defendants in separate litigation, to the judgment rendered as to the remaining non-settling defendants.  *Id.* at 810.

43.     Ultimately, the court reallocated the settlement payments in question, as it deemed appropriate, and noted that the credits it was allowing were of the kind "routinely given by courts in order to eliminate …double recovery."  *Id.* at 810.

44. In *Hall v. Lovell Regency Homes Limited Partnership*, 708 A.2d 344, 350 (Md.App. 1 1998), the court noted: "[d]amages for breach of contract seek to vindicate the promisee's expectation interest. Expectation interest damages include losses sustained, *i.e.,* out of pocket damages, and gains lost, *i.e.,* benefit of the bargain damages." (internal quotations omitted). Similarly, "the measure of damages for the breach of an express warranty in the sale of real property is the same as the measure of damages for breach of contract." *Id.* (citing *Hooton v. Mumaw Plumbing,* 271 Md. 565, 573 (1974), stating that "the measure of damages [in a breach of warranty action] is that amount of money which will render that which is guaranteed to be as warranted.").

45. In *Hall*, the court concluded that the damages in "contract, tort and warranty …sought by the homeowners and potentially recoverable by them were essentially identical." *Id.*

46. In *Leo Journagan Constr. Co., Inc. v. City Utilities of Springfield, Mo.,* 116 S.W.3d 711, 716 (Mo.App. 2003), the jury returned verdicts in favor of the plaintiff awarding damages for breach of contract due to interference, breach of contract for failure to pay and breach of implied warranty *ex contractu* in connection with the construction of a pipeline. The court, however, noted that the plaintiff "concedes that, although it had the right to recover under both the breach of contract for failure to pay…and breach of implied warranty *ex contractu* claims, the damage awards for those two verdicts would merge so that [the plaintiff] would not receive the windfall of a double recovery." *Id.* at n.4 (citing *Vogt v. Hayes,* 54 S.W.3d 207, 211 (Mo.Appp. 2001).

47. Similarly, in *Smith v. Orkin Exterminating Co., Inc.,* 1999 WL 33320921 (W.D.N.C.), the court dismissed the plaintiffs claim for breach of express warranty and

considered only the evidence of the parties with respect to the remaining claim for breach of contract. This dismissal was done pursuant to the parties' stipulation and in order to avoid plaintiff's "double recovery." *Id.*

48. In *Mead Corp. v. ABB Power Generation, Inc.,* 319 F.3d 790, 796, n.2 (6th Cir. 2003), the court stated: "where a contract fails to expressly exclude the owner's common law remedies, or to limit plaintiff's remedies to those expressly stipulated in the contract, a party can still invoke independent remedies," but "cannot, however, require a double recovery for the same injury, even where alternative theories of recovery – such as breach of contract and breach of warranty – are available." (internal quotations omitted).

49. In *Industrial Hard Chrome, Ltd. v. Hetran, Inc.,* 64 F.Supp.2d 741 (N.D. Ill. 1999), the plaintiff sued various parties on theories of breach of contract, breach of warranty and breach of a surety agreement. With respect to one of the plaintiff's warranty claims, the defendants moved to dismiss partly on the ground that it was duplicative of the plaintiff's breach of contract claim. *Id.* at 747. In denying this portion of the defendants' motion to dismiss, the court stated: "The Federal Rules of Civil Procedure allow for a flexible system of pleading, allowing plaintiffs to assert more than one position. Rule 8(e)(2) of the Federal Rules of Civil Procedure allows a party to allege "two or more statements of a claim…either in one count or defense or in separate counts or defenses. ***Although the plaintiffs cannot obtain double recovery, the court does not need to force plaintiffs to elect one remedy over the other.***" (internal quotations omitted and emphasis added; citing *Tribune Co. v. Geraghty & Miller, Inc.,* 1997 WL 438536 (holding that the plaintiff could not obtain duplicative recovery on breach of contract and breach of warranty claims based upon the same set of facts.)).

50. As the above cases indicate, while Orix was entitled to allege as many theories of recovery as it liked with respect to its alleged damages incurred in connection with the Arlington Apartments loan, it was only entitled to a single recovery. Therefore, to the extent United Rafizadeh can demonstrate, through discovery, that Orix has been made whole with respect to such loan, based on its breach of warranty claims against UBS Warburg, it should be allowed to do so and any evidence tending to support that contention should be ruled relevant and discoverable.

51. This is especially true in a bankruptcy context, where, as noted above, there is even a stronger single recovery rule than that noted in the state court cases cited above.

52. Further, because the Bankruptcy Court's Order Regarding Discovery Dispute conclusively ruled on the merits of United Rafizadeh's contention that the Debtors' were not entitled to a credit, its ruling is tantamount to a summary judgment ruling. The Bankruptcy Court reached the merits despite precluding discovery on the matters identified above and despite their being significant disputed legal and factual questions at issue.

## REQUEST FOR RELIEF

53. Based upon the foregoing, leave to appeal should be granted so that the issues raised above may be resolved and so that United Rafizadeh may ultimately be allowed to proceed with the discovery discussed above related to an issue, which, if resolved in United Rafizadeh's favor, will result in a significant benefit to the estate in the form of a reduction of Orix's claim. Indeed, if the Court grants this appeal and United Rafizadeh is successful, it is quite possible that this bankruptcy proceeding may be resolved in its entirety. Because Orix is the most active creditor involved in these proceedings, resolving the amount of its claim will almost certainly move these proceedings much closer to complete resolution.

October 14, 2005

                        Respectfully submitted,

                        LOCKE LIDDELL & SAPP LLP
                        /s/  Philip G. Eisenberg

                        Philip G. Eisenberg
                        State Bar No. 24033923
                        Mark A. Chavez
                        State Bar No. 24036357
                        Federal I.D. No. 33112
                        600 Travis Street, Suite 3400
                        Houston, Texas 77002
                        Phone:  (713) 226-1200
                        Fax:  (713) 223-3717

## **CERTIFICATE OF SERVICE**

    I hereby certify that on this 14th day of October 2005, a true and correct copy of the foregoing Notice of Appeal was served by U.S. mail, postage prepaid on all parties, excluding those parties who receive service via electronic mail.

                                                  /s/ Mark A. Chavez
                                                  MARK A. CHAVEZ