UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO:  05-39857-H1-7 |
| | ) | |
| | ) | Houston, Texas |
| CYRUS II PARTNERSHIP, | ) | |
| | ) | Tuesday, May 26, 2009 |
| | ) | |
| Debtor. | ) | (11:12 a.m. to 12:15 p.m.) |
| | ) | ( 1:33 p.m. to  3:58 p.m.) |

#930 - APPLICATION FOR COMPENSATION;
#931 - APPLICATION FOR COMPENSATION;
#942 - APPLICATION FOR COMPENSATION

BEFORE THE HONORABLE MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE

Appearances:          See next page

Case Manager:          Anita Dolozel

Court Recorder:        Paula Crawford

Transcribed by:        Exceptional Reporting Services, Inc.
                       14493 S. Padre Island Drive
                       Suite A-400
                       Corpus Christi, TX 78418-5940
                       361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>

| | |
|---|---|
| Diamond McCarthy, Special Counsel to Chapter 7 Trustee: | KYUNG LEE, ESQ. JASON RUDD, ESQ. Diamond McCarthy 909 Fannin, Suite 1500 Houston, TX 77010 |
| Gordon Arata, et al.: | LOUIS PHILLIPS, ESQ. 301 Main Street, Suite 1600 Baton Rouge, LA 70801 |
| Rodney Tow, Trustee: | JOE HILL, ESQ. Cage Hill & Niehaus 5851 San Felipe, Suite 950 Houston, TX 77057 |
| Also present: | RODNEY TOW, ESQ. Chapter 7 Trustee |
| Orix Capital Markets: | RANDALL A. RIOS, ESQ. LYNN KRAMER, ESQ. Munsch Hardt, et al. 700 Louisiana Suite 4600 Houston, TX 77002 |
| | NAN EITEL, ESQ. Jones Walker 201 St. Charles Avenue 49th Floor New Orleans, LA 70170 |

<u>INDEX</u>

| <u>GORDON ARATA'S WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| Louis Phillips | 10 | 37 | -- | -- |

<u>ORIX CAPITAL'S WITNESS</u>

| Nan Eitel | 49/70/81/92 | | | |

<u>REBUTTAL WITNESS</u>

| Louis Phillips | 95 | 110 | -- | -- |

| <u>GORDON ARATA'S EXHIBITS</u> | | | | <u>RECEIVED</u> |
|---|---|---|---|---|
| 1 THROUGH 35-A | | | | 9 |
| 36 THROUGH 50 | | | | 9 |

<u>ORIX CAPITAL MARKETS' EXHIBITS</u>
      <u>RECEIVED</u>

| 1 THROUGH 22 | | | | 46 |

4

1          **Houston, Texas; Tuesday, May 26, 2009; 11:12 a.m.**

2                    **(Call to Order)**

3          **THE COURT:**  All right, Cyrus II Partnership.  It is

4    05-39857.

5          **MR. LEE:**  Good morning, your Honor; Kyung Lee and

6    Jason Rudd on behalf of Diamond McCarthy, special counsel for

7    the Chapter 7 trustee.

8          **MR. RIOS:**  Good morning, your Honor; Randy Rios, Lynn

9    Kramer and Nan Eitel on behalf of ORIX Capital Markets, LLC.

10         **MR. HILL:**  Your Honor, Joe Hill, general counsel for

11   Rodney Tow.

12         **MR. PHILLIPS:**  Your Honor, Louis M. Phillips on

13   behalf of Gordon Arata McCollam Duplantis and Eagan, applicant.

14         **MR. TOW:**  Your Honor, Rodney Tow, trustee.

15         **THE COURT:**  All right.  Mr. Lee was here early and I

16   asked him how much time you-all were going to need, if he

17   thought we were going to need more than between now and lunch.

18   The afternoon's a zoo.  I've got time on June 1 for things we

19   don't finish today, but I'd just suggest let's get as much done

20   as we can between now and noon, recognizing that that may not

21   be everything and I don't want to rush you.

22         So tell me what everybody's calendars look like for

23   continuing this on June 1 if we need to.  That's Monday.

24         **MR. RIOS:**  Your Honor, just a couple of things.

25         **THE COURT:**  Okay.

1     **MR. RIOS:**  Mr. Lee and I had agreed that in light of

2 the fact that Mr. Phillips and Ms. Eitel are from out of town

3 and they traveled in today that we would take those

4 applications up first to the extent that we can get those

5 finished; that's the goal.

6     **THE COURT:**  Ms. Eitel's application?

7     **MR. RIOS:**  Excuse me.

8     **MS. EITEL:**  The Gordon Arata application.

9     **MR. RIOS:**  The Gordon Arata application.

10     **THE COURT:**  Okay.

11     **MR. RIOS:**  I apologize, your Honor.

12     **THE COURT:**  And then is Ms. Eitel going to testify?

13     **MR. RIOS:**  She is, your Honor.

14     **THE COURT:**  And will that apply to both Mr. Phillips

15 and to Mr. Lee's applications?

16     **MR. RIOS:**  She will not be testifying as to Mr. Lee's

17 application.

18     **THE COURT:**  Okay.  And you have no problem with that

19 I guess?

20     **MR. LEE:**  No, your Honor.  And in fact, the only

21 point I do need to make is I'm going to be putting on

22 Mr. Phillips on his application to assist him.

23     **THE COURT:**  Okay.  And -- go ahead.

24     **MR. RIOS:**  June 1st, your Honor --

25     **THE COURT:**  June 1st, which is next Monday, this

1    Monday.

2              **MR. RIOS:**  -- we anticipate calling Mr. Greg May with

3    ORIX.  He's available on June 4th of next week.  He's not

4    available on June 1st.  I apologize to the Court.

5              **THE COURT:**  I can do it at 3:30 on the 4th if that's

6    going to get us finished, or else we can start on the 1st and

7    then pick it up again with Mr. May on the 4th.

8              You two are just from across the street basically,

9    right?

10             **MR. RIOS:**  Correct, your Honor.

11             **THE COURT:**  Well, you're not quite across the street,

12   but close enough.

13             So I'll leave it up to you-all, and when we get to

14   the end of the hearing, we can either come back on Monday and

15   on Thursday or just on Thursday, depending on whether you think

16   an hour and a half is going to be enough to get it done.

17             **MR. RIOS:**  Very well, your Honor.

18             **THE COURT:**  Okay.  And maybe we'll pick up some of

19   that today.

20             Mr. Hill?

21             **MR. HILL:**  Your Honor, just one other preliminary

22   thing.  There was sort of a non-objection in a way to, or a

23   limited objection I guess, to Mr. Tow's fee application, but

24   what I anticipate from the witness list is he's going to be

25   cross examining in connection -- or examine in connection with

1    the two special counsel applications.  I'd like permission of

2    the Court to carry that evidence forward to the extent that it

3    impacts on Mr. Tow's application.

4          **THE COURT:**  Any objection by anyone?

5       **(No audible response)**

6          **THE COURT:**  That's fine; we'll do that.

7          What is the deal on Mr. Tow's application?  I

8    remember there was an amendment to the law on Chapter 7 trustee

9    fees.  Do I have to review that at all, his commission fee, or

10   is his commission fee etched in stone?

11         **MR. HILL:**  Well, when they admitted it, they didn't

12   make it quite as strong as the trustee wanted it, so I think

13   the Court still has latitude on that --

14         **THE COURT:**  Okay.

15         **MR. HILL:**  -- to review it.  And it is still the

16   maximum.  I think there is language in there that makes it more

17   akin to a commission than taking a Load Star-type approach with

18   it.

19         **THE COURT:**  Because I tried to look back at the

20   language to see what kind of discretion I had and couldn't find

21   that language that I thought had been added that eliminated the

22   discretion.  So, it's still discretion.  I don't mean totally

23   discretionary but the --

24         **MR. HILL:**  With some emphasis on the fact that it's a

25   commission, yes, sir; that's my understanding.  Now, as I

1    understand there are courts all over the country that are going

2    different directions on that a little bit, and it's still a

3    point of contention, but that's my understanding.

4              **THE COURT:**  So you do the calculation on the

5    commission and the Court could change it if it needed to.

6              **MR. HILL:**  Yes, sir, that's my understanding.

7              **MR. RIOS:**  It's consistent with our understanding as

8    well, your Honor.

9              **THE COURT:**  Okay.  All right, let's begin with

10   whoever's going to prosecute the Gordon Arata -- Who's your

11   first witness?

12             **MR. LEE:**  For the record, your Honor; Kyung Lee here

13   on behalf of Gordon Arata.  Lewis Phillips will be my first

14   witness.

15             **THE COURT:**  All right.  Mr. Phillips?

16             **MR. LEE:**  May I approach, your Honor?

17             **THE COURT:**  Yes, sir.

18             **MR. LEE:**  We have some exhibits which are not in CD

19   format.

20             Over the weekend, your Honor, for the record,

21   Mr. Phillips circulated the exhibit list and the witness list

22   to all the parties, and I believe Ms. Eitel has had those, as

23   well as other parties.

24             **THE COURT:**  Ms. Eitel, let me get this straight then.

25   You're a lawyer or you're a witness on the Gordon Arata?

1          **MS. EITEL:**  I think I'm both, your Honor.

2          **THE COURT:**  Okay.

3          **MS. EITEL:**  I am going to be a witness for the ORIX

4    side and I'm also going to handle some of the objection.  And

5    we can sort of talk about logistics once they get off the

6    stand.

7          **THE COURT:**  I don't know if Mr. Rios or you are going

8    to handle objections to the exhibits.

9          **MS. EITEL:**  We do not have objections --

10          **MR. RIOS:**  No objection, your Honor.

11          **MS. EITEL:**  -- to any of their exhibits.  We have not

12    discussed it.  I don't know if they have any to ours.  We have

13    no objections to their exhibits.

14          **THE COURT:**  Okay.  So we're going to admit one

15    through 35-A without objection.

16      **(Gordon Arata's Exhibit Numbers 1 through 35-A were**

17    **received in evidence)**

18          **MR. PHILLIPS:**  Your Honor, there are two volumes.

19          **THE COURT:**  And then we'll admit 36 through 50.

20      **(Gordon Arata's Exhibit Numbers 36 through 50 were**

21    **received in evidence)**

22      **(Pause)**

23          **THE COURT:**  Mr. Phillips, would you raise your hand,

24    please, sir?

25    //

Phillips - Direct / By Mr. Lee                    10

1          (LOUIS PHILLIPS, GORDON ARATA'S WITNESS, SWORN)

2             THE COURT:  Thank you.

3          (The Court addresses counsel appearing in another matter)

4          (Louis Phillips takes the witness stand)

5                          DIRECT EXAMINATION

6    BY MR. LEE:

7    Q    State your name.

8    A    Louis M. Phillips.

9    Q    And what firm are you with?

10   A    Gordon Arata McCollam Duplantis and Eagan, LLP.

11   Q    And what is your relationship to the firm?

12   A    I am a partner.

13   Q    What is the business of Gordon Arata?

14   A    It's a law firm that handles a variety of practice areas;

15   oil and gas, transaction oil and gas litigation, commercial

16   litigation, bankruptcy, transactional work.

17   Q    Can you tell the Court how long you've been with Gordon

18   Arata?

19   A    I started May 6th of 2002.

20   Q    And prior to May 6th, 2002, what did you do?

21   A    I was a bankruptcy judge from May 2nd, 1988, to May 1st, I

22   think, 2002.  Prior to that I was first an associate and then a

23   partner with the firm of Taylor Porter Brooks and Phillips in

24   Baton Rouge, Louisiana, from 1980 until May of 1988.

25   Q    Can you tell the Court what your relationship is with

Phillips - Direct / By Mr. Lee                              11

1    Mr. Rodney D. Tow?

2    A    I was employed as special counsel to Mr. Tow in 2006, I

3    believe.

4    A    And in that capacity, what was the kind of work you did

5    for Mr. Tow at the commencement of the representation?

6    A    I was retained to act as Louisiana counsel in connection

7    with litigation that had been instituted by ORIX -- perhaps a

8    predecessor of ORIX but I'll call it ORIX for now -- in

9    Louisiana state court that came to be known here I think as the

10   SBE litigation.

11   Q    Can you describe to the Court exactly what your role was

12   in that litigation?

13   A    Well, the trustee wished to intervene in the state court

14   proceeding pursuant to a settlement that was reached by the

15   trustee and ORIX in the Bankruptcy Court.  I assisted and

16   handled the intervention in the SBE litigation by the trustee,

17   and as well was Louisiana counsel for the estate in that

18   litigation.  We did a couple, I think, of amended petitions.

19   There were a number of proceedings that were handled in the

20   state court.  I handled some of those proceedings on behalf of

21   the estate.  We kind of mixed the work up, with ORIX handling

22   some and I was the Louisiana lawyer handling them in Louisiana.

23           Ultimately, the Louisiana litigation involved a

24   motion to -- an exception under Louisiana procedural law for

25   want of personal jurisdictional filed by several of the

Phillips - Direct / By Mr. Lee                    12

1    defendants, asserting that they were out of state residents and

2    were not subject to Louisiana state court jurisdiction

3    personally.  And we assisted in that.

4           There were also several other exceptions that I

5    handled for the trustee, but the litigation resulted -- the

6    exceptions were granted on the exceptions to personal

7    jurisdiction, which resulted in the dismissal of a number of

8    the defendants.  And after that, I worked with the team to, I

9    guess the best way to say it, is to try to figure out what to

10   do, since you had a pending lawsuit against a number of

11   defendants who were subject to *in persona* jurisdiction in

12   Louisiana but you didn't have a lawsuit against the other ones

13   against whom the estate and ORIX wanted to proceed.

14          There were issues about whether or not to appeal.  I

15   think there was an appeal of the denial -- dismissal of the

16   litigation.  There were also a lot of exceptions filed that

17   still had to be dealt with.  And I think it was about June of

18   2007 when that component of my representation basically ended,

19   and it ended with the decision having been made to move the

20   litigation to Texas.  We assisted in effectuating dismissal

21   without prejudice of the lawsuit that was in Louisiana, which,

22   frankly, was a pretty good stroke because there was some

23   authority that gave the Court discretion as to whether or not

24   to dismiss without prejudice.  But that litigation was

25   dismissed without prejudice.  And then --

Phillips - Direct / By Mr. Lee                    13

1   Q    Mr. Phillips, I'm going to interrupt you for just a

2   minute.

3   A    Okay.

4   Q    The dismissal of many of the defendants based on personal

5   jurisdiction occurred in January of 2007, correct?

6   A    I think so.

7   Q    And that was Judge Grant who granted --

8   A    Yes.

9   Q    -- that relief?

10  A    Yes.

11  Q    And then when you spoke of the other relief and the

12  remaining exception, that was also in Judge Grant's court --

13  A    Yes.

14  Q    -- that went through the summer of 2007?

15  A    Yes.

16  Q    Okay.  Now, those portions of the fee applications are not

17  being objected to by ORIX today, are they?

18  A    No.

19  Q    Okay.  Let's go to --

20  A    They were made subject to a prior fee application as well.

21  Q    Let's talk about your present fee application --

22  A    All right.

23  Q    -- all right?  How many -- how much in amounts are you

24  seeking in this final fee application of yours?

25  A    Sixty eight thousand nine hundred dollars and 75 cents.

Phillips - Direct / By Mr. Lee                          14

1   Q    Okay.  And insofar as out-of-pocket expenses are

2   concerned, how much in out-of-pocket are you seeking for this

3   period of time?

4   A    Thirteen hundred ninety one dollars and 30 cents.

5   Q    Now, tell the Court the kind of work you performed that

6   resulted in the estate incurring $68,000.  When did that --

7   First of all, let's talk about when did it begin?

8   A    I think the first time I billed was November 1st of 2007.

9   Q    What was that for?

10  A    That was a communication from the trustee about ORIX's

11  claim and a nullity action filed under Louisiana state law in

12  the 24th Judicial District in Louisiana, Jefferson Parish.

13  Q    Okay.  And when you say 'a nullity action', describe

14  briefly --

15  A    All right.

16  Q    -- for the Court what that is.

17  A    It was an action seeking to annul the judgment that gave

18  rise to the ORIX claim on the basis that ORIX had withheld a

19  particular piece of evidence or some piece of evidence.  And,

20  had the judge known about that evidence, the outcome would have

21  been different.

22  Q    Mr. Phillips, prior to November of 2007, had you heard

23  about this nullity action in any way?

24  A    Not that I remember.

25  Q    Okay.  So did Mr. Tow contact you in order to get you

1   involved in the nullity action?

2   A     Yes, I guess so.

3   Q     Okay.  And what were you supposed to do for him?

4   A     Well, I didn't really know anything about it, so the first

5   thing I was supposed to do was find out what was going on.  And

6   I think that we had a couple of phone calls early in November

7   and then we found out that there had been a nullity action

8   filed in state court by the debtors in these bankruptcy cases.

9               ORIX had removed the nullity action to federal

10  district court.  There had been a motion to remand and ORIX

11  responded to the motion to remand with a motion to dismiss or

12  alternatively to transfer venue to this Court.  The hearing

13  date was November 14th.

14  Q     Did you make an appearance at that hearing?

15  A     No.

16  Q     Did you file any pleadings in connection with that

17  hearing?

18  A     No.

19  Q     What happened --

20  A     No, I did not.

21  Q     Okay.  What happened at the November 14th, 2007, hearing?

22  A     There wasn't a hearing.  The district court only takes

23  argument if it asks for it.  I didn't know anything about the

24  substantive component.  The motion to dismiss was basically on

25  the basis of *res judicata* and no standing on the part of the

Phillips - Direct / By Mr. Lee                    16

1    debtors to bring the nullity action.

2              I obtained agreement to a continuance of the hearing,

3    and I think the debtor's counsel filed a consent motion to

4    continue on November 13th, and the district court denied the

5    continuance and issued a ruling on November 13th dismissing the

6    federal court action.

7    Q    Mr. Phillips, why are you being asked by the trustee in

8    November of 2007 to get yourself involved in the nullity

9    action?  What impact did this action have on the estate?

10   A    The nullity action, there was a judgment, number one, in

11   favor of ORIX for several million dollars.  The judgment had

12   been appealed prior to bankruptcy, but it was executory because

13   no bond had been posted, and the suspense of appeal under

14   Louisiana law had not been granted.  But an appeal had been

15   docketed.  And I think it was abated when the bankruptcy case

16   was filed, or something happened.  But as I understood it,

17   there was an appeal, and the nullity action would have gone to

18   the question of the amount of the judgment and whether or not

19   the ORIX claim would be subject to retrial, in essence, I guess

20   here.

21   Q    All right.  So it had to do with a way of potentially

22   disallowing a claim in the bankruptcy?

23   A    At least looking into whether or not the claim should be

24   disallowed within the context of the claim being the claim as

25   opposed to the claim having been reduced to judgment.

Phillips - Direct / By Mr. Lee                                    17

1    Q    Okay.  Now, did the district court in Louisiana take any

2    action around November 13th or 14th, 2007, in the nullity

3    action?

4    A    Yes, it dismissed it.  It dismissed the lawsuit.

5    Q    Did you evaluate for the trustee the basis for the

6    dismissal?

7    A    Yes.

8    Q    And what were the conclusions that you reached with

9    respect to the dismissal?

10   A    It looked like it was wrongly decided.

11   Q    The dismissal itself --

12   A    Yes.

13   Q    -- or the basis of the dismissal?

14   A    Both.  I mean, the dismissal was wrongly decided.  The

15   Court decided it based upon a presentation of what had gone on

16   in front of this Court, and it's argument -- ORIX's argument

17   was that this Court had ruled, I think by January 5th order,

18   that the debtor's claim under the nullity action right was

19   dismissed and that that constituted a dismissal with prejudice,

20   and therefore the nullity action had been decided and *res*

21   *judicata* precluded relitigation of it.

22   Q    And did the trustee disagree with that position?

23   A    Yes.

24   Q    Could you tell the Court on what basis it disagreed with

25   that position?

Phillips - Direct / By Mr. Lee                          18

1   A    Well, on the basis that after the January 5th order, and

2   this is in adversary proceeding 05-03715.  These are documents

3   28 through 30 -- 28, 29 and 30.

4          **THE COURT:**  Give me that, 0305 --

5          **THE WITNESS:**  05-03715.  And the documents are 28 and

6   29, and then there's another document, 30, which came later.

7          But what had not been given to the district court was

8   a February 2 order which seemed to interpret the January 5

9   order.

10          The other thing that had not been briefed, and this

11  was not ORIX's fault; it was trying to get the case dismissed.

12  But I had concerns that the district court had jurisdiction

13  even to take up dismissal on a substantive matter because of

14  the *Barrow* case which we cited in our -- ultimately in our

15  pleadings.  The prohibition on a federal court taking

16  jurisdiction over a nullity action or an action grounded fraud

17  or ill practices, which is the basis for the Louisiana nullity

18  action.

19  Q    So in 2007, did you file any pleadings with the district

20  court in respect of your views?

21  A    Yes, I did.

22  Q    Okay.  What did you file?

23  A    On November 14th the trustee filed a motion to have me

24  supplementally employed, and I believe on the 27th of November

25  -- the 27th or the 29th -- I filed two things.  I was bound by

Phillips - Direct / By Mr. Lee                                    19

1    the Rule 59 deadline.  I filed -- And the trustee was not a

2    party, so I moved to intervene and also moved for new trial.

3    Q    Was this in your view a way to make sure that certain

4    things did not happen as a result of the trustee not taking any

5    legal action in a nullity suit?

6    A    Yes.

7    Q    Okay.  Let's talk -- Did you do anything else in

8    connection with this nullity suit in 2007, to the best of your

9    recollection?

10   A    No.  We filed those papers, and I've gone back and looked.

11   My second fee application contained -- that's document 24, your

12   Honor.  My second fee application contained the time spent in

13   connection with the federal court action.  And I think it was

14   basically -- what we basically did was we dealt with -- we

15   dealt with the procedural posture of the case.  We filed our

16   pleadings on the 27th of November, and we -- I mean, we didn't

17   have a nullity action at that time.

18   Q    Okay.  Mr. Phillips, do you recall whether or not in the

19   present objection that ORIX has filed to your final fee

20   application whether it has objected to that time associated --

21   that you spent time in the second interim application on the

22   nullity suit?

23   A    Not that I can see.

24   Q    Okay.  They did not object to that?

25   A    No.

1  Q    Now, let's talk about what you did for the trustee in

2  2008.

3  A    All right.

4  Q    Can you categorize that work you did for the trustee,

5  please?

6  A    As I have gone through my application, I've broken it up

7  into categories.  Number one, completion of the federal court

8  litigation.

9  Q    And what do you mean by 'the federal court litigation'?

10  Is that the nullity suit?

11  A    I call it the federal court nullity action in my reply to

12  the ORIX objection to my fees.  We had to finish.  We had a

13  briefing deadline.  I think ORIX's brief in opposition to our

14  motion for new trial was filed the first week of January.  We

15  filed a -- We also filed a supplemental brief at the end of

16  December because this Court issued what we've termed a

17  clarification order, and I believe that's document number 30.

18       By the end of December, that order was entered, and

19  we submitted that order to the Court as well through a motion

20  to supplement our briefing.

21  Q    Okay.  Why was it necessary for you, the trustee, to file

22  pleadings when the lawsuit was being prosecuted by the debtor?

23  A    Well, the trustee -- I would say that the pleadings before

24  the Court, my application to be supplemental employment said

25  that the estate might have an interest in determining the

Phillips - Direct / By Mr. Lee                    21

1    nullity action and the ORIX claim.  Then there were proceedings

2    here, I think.  There was a contempt motion filed by ORIX in

3    response to the debtors having filed the nullity suit in state

4    court.  That came up for hearing I want to say in November.

5    The motion for contempt is number 11, and the order denying the

6    motion for contempt is number 14 of the document package.

7              And in the motion for contempt, general counsel for

8    the trustee appeared, and, as I understand it and as the order

9    denying the motion for contempt says, the trustee and the

10   debtors would submit a joint prosecution order to the Court

11   dealing with prosecuting the nullity action.  This was -- I

12   believe it was in November.  Maybe -- It was right when I filed

13   my papers, I think.

14   Q    November of 2007?

15   A    Yes.

16   Q    Okay.  So besides filing this additional supplemental

17   briefing in the end of December 2007, focus with me on what --

18   A    I will, I will.

19   Q    -- you did, in a brief way, what you did for 2008 for this

20   trustee.

21   A    Well, you asked me about how to complete the federal court

22   action.

23   Q    Right.

24   A    ORIX filed its brief and we filed -- we filed a motion to

25   reply to ORIX's brief, and the motion was granted.  And we

1   filed a reply to ORIX's opposition the first week of January of

2   2008.

3   Q    Okay.

4   A    And I think at that point the motion to dismiss was

5   submitted.  So when I say we had to finish the federal court

6   action, we had to finish the federal court action; it was still

7   pending.  And the briefing had not been done.  ORIX had not

8   filed its brief.  The clarification order was entered.  We had

9   to -- We felt like we needed to reply to ORIX's brief once it

10  was filed, and we did.

11  Q    Besides filing the reply, what you just talked about --

12  A    Uh-huh.

13  Q    -- tell the Court what other substantive areas of work --

14  A    Okay.

15  Q    -- you did for the trustee in 2008 that's covered by this

16  application.

17  A    All right.  That takes care of finishing the district

18  court litigation.

19  Q    Right.

20  A    I think we looked at the Judge's ruling and gave it to the

21  trustee, et cetera.  But we were also supposed to looking into

22  the nullity action, the merits of it.

23  Q    Okay.

24  A    I didn't know anything about it because I wasn't involved

25  in the trial.  We got started in January.

1    Q    Of 2008?

2    A    Right.  So one of the categories of work in 2008 is

3    looking into or analysis of the nullity action.  Another

4    category of work is looking into and analysis of the ORIX

5    claim, not from a position of nullity but assuming that the

6    judgment was valid.

7              Another component of our work was -- And I don't

8    think ORIX has opposed this -- was acting as kind of an

9    independent person dealing with the funding agreement

10   negotiations.

11   Q    Okay, what else?

12   A    I assist -- Well, I don't know if I assisted, but I

13   participated in, to a limited extent, the Rule 9019 proceeding

14   that was brought before this Court I believe in March.

15   Q    Okay, what else?

16   A    In the state court litigation, ORIX filed a summary

17   judgment motion and we filed a -- we participated in that.  We

18   filed an opposition.  ORIX replied.  Mondona and the debtor --

19   Mondona Rafizadeh and the debtors filed oppositions.  We filed

20   an opposition.  ORIX replied to Mondona and the debtors'

21   oppositions.  Ms. Eitel sent me an e-mail saying that we had

22   made a false statement in ours.  I looked at it; it was not a

23   correct representation.  There was a problem with our brief.  I

24   fixed it, gave it to my associate who was handling that hearing

25   because I had a pre-existing thing.

1   Q     Okay.

2   A     But we were involved in the summary judgment litigation,

3   which included, after the hearing, where we orally withdrew our

4   opposition, filing a formal withdrawal of our opposition to

5   summary judgment in the nullity action.

6   Q     Right.

7   A     That was in June of 2008.

8   Q     And that's all covered in what you're seeking today, the

9   $68,900.75?

10  A     Yes.  And there was one other -- there were a couple of

11  other things.  The last thing, a big piece of time, is that

12  after the summary judgment was rendered, ORIX filed a motion

13  for new trial in the state court litigation seeking against the

14  debtors sanctions and prevailing party fees and against the

15  trustee prevailing party fees.  And we opposed that on behalf

16  of the trustee.

17  Q     Tell the Court what benefit your work conferred upon the

18  trustee and this estate that you just described.

19  A     Well, the trustee, I thought, was in a very difficult

20  position.  He was co-plaintiff with ORIX in the big litigation

21  here.  He was also trustee.  I got contacted by the trustee and

22  part of his charge was to look into the nullity action and the

23  claim of ORIX.  I was --

24  Q     So, would you say it would be fair to say the claims

25  allowance was one of the issues that you were analyzing?

1   A     Well, that was the issue I was hired to do.  For some

2   reason, I was asked to be deposed and to testify in connection

3   with the 9019 action, and I came here to -- I don't know, I'll

4   have to leave it to you to determine the benefit of that, but I

5   came over here so I could be deposed by Ms. Eitel in Houston,

6   and then I was asked to testify and I've charged for that time.

7   And there was a little other time where I just communicated

8   with you while you were doing that 9019 action.

9   Q     So Mr. Phillips, I'm going to ask you again.  Tell the

10  Court what the benefit you conferred upon in connection with

11  the claims allowance by working for the trustee on that matter.

12  Tell the Court what that was.  What was the benefit?

13  A     Well, I felt like I had to right the situation in the

14  federal district court.  The federal district court process I

15  didn't think had been a knowing process.  It was told things

16  that had gone on here, and I don't think it was given the clear

17  picture.

18  Q     Okay.  That's number one.  What other benefits did you

19  confer upon the trustee?

20  A     I maintained or assisted the trustee in maintaining an

21  independent posture.  It was a hard case; ORIX was the big

22  creditor.  The other creditors were going to get paid through a

23  fund that everybody, including myself, had subordinated to, or

24  at least I did and I think ORIX did.  But Mr. Tow was a

25  plaintiff and Mr. Tow believed that -- a plaintiff and a

Phillips - Direct / By Mr. Lee                           26

1  trustee.  Mr. Tow believed that part of his duty as a trustee

2  was looking into the claim of ORIX.

3          There was no, as I understood the litigation, no one

4  knew what was going to be recovered.  And no one knew whether

5  or not there would be enough money to pay the claim or there

6  would be a lot of money over the -- And no one knew, but

7  Mr. Tow decided that it was necessary to do an evaluation of

8  the claim.

9          The claim was a Louisiana law claim, and so we did

10 two things.  After the federal court litigation was over, we

11 investigated the best we could the nullity action.  There was

12 also a joint prosecution order issued by this Court in May of

13 2008, which was presented to the Court by the trustee's general

14 counsel.  We complied best we could with the joint prosecution

15 order.

16         But primarily, I think, what we did -- I know what I

17 tried to do was maintain an independent posture.  And once I

18 got involved in the joint prosecution, I had -- I was bound by

19 it.  We met with debtors, we met with their lawyers on several

20 occasions.  I've gone back and looked; the joint prosecution

21 order is very -- very rigid.  I mean, we would have to come

22 back to the Court for all kinds of things.

23         We lost the summary judgment.  We withdrew the

24 summary judgment opposition.  We won the prevailing party.  I

25 don't know if there was a monetary benefit because ORIX is the

1  big creditor, and if ORIX has a bigger or smaller claim, maybe

2  it makes a difference, maybe it doesn't.  But Mr. Tow was

3  pretty well vilified, along with me, in the prevailing party

4  motion, and I felt like we needed to oppose it, and we opposed

5  it and it was unsuccessful.

6  Q    What other benefits that you can recall did you confer

7  upon the estate by virtue of your work that's covered here in

8  this fee application?  Anything else that the Court should know

9  about?

10 A    Well, I took up for the Court --

11 Q    Okay.

12 A    -- in the federal district court litigation.

13 Q    And --

14 A    ORIX said that the Court had issued an improper advisory

15 opinion in the clarification order and that the district court

16 ought to ignore it, and we showed in our reply that that was

17 legally incorrect, and we showed by focusing on the

18 clarification that it was factually incorrect.

19 Q    All right.  Anything else, Mr. Phillips?

20 A    Well, I think it was necessary to have an independent

21 person involved in the funding agreement; that's not been

22 objected to.  Neither has our work on the claim been objected

23 to.  Although I have to say that our work on the claim and on

24 the nullity action was overlapping because we did a lot of work

25 reviewing trial transcripts of the state court action that

Phillips - Direct / By Mr. Lee                           28

1   generated the ORIX judgment, reviewing exhibits.

2          We made a determination that we thought there was,

3   given the appellate review standard in Louisiana state court,

4   probably only one component of the ORIX claim, or two, that

5   could be objected to if the judgment was valid.  One was some

6   type of evening-up penalty amount or something, and the other

7   was post-judgment attorney's fees I didn't think they were

8   entitled to.  But that was a million something dollars worth of

9   reduction that could ultimately be done, but it wasn't relevant

10  until -- it could be relevant.  It could be relevant to get the

11  claim fixed ultimately.  It could be relevant to the amount you

12  were chasing in the federal court -- I mean, in the adversary

13  proceeding.

14  Q    Have you reviewed the objection filed by ORIX to your

15  final fee application?

16  A    Yes.

17  Q    All right.  Can you -- Do you have a copy of that

18  objection in front of you?

19  A    No.

20  Q    Okay.  It's document number 957.

21         Have you addressed the objections in some ways for

22  this Court?

23  A    I've tried to.  I filed a reply.

24  Q    All right.

25         **MR. LEE:**  Should we go through the reply right now or

Phillips - Direct / By Mr. Lee                               29

1   will there be too many things that you believe you've already

2   spoken about which doesn't need to be covered in a reply?

3          **THE COURT:**  I've read the objection and I also read

4   the reply this morning.  So, I don't know if that -- You're

5   welcome to go into it, but just so that you know, I did have a

6   chance to read it this morning.

7   **BY MR. LEE:**

8   Q    Mr. Phillips, what I'm going to do is, I'm going to give

9   you a copy of your reply.  I want you to take a look at it for

10  a minute and tell us if there are any other things that you'd

11  like to give some oral testimony on in connection with the

12  reply that you've missed in your testimony today.

13         **MR. LEE:**  May I approach, your Honor?

14         **THE COURT:**  Yes, sir.

15  **BY MR. LEE:**

16  Q    Mr. Phillips, will you take a look at your objection,

17  which I've just -- the reply I've just handed you and let me

18  know if there are certain pages on which points are made that

19  you want to highlight for the Court that you were not able to

20  do so with your testimony today.

21  A    What I've tried to do in the reply was break out the

22  components of the objection.  The Court has read the reply.  It

23  would be just repeating numbers.

24         I tried to break out that I didn't understand the

25  objection which says it doesn't oppose my 2007 time because I

Phillips - Direct / By Mr. Lee                    30

1    was looking at the ORIX nullity action when I wasn't.  I was

2    doing the federal court action in 2007.  I started looking at

3    the nullity action early in 2008, in January, and was

4    immediately pretty well called off by the trustee, who advised,

5    'Stop doing what you're doing.  I've been to a mediation and I

6    may be settling this thing', the overall litigation.

7            So I did, and we didn't resume our work until -- We

8    had a little bit of time but it was basically dealing with the

9    settlement and how to work in the fact that I think under the

10   settlement the debtors were retaining the right to object to

11   ORIX's claim and how to deal with that; I had some involvement.

12           So the work I did looking at the nullity and the

13   claim was done basically a little bit of time before March, but

14   it was done basically the 20th of March through the 20th of

15   June.

16   Q    Okay.

17   A    And then we did the summary judgment; then we did the

18   prevailing party, and then I was out.  I stopped until 2009,

19   tidying up after the settlement and doing the fee application.

20   Q    Mr. Phillips, let me cut to the chase.  The gravamen of

21   the ORIX objection is that you knew from day one that they had

22   provided the trustee and you with data in order to show to you

23   conclusively that the nullity action was totally without merit.

24   You knew that, according to the objection.  You agreed with

25   that proposition and why it was necessary for you to incur

EXCEPTIONAL REPORTING SERVICES, INC

Phillips - Direct / By Mr. Lee                               31

1    these additional fees after ORIX gave you the data points on

2    that.

3    A    Well, I didn't know that.  I was involved in the federal

4    court litigation, which had nothing to do with the substance.

5    And I thought basically, after I dealt with the federal court

6    litigation, that I needed to see both sides.  There was a joint

7    prosecution motion floating around or an order from this Court

8    to submit a joint prosecution order that didn't get done until

9    May of 2008, but it was always kind of the back of everybody's

10   mind.  I didn't know quite how to handle it, but I felt like I

11   needed to look at both sides.

12           I will also say, although I thought that the nullity

13   action would be very difficult, given the fact that the trustee

14   had advised the Court that the trustee might have an interest

15   in looking into it; we had to look into it.  And that involved

16   looking into both sides of it.

17           Ms. Eitel, as counsel for ORIX, sent me a package.

18   She did, at the end of November.  But I was filing stuff.  I

19   didn't have time to look, and I didn't think it was appropriate

20   to say that I'm not going to file anything to right a federal

21   court that made a wrong decision on a substantive basis when

22   the merits were not part of the action by ORIX in the federal

23   court.  I made that call, and then, you know, I just -- I felt

24   like we needed to look into both sides.

25   Q    And is that what most of the time you spent and you're

Phillips - Direct / By Mr. Lee                              32

1  seeking to recover here, is that what that was for?

2  A    Well, about $24,000 worth of time was spent looking into

3  the merits of the nullity action as best I can tell from my fee

4  application.

5  Q    And what was the other portion of the fee application

6  attributable to?  You have 68,000 --

7  A    I have about $7,100 involved in the summary judgment;

8  4,950 involved in the 9019 action; 9,572 involved in the

9  prevailing party motion; about 4,500 involved in finishing the

10 federal court action; and I think there's about 13,000 some-odd

11 that ORIX does not oppose.

12 Q    How many hours have you spent in preparing to come here to

13 do this objection and respond to the ORIX objection?

14 A    Well, probably 20 to 25.  I've not kept it.  I worked all

15 weekend and yesterday.

16 Q    And what is your hourly rate?

17 A    It's $375 an hour.

18 Q    In your final fee application, did you seek allowance of

19 any of those amounts --

20 A    No.

21 Q    -- in connection with this fee application process?

22 A    No, I did not.  I drove over here today; I did not fly, so

23 I'm -- I did not spend the night last night is the point.  I

24 drove this morning.

25 Q    Mr. Phillips, do you have any other observations you'd

Phillips - Direct / By Mr. Lee                              33

1    like to provide to the Court in support of your application

2    before I pass you as a witness?

3    A     Well, the only thing I would say is that we did file -- we

4    did file an opposition to the summary judgment motion; filed in

5    state court.  ORIX had filed a very detailed summary judgment

6    motion.  I met with the Rafizadehs and their counsel pursuant

7    to Mr. Tow's request prior to the hearing on summary judgment,

8    prior to our filing a response on summary judgment.

9            We were subject to the joint prosecution order, which

10   is in the documents and which said that we would deal with them

11   and basically, if there was any dispute about anything --

12   discovery, tactics, filing things -- that it would have to come

13   before the Bankruptcy Court.  They provided me with voluminous

14   amounts of documents, and we took it on ourselves to read the

15   trial transcript of the state court litigation, to go through

16   the evidence.  You'll see big blocks of time with my associate

17   doing it.

18           I was not available on the date for the hearing on

19   the summary judgment, and I was not really available for the

20   two or three -- Well, I met with the Rafizadehs, but I was

21   trying to get a Chapter 11 case up for confirmation on the 25th

22   of June.

23           We knew about the summary judgment motion having been

24   filed in April.  We didn't know about the date of the hearing.

25   When I found out, I said, 'I'm not going to be there.'

Phillips - Direct / By Mr. Lee                    34

1    Ms. Eitel properly said, 'You knew about the motion.'  I said,

2    'You're right.'  I just didn't know when the hearing date was

3    because we weren't served with the rule to show cause as is

4    required.  But frankly, we intervened in the federal court

5    action; it was granted.  That must not have been reflected in

6    the state court action.

7         We did not get formal service but we did not oppose

8    the hearing date.

9    Q    Okay.

10   A    I asked for an extension of time to file a reply.  I met

11   with the Rafizadehs I think on the 22nd of June.  They came up

12   with an argument about the summary judgment, that the report

13   that was supposedly not turned over was a 1999 report.

14        The material sent by ORIX was very detailed; had this

15   Mr. Bomar's name all over it.  It also had 2000 in it, and it

16   had other things.  And the debtor said, 'Look at all of the

17   stamps.  The stamps don't show the exhibit number from the

18   deposition that he was supposedly testifying about.'

19        My associate basically did the opposition because I

20   was not available.  It's my bad if I missed the sentence.  I

21   have to say that when Ms. Eitel sent me the e-mail saying that

22   we had a false statement in our brief in opposition to the

23   summary judgment, I didn't remember it, and I didn't -- whether

24   I missed it when I was reviewing it, I don't know, but it did

25   not properly reflect, and we have shown the Court what we --

Phillips - Direct / By Mr. Lee                          35

1    what I fixed the morning before the hearing.  At 2:00 o'clock

2    in the morning I went to the office and fixed it.

3            We took the position that if, in fact, the report was

4    the report, they win.  As I understand what happened at the

5    hearing -- I wasn't there -- Ms. Eitel did her customarily fine

6    trial job; showed that all versions of the report, including

7    the one with the exhibit sticker relating to the deposition,

8    were the same thing.

9            At that hearing, I think Super Future Equities made

10   an appearance; asked for a continuance.  We opposed it.  At

11   that hearing, upon argument, as I understand it, my associate

12   advised the Court we would be withdrawing our opposition to the

13   summary judgment.  We did follow it up the next day with a

14   formal withdrawal of our opposition to the summary judgment.

15   Summary judgment was granted.

16           I felt like we could do that under the joint

17   prosecution order because that was not us withdrawing from the

18   nullity action, which we couldn't do without this Court's

19   approval.  But I didn't think the joint prosecution order

20   required that in the face of something I knew to be that I'd

21   have to take an opposing position.

22   Q    Okay.

23   A    We withdrew it.  If we messed up, we messed up.

24   Q    And along those lines, Mr. Phillips, are you here today

25   willing to tell the Court if you are willing to take some type

Phillips - Direct / By Mr. Lee                                36

1   of a voluntary reduction to your fee application associated

2   with the issues that have arisen?

3   A    Well, I offered that last week to keep from having this

4   hearing.  In fact, I offered a reduction of more than the

5   amount we spent on the summary judgment hearing to keep from

6   having to come.  You know, I'm here because I have to be.  What

7   the Judge rules, the Judge rules.  I'm not going to spend any

8   more time on this than I have to, so if you're asking whether

9   I'm going to appeal the Judge's ruling, my guess is 'no'.  I'm

10  tired.

11  Q    Can you tell the Court whether it is your belief that your

12  work that's associated with the final fee application conferred

13  a benefit onto the estate?

14  A    I think it did.  I think it was very important for Mr. Tow

15  to be an independent trustee, and I tried my best.

16          MR. LEE:  Pass the witness, your Honor.

17          THE COURT:  Ms. Eitel?

18          MS. EITEL:  Good morning, Mr. Phillips.  I think it's

19  still morning by a couple of minutes.

20          THE COURT:  What we're going to do is we'll go for

21  about 15 minutes and then we'll come back at 1:30.  The 1:30 is

22  going to only take two or three minutes.  That'll give you

23  another 30 minutes then, and then you-all may have to come back

24  although I'm hoping not.

25          MS. EITEL:  Your Honor, we're fine.  I'm on standby

Phillips - Cross / By Ms. Eitel                    37

1   for all day, whatever the Court can work in, and we're --

2             THE COURT:  So let's do our best.  So, take about 15

3   minutes for now.

4             MS. EITEL:  And we're all big boys and girls; we can

5   handle the choppiness if the Court can accommodate us.  Thank

6   you.

7                           CROSS EXAMINATION

8   BY MS. EITEL:

9   Q    Mr. Phillips, what was the benefit to the estate from

10  pursuing the nullity suit?

11  A    I don't think -- And I guess an opposition, filing an

12  opposition to your summary judgment was pursuing the nullity

13  suit, but I didn't act as a litigant proactive except in the

14  federal court litigation.  We didn't ask for discovery.  We

15  didn't seek any depositions.  We did an investigation based on

16  documents that were provided by you and provided by the other

17  side.

18            So, I pursued the nullity action to an extent in the

19  federal court litigation.  I think the benefit to this estate

20  and to the process is that the federal district court made a

21  wrong decision, and it made a wrong decision based on, I think,

22  it's my belief, an incomplete record submitted to it.

23            All I did in the federal court litigation, it seems

24  to me is -- and the district court agreed; it reversed itself

25  on all points -- keep it alive so that I could look into it.

1   That was what the trustee asked me to do.

2   Q    So the trustee asked you to keep it alive so you could

3   look into it?

4   A    Well, through the federal -- Yeah, to get to federal -- to

5   deal with the federal court litigation, after I told him I

6   thought it was wrong.  No, he didn't say, 'Go fix that.'  I

7   told him it was wrong and then he said 'Fix it.'

8   Q    Okay.  Now, on November 26th, 2007, you received a copy of

9   a letter that I wrote on behalf of ORIX, correct?

10  A    I did.

11  Q    And attached to the letter there is a production log from

12  the underlying foreclosure litigation, correct?

13  A    There was.

14  Q    And the production log showed a number of documents that

15  have introduced the Rafizadehs with specific Bates number,

16  correct?

17  A    Correct.

18  Q    And also attached to that November 26th letter was an OCM

19  document -- one of others, but OCM 5819.  Do you recall that?

20  A    The number.  I mean, if you say you sent it to me, I'll

21  assume you sent it to me.

22  Q    And --

23  A    I put those e-mail -- I put that e-mail in my papers too,

24  so it's -- whatever it is, it is.

25  Q    And attached also to that November 26th letter was a copy

1   of Mrs. Rafizadeh's trial Exhibit 22 from the 2004 litigation,

2   correct?

3   A    Yes.

4   Q    And between November 26th, 2000, and June -- excuse me,

5   November 26th, 2007, and June 26th, 2008, you made no further

6   requests for documents from ORIX related to the nullity

7   allegations, correct?

8   A    I think that's right.

9   Q    And you filed no formal request for production in the

10  nullity action either in state or federal court, correct?

11  A    That's correct.

12  Q    Now, you filed the motions for new trial in the suit when

13  it was removed to federal court on November 28th, 2007,

14  correct?

15  A    Yes.

16  Q    And you set the hearing for January --

17  A    I think maybe it was the -- Was it the 28th or the 27th?

18  I've forgotten, but it was --

19  Q    I believe it was the 28th of 2007; somewhere around there.

20  And you set them for hearing on January 9th, 2008, is that

21  correct?

22  A    I believe that's right.

23  Q    Do you recall advising ORIX that you had set them for

24  hearing on January 9th because that would hopefully give the

25  trustee time to analyze and review the nullity suit?

Phillips - Cross / By Ms. Eitel                          40

1   A    I may have said that.  I may have said that hopefully it

2   would.  It didn't.

3   Q    Now, I think said earlier that you had not begun analyzing

4   the nullity suit until January of 2008, is that correct?

5   A    Well, I don't think that's -- I mean, I didn't do much.  I

6   know that I read your papers and I put in my reply that I don't

7   see any time for it.  That's not an unusual occurrence for me;

8   I'm not a very good time keeper.

9   Q    Well, let me be clear.  The fee application that's before

10  the Court today is only for time from January 1, 2008, forward,

11  isn't that correct?

12  A    That's correct.

13  Q    But there are costs that go back to November 2007?

14  A    Yeah, that weren't billed.

15  Q    Okay.

16  A    Right.

17  Q    So in today's fee application, there's no time related to

18  November or December of 2007?

19  A    Correct.

20  Q    Okay.  So my question when we started was why you waited

21  until -- You said you waited till January 2008 to review the

22  nullity suit, and you were explaining that maybe that was or

23  was not correct.

24  A    No, I think it's correct.  I think I looked at what you

25  sent, but I didn't have the experience of what had gone on.  I

1    haven't -- I hadn't even studied the nullity action.  I just

2    found out about it in November.  I was faced with a Rule 59

3    deadline and a motion of dismissal that had nothing to do with

4    the merits.  And so what I did was address the matter at hand,

5    and I may very well have said, 'I hope I can look into this by

6    the hearing date.'  But I didn't.

7              You filed -- We had the matter that was set here, the

8    clarification matter.  We filed a supplement in the federal

9    court because we thought the federal court ought to hear about

10   it.  You filed a reply.  We didn't like your reply -- your

11   response.  We filed a reply to your response.  And at that

12   point, we had submitted it to the federal court.

13             And I think I started looking at material because I

14   communicated with the other side and asked them, you know, 'If

15   we win, what are you going to show me?'  And they started

16   sending me stuff, and I looked at it, maybe -- I think my fee

17   app says on the 21st of November or the 9th -- I mean, January.

18   And then Mr. Tow contacted me -- Yeah, the 21st of January I

19   started looking over documents that Mr. Starr and Ms. McIlwe

20   from Louisiana, counsel for the debtors, had sent.  And Mr. Tow

21   on the 22nd said 'stop'.

22   Q    So you believed that you started reviewing the nullity

23   suit on January 21, 2008, and you were told to stop on January

24   22nd?

25   A    I may have done a little bit prior to January 21st, but --

```
                    Phillips - Cross / By Ms. Eitel                42
```

1  And I know that I read your stuff but I just didn't bill for

2  it, apparently.  But I -- And I know I communicated with the

3  other side, but it was hard to get situated and get materials

4  back and forth, but --

5  Q    When you say you read 'your stuff', you mean my November

6  22nd, 2006, letter --

7  A    Yeah.

8  Q    -- with attachments?  Okay.

9         And you said the trustee told you to stop because the

10  trustee had settled the adversary proceeding on January 21,

11  correct?

12  A    That's what -- I don't remember the dates, but my

13  application says that I got notice from Mr. Tow that he had

14  reached some type of settlement in principle with the -- in the

15  adversary proceeding and for me to stop.  And I said 'okay.'

16  Q    And did you understand that the trustee had assigned the

17  right to prosecute the nullity suit to the Rafizadehs as part

18  of the settlement?

19  A    Yeah.  I mean, I -- That's one way of looking at it I

20  guess.  I think I was involved in some discussions about how to

21  handle the language about that, but --

22  Q    But you understood the trustee had assigned the right to

23  --

24  A    I understood that the trustee had either assigned the

25  right or had said he wasn't going to handle it anymore.  In

Phillips - Cross / By Ms. Eitel                           43

1   other words, that it wouldn't be resolved by the settlement.

2   Q    And then the 9019 hearing went forward on March 11, 2008.

3   Does that sound about right?

4   A    Yeah.

5   Q    And the settlement was rejected by the Court?

6   A    That's what I understand, yes.

7   Q    Now, ORIX filed its motion for summary judgment on April

8   24th, 2008.  Does that sound about right?

9   A    Yes.

10  Q    And you received the ORIX motion and exhibits by e-mail

11  but not by service by the sheriff, correct?

12  A    Correct.

13  Q    And the exhibits to the ORIX summary judgment included

14  some of the same items that were attached to the November 26th,

15  2000, letter?

16  A    Yes.

17  Q    In fact, it included the production log?

18  A    It included -- Yes, it's in there -- it's in our papers.

19  In the e-mail, your April -- I think your April 24th e-mail is

20  in my documents.

21  Q    Right.  And it included the copy of what ORIX said was the

22  Bomar report --

23  A    Yes.

24  Q    -- that it had produced, according to the production log,

25  and included a copy of Mrs. Rafizadeh's trial exhibit 22 from

Phillips - Cross / By Ms. Eitel                                      44

1   the 2004 trial?

2   A    Yes.  The numbers, I'm assuming you're not trying to trick

3   me on the numbers.

4   Q    I'm not trying to trick you on the numbers, but just in

5   terms of the substance; that's correct.

6           Now, that was April 24th, and the trustee, timely, as

7   we agreed, filed this brief on June 24th.  Does that sound

8   right?

9   A    Yes.

10  Q    The day before the summary judgment hearing?

11  A    Yes.

12  Q    By agreement.  And the trustee opposed ORIX's motion for

13  summary judgment, correct?

14  A    The trustee did.

15  Q    And in the opposition to the motion for summary judgment,

16  you represented that you thought there should be more time for

17  discovery to investigate the merits of the nullity suit,

18  correct?

19  A    I think I said that.

20  Q    And you've already talked earlier about the inaccurate

21  statement that you corrected on June 25, correct?

22  A    I corrected a statement on June 25.  I gave a redline to

23  my associate, who, as I understand it, delivered it to you and

24  to the Court at hearing.

25  Q    Now, between the order of intervention on January 22nd and

1   the summary judgment hearing on June 26th, the trustee had not

2   sought any discovery from ORIX?

3   A    We did not.

4   Q    And the trustee withdrew his opposition to the ORIX motion

5   for summary judgment the day after the hearing, correct?

6   A    I think we withdrew it orally in court, but I wasn't

7   there.  But we did withdraw it the next day.

8   Q    And that was June 26th; that was seven months to the day

9   after ORIX had provided you its letter on November 26th, 2007,

10  showing the production log, the Bomar report and Mrs.

11  Rafizadeh's trial exhibit 22, which was a version of --

12  A    It was seven; that's correct.

13          **MS. EITEL:**  No further questions.

14          **THE COURT:**  Thank you.  Anything further?

15          **MR. LEE:**  Nothing further, your Honor, except for

16  admission of the exhibits, which I think we did at the very

17  beginning.

18          **THE COURT:**  We haven't admitted Ms. Eitel's exhibits.

19          Did you want to offer those?

20          **MS. EITEL:**  Do you have any objections to any of

21  ours?

22      **(Pause - Ms. Eitel confers with Mr. Lee)**

23          **MR. LEE:**  No objection.

24          **THE COURT:**  I don't think I have them yet either.

25          **MS. EITEL:**  I'm sorry, your Honor?

1          **THE COURT:**  I don't believe I have a set.

2          **MS. EITEL:**  Oh, I'm sorry.

3          Your Honor, we are offering, and admitting if we may,

4    ORIX Exhibits 1 through -- my number's right here --

5          **THE COURT:**  One through 22.

6          **MS. EITEL:**  -- 22.

7          **THE COURT:**  And no objections, right?

8          **MR. LEE:**  No objections, your Honor.

9          **THE COURT:**  Exhibits 1 through 22 are admitted.

10         **(ORIX Capital Markets' Exhibit Numbers 1 through 22 were**

11   **received in evidence)**

12         **THE COURT:**  You can step down, please.

13         **THE WITNESS:**  Thank you very much, your Honor.

14         **THE COURT:**  Thank you, Mr. Phillips.

15         May Mr. Phillips be excused to Louisiana?

16         **MR. LEE:**  Yes, your Honor.  I think --

17         **THE COURT:**  He's welcome to stay, but if he wanted to

18   leave, he could leave, right?

19         **MR. LEE:**  I just wanted to have him available in case

20   he wanted to make any closing statements for the Court.

21         **THE COURT:**  I have no problem with him sticking

22   around, but he can --

23         **MS. EITEL:**  He may be excused but we would like him

24   to stay.

25         **THE COURT:**  That's fine.

47

1          **MR. PHILLIPS:**  Do you want to do a closing?

2          **MS. EITEL:**  If you want to rest on the brief,

3    Mr. Phillips, I'm perfectly comfortable accommodating you and

4    letting him get back, so whatever you want to do, I'm --

5    Whatever the Judge wants, whatever you want, I'm fine.

6          **MR. PHILLIPS:**  I don't have anything else to say

7    unless the Court has any questions of me.

8          **THE COURT:**  I don't know what Ms. Eitel is going to

9    testify to.

10         **MR. PHILLIPS:**  Oh, okay; that's right.

11         **THE COURT:**  So, we're going to adjourn till 1:30.

12   And then, Ms. Eitel -- it's a short hearing and then you're

13   going to take the stand, right?

14         **MS. EITEL:**  I believe they're calling Mr. Tow next.

15         **THE COURT:**  Oh, you're calling Mr. Tow?

16         **MS. EITEL:**  Oh, no?

17         **MR. LEE:**  We're not calling Mr. Tow.

18         **THE COURT:**  So you're resting?

19         **MR. LEE:**  We're resting.

20         **MS. EITEL:**  Okay.

21         **THE COURT:**  And are you going to call any witnesses

22   then?

23         **MS. EITEL:**  Just myself.

24         **THE COURT:**  You are going to call you.

25         **MR. RIOS:**  Your Honor, yes, I'm going to call

48

1  Ms. Eitel.  I would anticipate it would take about,

2  unfortunately, one hour.

3          THE COURT:  Okay.  It'll be a very choppy afternoon

4  as Ms. Eitel described it, but we'll -- just trying to do

5  deference to both Ms. Eitel and Mr. Phillips, we'll try and get

6  done this afternoon at some point.  But you may get a lot of

7  interruptions, unfortunately.  We'll see.  1:30 is going to be

8  short, and I think 2:00 may fall apart, too, so, we'll see how

9  things go.

10          MR. LEE:  Thank you, your Honor.

11          MS. EITEL:  Thank you, your Honor.

12          THE COURT:  See you-all then.

13          MR. PHILLIPS:  Thank you, your Honor.

14          THE COURT:  Thank you.

15          THE CLERK:  All rise.

16     (Recess from 12:14 p.m. to 1:33 p.m.)

17          THE COURT:  Let's go back on the Rafizadeh matter.

18          MR. RIOS:  Your Honor, ORIX calls Nan Eitel.

19          THE COURT:  All right.  Ms. Eitel.

20          Raise your hand.

21        NAN EITEL, ORIX CAPITAL MARKETS' WITNESS, SWORN

22          MR. PHILLIPS:  Your Honor, Louis M. Phillips.

23          Would it be satisfactory to the Court if I acted as

24  counsel, as opposed to Mr. Lee?

25          THE COURT:  That's fine.

Eitel - Direct / By Mr. Rios                    49

1          **MR. PHILLIPS:**  Okay.  Thanks.

2          **THE COURT:**  Just -- get the phone system set back up

3     right.

4       **(Pause)**

5          **THE COURT:**  All right.  Go ahead, please.

6          **MR. RIOS:**  Thank you, your Honor.

7                         **DIRECT EXAMINATION**

8     **BY MR. RIOS:**

9     Q     Please state your name.

10    A     Nan Eitel.

11    Q     Ms. Eitel, can you spell your last name, please?

12    A     E-I-T-E-L.

13    Q     How are you employed?

14    A     I am a partner of the Jones Walker law firm, now based in

15    Washington, D.C.; before Hurricane Katrina, out of New Orleans.

16    Q     And what is your connection to the case before the Court?

17    A     I represent ORIX Capital Markets in its role as a special

18    servicer for the MLMI Trust since early 2002.  I actually filed

19    the foreclosure litigation in Louisiana state court against

20    Cyrus and Bahar Development and Mrs. Rafizadeh.  I was there

21    when the receiver was appointed.  I actually co-tried the case

22    in Louisiana state court in July, 2004, that went to judgment

23    in the end of 2004; represented ORIX again in post-judgment

24    litigation regarding that; and then, once the bankruptcy was

25    filed, acted as co-counsel with the Winstead firm initially;

Eitel - Direct / By Mr. Rios                            50

1   then, when they were disqualified, became co-counsel with the -

2   - at some point in the Munsch Hardt firm in the bankruptcy

3   proceeding.

4   Q    So, you have been involved in this case from its inception

5   for seven plus years?

6   A    I have.  I think I am the only one still standing.

7   Q    Now, I'd like to get to the objection to the Gordon Arata

8   fee application that the Court is hearing today.

9          Can you summarize for the Court the different bases

10  for the objection that ORIX has filed?

11  A    There are two principal bases for the objection.  The

12  first relates to fees and expenses for the nullity suit.  The

13  trustee intervened in the nullity suit that was filed in

14  Louisiana state court by Mrs. Rafizadeh as a plaintiff, and

15  that's about $50,000 and some change in fees.

16         The second basis for the objection, a much smaller

17  objection, is about $4,000 related to the rejected compromise

18  the trustee reached in January, 2008, and it was disapproved in

19  March, 2008.

20  Q    Ms. Eitel, this -- the fee application today is a final

21  fee application, correct?

22  A    Yes.

23  Q    And ORIX has not objected to any fees or expenses that

24  were previously awarded by orders of this Court.

25  A    That's correct.  We did not go back and object.  We didn't

EXCEPTIONAL REPORTING SERVICES, INC

Eitel - Direct / By Mr. Rios                                    51

1  think we had a basis to object to time that was spent before

2  January, 2008.

3  Q    All right.  Let's talk about the first category that are

4  subject to ORIX's objection, namely, the nullity suit.

5        Can you briefly describe what the nullity suit is?

6  A    Yes.  Much like federal rules and federal law, Louisiana

7  has an action where you can annul a judgment if there was fraud

8  or ill practice in procuring of the judgment.  It's a very

9  serious allegation.  Mrs. Rafizadeh filed the nullity suit in

10 Louisiana state court in August, 2007, and in her lawsuit she

11 accused ORIX of having withheld or not produced documents that

12 were requested in discovery under the underlying guarantor and

13 foreclosure litigation that was tried in 2004.  The principal

14 document that she mentioned in her petition that she says was

15 not produced was something called the "Bomar report" after

16 Henry Bomar, who worked for ORIX Capital Markets.

17 Q    Were there any other bases that she sought to nullify the

18 judgment?

19 A    Not that I'm aware of.  It was basically the withholding

20 of documents, and basically the Bomar report was the one

21 document that she mentioned by description and name in her

22 nullity suit.

23 Q    Okay.  When did ORIX become aware of the nullity suit?

24 A    August 14th, 2007, ORIX was served with it; or I should

25 say my law firm, Jones Walker, was served with it in the New

Eitel - Direct / By Mr. Rios                                    52

1   Orleans office, and I happened to be in New Orleans working

2   that week, and we got the suit on August 14th.

3   Q    In August of 2007 or shortly thereafter, what did ORIX do

4   when it became aware of the nullity suit?

5   A    That very day we began the process of procuring the

6   discovery responses and requests from the underlying

7   litigation.  Mind you, this is August, 2007.  We had tried the

8   case in July, 2004, so it was three years post trial, two and a

9   half years post judgment.  And we knew -- and the way that I

10  say that we knew that it just couldn't be true, because there

11  had been tens of thousands upon hundreds of thousands of

12  documents produced -- that there was just no way that that was

13  true.  So, we started that process of trying to locate

14  documents, discovery requests, things that were archived.

15           The second thing that we did -- and I did it either

16  that day or the next -- I called Mr. Lee, the trustee's special

17  counsel for the adversary proceeding, and advised him of the

18  nullity suit, probably sent him a copy, and asked if the

19  trustee would get involved, because we believed, since it

20  related to a pre-petition judgment, that this was a pre-

21  petition cause of action and that Mrs. Rafizadeh did not really

22  have the right to be able to prosecute the nullity suit and

23  this should be the trustee's responsibility if anything was

24  going to happen.  And we also wanted -- we thought it would be

25  best for the trustee to be involved.

Eitel - Direct / By Mr. Rios                           53

1  Q    Did Mr. Lee advise of the trustee's position with respect

2  to the nullity suit on that date?

3  A    Not that day, but he promised to get back to me very

4  quickly, and he did, as he always does, and sometime -- it was

5  either the next day or the next week; I'm not sure when -- he

6  said that he discussed the nullity suit with the trustee,

7  Mr. Tow, and I think, to paraphrase, he says, "You know, Rodney

8  says it's not his fight; he doesn't want to get involved."

9  Q    Okay.  Let me back up just for a second.

10          You testified about the fact that lawyers with Jones

11  Walker started reviewing documents that had been produced in

12  the underlying nullity -- or excuse me -- the underlying

13  Louisiana case.

14  A    Right.

15  Q    Was the purpose of the review to confirm whether or not

16  the Bomar report had been produced?

17  A    Absolutely.

18  Q    What did ORIX do next with respect to the nullity suit?

19  A    We removed the suit to federal court in the Eastern

20  District of Louisiana, and our ultimate goal was either to get

21  it dismissed or to transfer venue here to the Southern District

22  of Texas for ultimate referral to the bankruptcy court.

23  Q    Did ORIX take any action in connection with the nullity

24  suit here in bankruptcy court in Houston?

25  A    We did.  That same fall, around the same time, we filed a

1    motion for contempt against Mrs. Rafizadeh, again, on the same

2    basis that we had asked the trustee to get involved; namely, we

3    believed this was a pre-petition cause of action that belonged

4    to her estate and not to her individually as a debtor.  And,

5    so, we filed that motion and set it for hearing, and it was, in

6    fact, heard on November 5, 2007.

7    Q    Now, Did ORIX believe that the nullity action was making

8    an end run at the claim objection process?

9    A    Absolutely.  And that was why we had filed -- one of the

10   reasons we had filed the motion for contempt and one of the

11   reasons we wanted the trustee involved, because essentially, if

12   the nullity suit were successful, it had the ultimate effect of

13   disallowing -- or could have the ultimate effect of disallowing

14   the ORIX claim, which had already in part been -- the secured

15   portion of which had already been allowed by an order of this

16   Court in 2006.

17   Q    Do you recall the result of the contempt motion that was

18   filed against Ms. Rafizadeh?

19   A    We did.  We lost.  The Court ruled against us and saying

20   that she was -- finding she was not in contempt, but there was

21   a development that we thought was also positive where the

22   trustee was ordered to develop a joint prosecution agreement

23   with Mrs. Rafizadeh and that the trustee needed to control the

24   nullity action for the same way that he controlled the

25   adversary proceeding in which ORIX was a co-plaintiff.

Eitel - Direct / By Mr. Rios                    55

1  Q    After the November 5th hearing -- contempt hearing -- what

2  was the next thing that happened with respect to the nullity

3  suit?

4  A    That was a very busy week, if you recall, October/November

5  2007, and I believe that we actually had some conversations in

6  the courtroom here and made arrangements to have a conference

7  call to discuss the merits of the nullity suit, how to proceed

8  with the trustee's team.  I believe I spoke to Mr. Hill about

9  that here.  I also learned, I think, that Mr. Tow wanted to get

10 Mr. Phillips involved, since it was a Louisiana matter, and I

11 believe that we set and, in fact, had a conference call on

12 Friday, November 9th, to talk about the nullity suit.

13 Mr. Phillips participated; I believe Mr. Tow participated; I

14 believe that Mr. Hill ended up having a conflict.

15 Q    How did you leave things at the conclusion of that

16 conference call?  Or, was ORIX supposed to do something?

17 A    Well, what we agreed to on that call was the trustee said

18 he needed time to evaluate the nullity suit, and, as I

19 mentioned earlier, we had filed a motion to dismiss in federal

20 court and, alternatively, a motion to transfer venue to the

21 Southern District of Texas.  The hearing date for those motions

22 was November 14th.

23      So, on November 9th the trustee said, you know, "I've

24 got this joint prosecution order, everybody that's going to be

25 involved; I just need some time" -- this is Friday, November

Eitel - Direct / By Mr. Rios                                    56

1   9th; the hearing date's on Wednesday -- "can we continue it?"

2   And we did.  We agreed to a continuance.  I don't know what

3   duration -- a month, six weeks; I'm not sure -- to give the

4   trustee time to evaluate it.  We also involved Mrs. Rafizadeh's

5   counsel in those conversations, and Mrs. Rafizadeh's counsel

6   had responsibility for drafting and filing the motion to

7   continue.

8   Q    Okay.  Now, we brushed on this just a little, a little

9   while ago, Ms. Eitel; the substance of the conversation that

10  took place on November 9th.

11          Do you recall --

12  A    I do.

13  Q    -- basically what was discussed?

14  A    I think that we tried to explain to the trustee and his

15  counsel why the nullity suit had no legal or no factual basis

16  and was really wholly without merit; that he had no factual

17  basis because, as I mentioned earlier, we knew that we produced

18  thousands of pages of documents.  By November 9 -- in fact, it

19  may have actually been on November 9 -- we had gone into a room

20  at the Munsch Hardt firm where all of the files from the

21  Winstead firm had been transferred and went through boxes and

22  boxes and boxes of documents with my associate and had pulled

23  out various Bates-numbered documents, different numbers of the

24  Bomar report, and shown conclusively that it was, in fact,

25  produced.  And it was produced several different times under

Eitel - Direct / By Mr. Rios                      57

1    several different Bates numbers because the Bomar report was

2    maintained in different places for different purposes within

3    the ORIX things.  So, we said:  There is no merit to the

4    allegations that the documents were not produced.

5    Q     What about legal basis?

6    A     We also claimed that there was no -- even if

7    Mrs. Rafizadeh were absolutely right, that ORIX had done

8    something terrible and not produced the documents, there was no

9    legal basis for it, because one of the things that a nullity

10   plaintiff has to prove is that enforcement of the judgment

11   would be unconscionable and inequitable as to the plaintiff.

12   And our position was that it cannot be unconscionable and

13   inequitable because she had received her discharge.  And she as

14   a discharge debtor would never have the judgment enforced

15   against her.  So, she couldn't meet that element of the claim.

16   And, secondly, she challenged in the nullity suit that there

17   was information about the property was not in bad condition.

18          Back up for a second.  The 2004 judgment found five

19   events of default with respect to the Cyrus II loan and eight

20   recourse carve-out triggers.  One of those was the property was

21   in bad condition.  And Mrs. Rafizadeh's nullity suit related

22   only to condition of the property, and it did not attack any of

23   the other four bases.  So, even if everything she said were

24   right, the judgment would still stand independently; the things

25   like fraud and other defaults.

Eitel - Direct / By Mr. Rios                              58

1    Q    Okay.  Let's go back to the November 14th hearing that had

2    been scheduled in federal district court in Louisiana on ORIX's

3    motion to dismiss.

4              Did that hearing occur?

5    A    It did not.  What happened was the -- Mrs. Rafizadeh's

6    counsel filed the motion to continue on November 13th; and

7    although the submission date was November 14th, the district

8    court issued its decision a day early and entered an order

9    dismissing the nullity suit as ORIX had requested.

10   Q    Okay.  So, the case got dismissed --

11   A    On November 13th.  Yes.

12   Q    -- notwithstanding the fact that ORIX had agreed with the

13   trustee to continue that hearing?

14   A    That's correct.  It's just -- I think what happened -- I

15   don't know for sure -- I don't think the motion to continue was

16   denied; I think it just didn't -- that Mrs. Rafizadeh's lawyer

17   didn't get it there before the judge had entered the order of

18   dismissal.

19   Q    Okay.  After the Louisiana court dismissed the case, what

20   did ORIX do next?

21   A    Well, we had several conversations with the trustee's

22   team.  You kind of come up on the Thanksgiving holidays; but we

23   promised the trustee's team that we would provide the written

24   analysis and documentary proof that the documents had been

25   produced.  There was a call -- just, also, some context; ORIX

Eitel - Direct / By Mr. Rios                                    59

1   had been asking the trustee to sort of lay it on the line with

2   what his position was with respect to the ORIX claim.  It was

3   important for ORIX to know whether the trustee thought that a

4   couple of hundred thousand dollars of the ORIX claim was

5   objectionable or a couple of million dollars, because it needed

6   that information to assess how and how much time and money to

7   put into this fight.  So, the trustee and his team asked some

8   specific questions about issues related to the claim.  One part

9   of that conversation was the nullity allegations raised by

10  Mrs. Rafizadeh.  Another part of that conversation related to

11  things like the prepayment yield maintenance premium.

12          So, on the Monday after Thanksgiving, November 26th,

13  I sent a letter that had been reviewed and approved by ORIX

14  that was addressed to Mr. Hill and copied to Mr. Phillips and

15  set forth, as we had in our phone calls, that the nullity suit

16  had no factual basis and had no legal basis, and I attached to

17  that correspondence the documents, in black and white, showing

18  the production of the Bomar report to Mrs. Rafizadeh and the

19  fact that Mrs. Rafizadeh had actually used it as a trial

20  exhibit in the 2004 trial.

21  Q    Okay.  Ms. Eitel, let me refer you to ORIX Exhibit 1.

22  A    ORIX Exhibit 1 is the November 26th, 2007, letter that I

23  mentioned.  It's the -- sort of our analysis and, you know,

24  piece trying to persuade the trustee that the Louisiana

25  judgment is on firm factual and legal footing and should not be

Eitel - Direct / By Mr. Rios                              60

1   challenged by him; and attached to it is the production log.

2   Q    Is that page seven of 34 that's date stamped --

3   A    Yes.

4   Q    -- up at the top?

5   A    It is page seven of 34 behind Exhibit 1 at the top.

6   That's exactly -- that's the first page of the production log.

7            And if you'll see two lines down, you'll see OCM,

8   lots of leading zeros and one, and documents through 7754.

9   They were produced August 1, 2002; copies arranged for by

10  Rubin.  Matt Rubin at that time was Mrs. Rafizadeh's counsel in

11  Texas.

12           And, then, behind the production log you'll see a

13  file stamp, and you'll see some more Bates numbers.  We were

14  probably over-inclusive in the documents we sent to the

15  trustee.  We sent things other than the actual one-page 1999

16  Bomar report, but I think document OCM 5819 is what is the

17  Bomar 1999 report.  But we sent other matters that were in the

18  same file to put it in context and not just to sort of cherry-

19  pick out the one piece of paper.

20           And, then, starting on page 27 of 34 on Exhibit 1

21  you'll see a very messy plaintiff's exhibit list.  This was

22  Mrs. Rafizadeh's exhibit list as maintained by the courtroom

23  deputy at the July, 2004, trial, and behind it is a two-page

24  document, Trial Exhibit 22, and this is -- the first page is

25  the Bomar report from 1999, as admitted by Mrs. Rafizadeh, and

Eitel - Direct / By Mr. Rios                    61

1   if you look at the top left-hand corner, you'll see OCM 005 and

2   the beginning of the number "eight."  It gets cut off.  But

3   that's OCM 005819.

4            And, then, she paired it with an out-of-sequence

5   document, OCM 002573, which is a different document, but

6   updating the earlier 1999 report.

7   Q    All right.  Now, this letter was addressed to Mr. Hill,

8   correct?

9   A    Yes, it was.

10  Q    You testified that this also went to Mr. Phillips.  Let me

11  refer you to ORIX Exhibit 2.  And --

12  A    Yes.  If you'll look at the first e-mail in Exhibit 2, on

13  November 26th, 2007, I transmitted the ORIX letter with

14  attachments to Mr. Hill and Mr. Wentworth, and you'll see the

15  first cc on there is Louis Phillips.  I also copied other

16  people, including Mr. Tow himself and his special counsel and

17  Diamond McCarthy in the adversary proceeding.

18  Q    And, then, the top part of Exhibit 2, it appears as though

19  Mr. Hill forwarded your letter on to Mr. Rafizadeh's counsel,

20  Mr. Higgins?

21  A    That's correct; with my permission.  Mr. Hill asked if we

22  had any objection to sharing our analysis of that with the

23  Rafizadehs' counsel, Mr. Higgins, and I said absolutely not.

24  And, so, on December 20th he sent it to the Rafizadehs.

25  Q    Okay.  Now, you sent that letter on November 26th --

Eitel - Direct / By Mr. Rios                                    62

1   A     I did.

2   Q     -- correct?

3               At any time between November 26th on, did anybody

4   from the trustee's team ever follow up with you and ask you

5   questions about the letter?

6   A     Never got a single question about the letter, never got a

7   single question about the documents, until the summary judgment

8   hearing seven months later.

9   Q     Okay.  Did anybody ask you for supplemental documentation?

10  A     No.  We had received no requests for additional documents

11  or explanation from the trustee regarding the package we had

12  prepared and sent.

13  Q     So, did anybody say, "These documents don't establish what

14  you believe they establish"?

15  A     Nobody ever challenged or contested that we had

16  established that the Bomar report was produced.

17  Q     Okay.  What happened next, after you sent the November

18  26th letter, in connection with the nullity suit?

19  A     I believe -- the timing was such this letter went out late

20  of the night of the 26th.  The trustee, as he testified, was

21  running up against a deadline to file a motion for new trial,

22  and he wanted to preserve his rights, and he told us he wanted

23  to preserve his rights in the event he needed to pursue the

24  nullity suit.  So, the trustee on November 28th filed both a

25  motion to intervene in the suit as removed to federal court and

Eitel - Direct / By Mr. Rios                                63

1  a motion for new trial to reconsider the order of dismissal

2  entered on November 13th.

3  Q    Now, those were filed in 2007?

4  A    Yes.

5  Q    And those are not part of any fees that ORIX is objecting

6  to.

7  A    That's correct.

8  Q    Is that correct?

9  A    We understood the trustee needed some time, some breathing

10 room, to figure this out, and, so, he had to take that action

11 to protect the record, if you will, or protect his rights while

12 he evaluated the nullity suit.

13 Q    Okay.  Let me refer you quickly to ORIX Exhibits 3 and 4.

14 A    Exhibit 3 is a trustee's motion to intervene filed on

15 November 28th, and Exhibit 4 is a trustee's motion for new

16 trial in the nullity suit, also filed November 28th.

17 Q    Let me also refer you to ORIX Exhibit 5, please.

18 A    Yes.  Exhibit 5 is the transmittal e-mail that

19 Mr. Phillips sent to me on November 28th and said:  Here are

20 the intervention papers we're going to file, and we're going

21 to -- given the time pressure, believe the trustee must file

22 the intervention along with a reconsideration request.  And,

23 then, he said:

24         "We have attempted to provide the Court with a basis

25         for intervention of right that is essentially

Eitel - Direct / By Mr. Rios                              64

1          neutral, and, as you can see, the noticed hearing

2          date will be January 9, 2008.  Hopefully, this will

3          give the trustee the necessary time within which to

4          perform analysis."

5   Q    Okay.  So, the hearing was scheduled for January 9th on

6   the motion to intervene and a motion to reconsider, correct?

7   A    That's correct.

8   Q    Did ORIX engage in any further conversations with the

9   trustee or the trustee's team between that time and the

10  hearing -- the date of the hearing on January 9th?

11  A    No.  I think the only request or communication was with

12  Mr. Hill when he asked to send my letter to Mr. Higgins in

13  December.  But, other than that, there was absolutely no

14  discussion or communication about the nullity suit with the

15  trustee and the documents that we had sent.

16  Q    Now, prior to the January 9th hearing, were there any

17  supplemental pleadings filed in the Federal District Court in

18  Louisiana?

19  A    There were, and they related actually to actions taken

20  here in the bankruptcy court.  The trustee had filed a motion

21  for clarification with the bankruptcy court as to whether any

22  prior orders of this Court precluded Mrs. Rafizadeh from

23  pursuing the nullity action in Louisiana.  One of the bases for

24  our motion to dismiss that had been granted -- one was that our

25  claim had been partially allowed, and, so, the claim order was

Eitel - Direct / By Mr. Rios                           65

1    res judicata and she could not attack that claim allowance

2    order from 2006 on the secured portion.

3              Another bases of our argument was that she did not

4    have standing.  And we based that on an order entered in the

5    dischargeability litigation where Mrs. Rafizadeh was denied

6    leave to amend her counterclaim, partly because it would be

7    futile because she didn't have standing or pecuniary interest.

8              So, the trustee sought and obtained a clarifying

9    order from this Court in late December, and then based on that

10   order filed a supplemental brief in further support of his

11   motion for new trial and reconsideration on January 2nd, 2008.

12   Q    All right.  Let me ask you to look at Exhibit 6, please.

13   A    And Exhibit 6 is, in fact, the January 2, 2008,

14   supplemental brief of the trustee where he urges the Court to

15   consider this Court's ruling that there is nothing precluding

16   Mrs. Rafizadeh from prosecuting the nullity suit.

17   Q    Okay.  When ORIX received the exhibit -- excuse me.  When

18   ORIX received Exhibit 6, what was its reaction?

19   A    We were very concerned, a little frustrated, because we

20   had sent the trustee this pretty conclusive package of

21   documents on November 26th.  We also were anticipating some

22   affirmative response, yea or nay, from the trustee by early

23   January.  I think Mr. Phillips had hoped to do something by

24   January 9.  And despite the trustee saying that he's trying to

25   be neutral in this matter, it looked like at this point he's

Eitel - Direct / By Mr. Rios                                    66

1  really trying to keep the nullity suit alive, and we've gotten

2  no response to what we'd sent almost five weeks earlier about

3  the documents were produced.  So, we were concerned about the

4  apparent effort to keep the nullity suit alive in the face of

5  really uncontradicted and irrefutable evidence the documents

6  were produced.

7  Q    Well, did the trustee complete the analysis with respect

8  to the nullity action by January 9th, 2008, as Mr. Phillips

9  hoped he could?

10 A    No.  The only written response we ever got with respect to

11 the nullity suit was the opposition to summary judgment filed

12 the night before the hearing in June.  It was almost seven

13 months before we got any written response.  And it really

14 didn't go into the merits of it; it just said, "We need more

15 time."

16 Q    All right.  Let's turn our attention now to the failed

17 9019 motion.  Let me ask you to take a look at ORIX Exhibit 7.

18 A    Exhibit 7 is the term sheet that was e-mailed to ORIX and

19 to everyone on the morning of January 22nd by Mr. Lee.  It's

20 not executed, and there was a subsequent amendment to it, but

21 this is the one that we received on January 22, 2008.

22        **(Pause)**

23 BY MR. RIOS:

24 Q    Ms. Eitel, did the proposed settlement address the nullity

25 suit?

Eitel - Direct / By Mr. Rios                              67

1   A     It did.  One of the most disturbing terms in the

2   settlement agreement, to ORIX, at least, were the non-monetary

3   terms, and the trustee in the settlement assigned the right, I

4   guess, to the Rafizadehs or the settling parties, depending how

5   you define it, the right to prosecute -- the right to prosecute

6   the appeal of the judgment and the related nullity action and

7   any matters related to the appeal of the Louisiana judgment, as

8   well as the ORIX claim objection.

9         So, yes, effectively, the trustee transferred his

10  rights in the nullity suit that we had been trying to get him

11  to dismiss over to the Rafizadehs on January 21st.

12  Q     What was ORIX's reaction to these components of the

13  proposed settlement?

14  A     It was not pleasant.  They were -- outrage might be --

15  might not be an overstatement; but just very disturbing to have

16  this kind of term negotiated and handed over to the Rafizadehs,

17  particularly when -- I say again -- nobody had ever challenged

18  the voracity of the evidence or the conclusiveness of the

19  evidence that the Bomar report had been produced.

20  Q     Okay.  Now, the hearing on the motion to approve

21  compromise was scheduled for March 11th --

22  A     Two thousand eight.

23  Q     -- 2008?

24  A     Yes.

25  Q     Did anything transpire between 1/22/08 when ORIX received

Eitel - Direct / By Mr. Rios                      68

1   a copy of the term sheet and the March 11th, 2008, hearing on

2   the 9019 motion?

3   A     During that time we were, obviously, mostly focused on the

4   9019, but we were still concerned about the nullity suit.  So,

5   on March 7th I wrote to Mrs. Rafizadeh's counsel and said, "I

6   think you already have the November 26th letter and attachments

7   I gave to the trustee, but in case you don't, here is a copy."

8   And it was a fairly strident -- maybe is not the right word --

9   but pretty tough letter to the counsel saying this lawsuit

10  doesn't meet the Article 863 standards for pleading.  Louisiana

11  Article 863 is our equivalent of Rule 11.  And I just wanted to

12  give them fair warning that we had conclusive proof that the

13  nullity suit was false and it was just factually wrong, and I

14  wanted to give them a chance to correct their error.  At this

15  time the trustee's hands were tied about the nullity suit

16  because of the settlement, but I thought I would try to go to

17  Mrs. Rafizadeh's counsel directly.

18  Q     And does that letter appear in the exhibit binder as ORIX

19  Exhibit 8?

20  A     Yes.  Exhibit 8 is my letter to Mrs. Rafizadeh's Louisiana

21  counsel.

22  Q     Okay.  What about the federal district court in Louisiana?

23  Did it take any action with respect to matters that were

24  pending before it during that 1/22/08 to 3/11/08 time period?

25  A     It did.  Ironically enough, on January 22nd, the same day

Eitel - Direct / By Mr. Rios                              69

1    that we learned of the trustee's settlement, the Louisiana

2    district court granted the trustee's motion to intervene, which

3    ORIX had not opposed, and also granted the trustee and **in**

4    Mrs. Rafizadeh's motion for new trial, and he vacated his

5    earlier judgment and remanded the nullity action back to

6    Louisiana state court.  So, we were back at, you know, square

7    one.

8    Q    You may have answered this, and I may --

9              **THE COURT:**  Okay.  I'm going to go ahead and -- I'm

10   going to go ahead and interrupt you now.  We're going to take

11   our 2:00 o'clock.

12             You can either step down or stay there.

13             **THE WITNESS:**  I'll --

14             **THE COURT:**  I'm not sure how long we're going to be

15   at 2:00 o'clock.

16             Thank you.

17        **(Proceeding was recessed from 2:02 p.m. to 2:11 p.m.)**

18             **THE COURT:**  All right.  Mr. Rios.  We're going until

19   about 2:27, and then I've got to go to a meeting at 2:30, and

20   then we'll just continue when we can.

21             **MR. RIOS:**  I'm sorry, Judge.  Did you say you have to

22   go to a meeting?

23             **THE COURT:**  I have to go to a meeting at 2:30 here in

24   the courthouse, and I'll be back.  And there'll be other

25   hearings, but I'm going to keep you going this afternoon.  I'm

Eitel - Direct / By Mr. Rios                    70

1   just telling you, you all got until 2:27.

2            MR. RIOS:  Judge, just to let the Court know where I

3   am, I'm about halfway through.

4            THE COURT:  That's fine.  I don't -- I'm really not

5   rushing you.  I'm just signposting you.

6                    DIRECT EXAMINATION (RESUMED)

7   BY MR. RIOS:

8   Q    Ms. Eitel, we were previously discussing Orix Exhibit 8,

9   and I don't recall whether or not I asked you whether or not

10  Ms. Rafizadeh agreed to withdraw the nullity action.

11  A    Her counsel rejected our demand and said they were going

12  to go forward the nullity suit.

13  Q    Now, Ms. Rafizadeh -- excuse me -- I think you testified

14  that -- you did, that the 9019 hearing took place on March

15  11th, 2008.

16  A    That's right.

17  Q    What happened at that hearing?

18  A    Well, Mr. Tow testified that he had put the nullity suit

19  as a plum on the table for the Rafizadehs to settle with him,

20  among some other things.  That was one of the non-monetary

21  terms to which Orix had objected, and this Court ultimately

22  disapproved that settlement based on, among other things, the

23  non-monetary terms and Orix's views and the lack of deference

24  given to Orix's reasonable views.

25  Q    All right.  And let me ask you to take a look at Orix

Eitel - Direct / By Mr. Rios                                    71

1   Exhibit 9.

2   A     Orix Exhibit 9 is an excerpt of the transcript from the

3   9019 on March 11th.  It has the testimony I mentioned about

4   Mr. Tow having this as a plum out there for the Rafizadehs so

5   they would settle with him, and at the end, it has the Court's

6   oral rulings given at the conclusion of the hearing.

7   Q     Wherein the Court emphasizes the non-monetary aspects --

8   A     Yes, the --

9   Q     -- of the compromise?

10  A     The Court said that one of the problems he had was that

11  there was no consideration of Orix's reasonable views regarding

12  these non-monetary terms that were going to inflict injury on

13  Orix.

14  Q     All right.  Now, after the March 11th settlement hearing

15  on the 9019, did you approach Trustee's counsel to begin

16  discussions related to the nullity action and other matters?

17  A     Yes.  In fact, the very night of the 9019, you know, it

18  was a hard-fought battle.  You know, it was a tough day for

19  everyone, equally respect on both sides.  Couple of hours

20  later, I sent Mr. Lee an email and said, "Let's try to put this

21  whole thing back together again.  Can we talk in the morning

22  before I leave down?"  And he, very nicely, said, "Yes.  Why

23  don't I come over to your hotel before you leave?"  And so

24  Mr. Lee and Mr. Hirsch and I met over breakfast and coffee the

25  next morning, talked about a lot of stuff.  I think I mentioned

Eitel - Direct / By Mr. Rios                                72

1    the nullity suit as sort of part and parcel of the things that

2    needed to be addressed.  Certainly, the funding agreement

3    needed to be finalized and dawned, and then also, a strategy to

4    get back on board with the adversary proceedings.  So that was

5    party step number one.  I believe -- I can't recall with

6    particularity any particular conversations over the next few

7    weeks, but we did talk about the -- I'm fairly certain we

8    talked about the claim objection.  And in fact, the Trustee,

9    through Mr. Phillips, sent us a memo on April 4th discussing

10   the Orix claim.

11   Q    Was that the first conversation that you had with somebody

12   on the Trustee's side related to the Orix claim subsequent to

13   the March 11th hearing that you recall?

14   A    (No audible response)

15   Q    Let me strike the question.  Was that the first

16   substantive discussion or communication that Orix received

17   regarding Orix's proof of claim?

18   A    Yeah, the April 4th memo, yes.  Absolutely.  And it was a

19   memo from Mr. Phillips, and it addressed the issues -- not the

20   nullity suit, but it addressed the yield maintenance premium

21   default interest and, I believe, post-judgment attorney's fees

22   aspects of the claim.

23   Q    Is that Orix Exhibit 10?

24   A    Yes.  The first is the email from Mr. Phillips that said,

25   "Here's a memo.  Authorized to transmit."  And then, that is

Eitel - Direct / By Mr. Rios                    73

1   followed by a -- what, a five, six-page -- six-page memo from

2   Mr. Phillips analyzing the claim, but it doesn't deal with the

3   nullity suit.  It just simply said, "We've provided our

4   analysis to the Rafizadehs of the nullity suit."  We didn't get

5   it.  They didn't tell us what it was, and they didn't give us

6   the written analysis.

7   Q    Do you recall how Orix reacted to the memo?

8   A    Once again, upset because by now, it's April, and we've

9   been asking the Trustee and telling the Trustee's team that the

10  nullity suit doesn't have any merit, and we just keep thinking

11  we're just getting delayed.  And one of the things to remember

12  is the nullity suit is a very, very serious allegation.  I

13  mean, you're accusing someone not just of fraud but of fraud on

14  a Court in a judicial proceeding, and you know, particularly as

15  a lawyer who was involved in the underlying litigation, we took

16  that very seriously, and it just was concerning to us that now

17  here we were five months later and just didn't have any

18  resolution with the Trustee.

19          THE COURT:  Where in this memo does it refer to the

20  nullity suit?

21          THE WITNESS:  Your Honor, I believe it's the final

22  page, when you flip --

23          THE COURT:  Okay.  That's the last paragraph?

24          THE WITNESS:  Yes, your Honor, the final paragraph.

25  "As we have submitted to the Rafizadehs our analysis of the

Eitel - Direct / By Mr. Rios                    74

1   merits of the petition to annul judgment."  And that's the only

2   portion of the six-page memo that mentions or addresses the

3   nullity suit.  And so we were just very concerned.  We had

4   provided the documents in November.  Nobody had ever questioned

5   the documents.  We were just frustrated, didn't really know --

6   we didn't want to litigate with the Trustee.  We thought we

7   could just resolve this consensually, but it became very clear

8   as of April 4th that that was not going to happen.

9   **BY MR. RIOS:**

10  Q    Ms. Eitel, as I understand, then the procedural posture of

11  the nullity suit as of April 2008, the case was now back in

12  Louisiana State Court.

13  A    The case was back in the Louisiana State Court, and then

14  once the settlement had been rejected, it was the Trustee's and

15  Mrs. Rafizadeh's to co-prosecute together in state court.

16  Q    What action did Orix take next with respect to the nullity

17  action?

18  A    We decided to go ahead and file a motion for summary

19  judgment since we could not get a consensual resolution, and on

20  April 24th, Orix filed a motion for summary judgment, saying

21  that just as we had told the Trustee back in November 26th,

22  that there was no legal or factual basis for the nullity suit

23  and it should be dismissed.

24  Q    Let me refer you to Exhibits 11 and 12, please.

25  A    Exhibit 11 is Orix's motion for summary judgment filed

Eitel - Direct / By Mr. Rios                               75

1   April 24th, 2008, and attached to it are the eight exhibits

2   that were our summary judgment exhibits.  Exhibit 3 is an

3   affidavit of Jeff Joyce that basically attests to the things we

4   had told the Trustee, saying "Here's a production log and

5   here's documents that were produced to the Rafizadehs."  So the

6   Trustee had had that.  And Exhibit 6 was Mrs. Rafizadeh's Trial

7   Exhibit 22.  A couple of other things in there were the trial

8   transcript, which the Trustee, he had had, Mr. Phillips said

9   they had been reviewing.  And on the trial transcript -- I

10  think that's Exhibit 7 -- you have Mr. Schuman Rafizadeh

11  testifying about the 1999 Bomar (phonetic) report, Trial

12  Exhibit 22.

13  Q    Okay.  So most of the exhibits that were attached to

14  Orix's motion for summary judgment were the very same documents

15  that were provided to Mr. Hill and Mr. Phillips on November

16  26th by you?

17  A    I don't think I'd say most because there were eight, but

18  certainly, the substantial documents showing the production

19  were the same documents from November 26th, and we just

20  supplemented and amplified.  We gave them some deposition

21  testimony relating to it, but yes, the key documents, the

22  production log, the Bomar report as produced and as used by

23  Mrs. Rafizadeh at trial, were all things the Trustee had.  In

24  addition, the Trustee also had the judgment and reasons for

25  judgment and the trial transcripts, and one exhibit was the

Eitel - Direct / By Mr. Rios                                    76

1   discharge order.  The only thing the Trustee may not have had

2   were Exhibits 4 and 5, which was deposition testimony excerpts

3   showing, again, Mrs. Rafizadeh's lawyers questioning Orix

4   employees about the Bomar report.

5   Q    All right.

6   A    And Exhibit 12, you asked me, is our memo in support.

7   Q    Right.  Ms. Eitel, did you provide Mr. Phillips with a

8   copy of the motion for summary judgment and the memorandum of

9   law?

10  A    I did.  I emailed it to Mr. Phillips that night after it

11  was filed and informed him that the Court was going to be

12  setting hearings the week of June 23rd, as we had been advised

13  by the clerk's office.

14  Q    Is that email Orix Exhibit 13?

15  A    Yes, that's exactly right.  Orix Exhibit 13 is my email to

16  Mr. Phillips and copied to Mr. Hill and Mr. Wentworth,

17  attaching the motion with all the exhibits and the memo.

18  Q    Now, as I understand it, there is a procedure in Louisiana

19  that's a little different that what we're accustomed to that,

20  and that being that certain pleadings or orders get actually

21  served by a sheriff, and there's some issues raised as to

22  whether or not -- actually, I think it's acknowledged that

23  Mr. Phillips didn't receive service through that process.

24  Could you take Judge Isgur through that, please?

25  A    I can.  In Louisiana, when you file a motion, you also

Eitel - Direct / By Mr. Rios                        77

1   file what's called a rule to show cause, which is essentially a

2   notice of hearing.  But the way it happens in state court

3   there, it's kind of old-fashioned.  You file it, and the judge

4   or the clerk's office actually fills in and sets the date for

5   the hearing, provides it to the clerk, who provides it to the

6   sheriff.  And you have to -- when you go file a motion like

7   that, you make request of the sheriff for service.  In this

8   particular incidence, my office requested service, according to

9   the state court docket as it existed at that time, and because

10  the Trustee had intervened while the suit was in federal court,

11  the state court had no record of his intervention.  And so when

12  the service of the actual rule to show cause, or i.e. the

13  notice of hearing, was made, that did not get served on

14  Mr. Phillips or anybody for the Trustee's team.  They were only

15  -- I shouldn't say served, but they were only provided the

16  motion for summary judgment.  Technically, email is not service

17  either.  You can serve by fax.  You can serve by hand.  But in

18  this day and age, it's kind of routine matter to send things by

19  email, and Mr. Phillips got it and acknowledged getting it on

20  April 24th, the day it was filed.  But he just did not get

21  served with the rule.

22  Q    That was almost -- April 24th was what, approximately two

23  months before the hearing?

24  A    Yes, the hearing was ultimately set for June 25.  I

25  figured out on June 11th, when I was starting to get ready for

Eitel - Direct / By Mr. Rios                    78

1   the hearings two weeks away, that Mr. Phillips had not been

2   served with the rule to show cause, and I discovered that error

3   and contacted him immediately as soon as I discovered that.

4   Q    Did you have any discussions with him?  I mean, did you

5   send him an email regarding that?

6   A    I did.  I started emailing him on June 11th and informed

7   him that I realized he had not been served with a rule to show

8   cause for the hearing on the 25th, even though he had the

9   motion for summary judgment, and that given the delay in

10  getting state court setting, this -- and since it had taken us

11  60 days to get a hearing date, I very much wanted to preserve

12  the June 25 trial date and asked if he would work with me on

13  trying to keep the hearing date of June 25, and in exchange, I

14  offered to give him whatever extension of time he needed to get

15  his brief on file.  My benchmark for my discussion with him was

16  that, technically, under Louisiana rules, you can serve

17  somebody with a rule to show cause for a summary judgment

18  hearing 15 days in advance.  Their opposition would be due

19  seven or eight days later.  When -- so when I contacted him on

20  June 11th, if I had served him on June 10 -- I could have

21  served him legitimately on June 10th -- or the sheriff could --

22  with the rule, and he would have had to respond seven or eight

23  days later.  So I said, "Look, now you know when the hearing

24  is.  You know, will you just, you know, waive service of the

25  rule and then just file your opposition when you need to," and

Eitel - Direct / By Mr. Rios                                    79

1   he ultimately agreed to do that and go forward.  And in fact,

2   we agreed that he could file his opposition the day before the

3   hearing, and he did.

4   Q    Okay.  And during this time period, that being for the

5   date Orix filed its motion for summary judgment until the date

6   that the Trustee filed his opposition, were there any

7   discussions with the Trustee or Trustee's professionals

8   regarding the nullity suit and Orix?

9   A    There were no discussions regarding the substantive

10  nullity suit.  The only communications were the emails I just

11  discussed about scheduling and response dates.  But again, no

12  discussion of the documents, the merits, the arguments, or

13  anything.

14  Q    You know, Ms. Eitel, for purposes of clarification, let me

15  ask you to take a quick look at Exhibit 20.  I believe you've

16  already testified about that.  Can you please tell the Court

17  what that exhibit is?

18  A    Exhibit 20, in the last page of it, you go through the

19  document, is my June 11th email when I realized Mr. Phillips

20  had not been served and said, "Accept my apologies, but the

21  hearing is set for the 25th at 10:00 a.m., and let's try to

22  keep that hearing date and work around it," and then there's an

23  email chain after it as we try to keep back in touch, trying to

24  keep -- again, trying to keep the June 25 hearing day.  And he

25  told me he was going to talk to Rodney.

Eitel - Direct / By Mr. Rios                           80

1  Q    Yeah.  And then take a look at Exhibit 21, also.

2  A    Exhibit 21 is another email chain related to that.  I

3  think at one point, I was afraid I had not actually sent

4  Mr. Phillips the summary judgment, but I confirmed that I had,

5  and so I wrote him and said, "Oh, I found my transmittal from

6  April 24th.  Can we still try to keep the hearing date on June

7  25 with you filing your brief, you know, with an extension of

8  time?"  And so Mr. Phillips said, "Yes," you know, "I point out

9  that you didn't serve me with a rule to show cause, but I

10 will," you know, "we will go forward with the hearing on June

11 25 if I can file my brief late."  So we did.

12 Q    All right.  Ms. Eitel, let me take you back to Trustee --

13 excuse me -- Orix Exhibit 14.

14 A    Exhibit 14 is the Trustee's opposition to the motion for

15 summary judgment that I mentioned.  He -- it was filed on June

16 24th.

17          THE COURT:  I'm going to go ahead and break now.

18          MR. RIOS:  Very well, your Honor.

19          THE COURT:  I'll come back as soon as I can, probably

20 around 2:45 or so.

21     **(Recess taken from 2:26 p.m. to 2:48 p.m.)**

22          THE COURT:  Be seated.  So that you all know where we

23 are, there's a three o' clock unopposed small fee hearing, and

24 then there's not another hearing until four o' clock, so --

25          MR. RIOS:  Thank you, your Honor.  May I proceed?

Eitel - Direct / By Mr. Rios                                    81

1      **THE COURT:**  Yes, sir, please.

2                **DIRECT EXAMINATION (RESUMED)**

3  **BY MR. RIOS:**

4  Q    Ms. Eitel, I think we left off before the break -- I was

5  going to ask you to refer to Orix Exhibit 14.

6  A    Exhibit 14 is the Trustee's opposition to Orix's motion

7  for summary judgment that was filed in Louisiana State Court on

8  June 24th, 2008, the day before the summary judgment hearing

9  and that proceeding.

10 Q    Ms. Eitel, let me refer you to Page 4 of that motion,

11 under the subheading C, summary judgment, is it appropriate at

12 this stage.  Do you see that?

13 A    I'm sorry, yes.

14 Q    What were the grounds that the Trustee was arguing for the

15 denial of summary judgment?

16 A    Well, the principal ground was that the Trustee -- or they

17 needed to do some -- they needed to -- discovery.  "The parties

18 have not conducted adequate discovery and needed a fair

19 opportunity to carry out discovery and present their claim

20 before there was action on a motion for summary judgment."

21 Basically, more time to get more information or conduct

22 discovery.

23 Q    Okay.  Did -- I'd also like you to read the sentence that

24 begins, "As stated by Mondona," after that string cite of

25 cases.

Eitel - Direct / By Mr. Rios                    82

1    A     Yes.   The Trustee said, quote, "As stated by Mondona, Orix

2    has not produced the Bomar report, despite repeated requests to

3    do so."   This is the statement that Mr. Phillips and I

4    discussed earlier today, that we challenged as being absolutely

5    incorrect and that the Trustee did file a revised brief the

6    next day, modifying that statement because it was not true.

7    Q     Now, I've asked you this question several times, that the

8    -- what Orix's reaction was.   I think he had used various

9    adjectives like "stunned," "disbelief," things of that nature.

10   Needless to say, was their reaction consistent with your prior

11   testimony?

12   A     It was.   We were very concerned, once again, for several

13   reasons.   Now, we are seven months beyond our disclosure and

14   providing to the Trustee.   The documents of the Bomar report

15   had been produced.   The Trustee's taking the position that

16   there's time needed, you know, needed to do some discovery, but

17   in the seven months since we provided the documents, we have

18   not been asked for additional documents, we have not been asked

19   substantive questions about what we had provided or produced.

20   And that just seemed to me to be keeping alive a very frivolous

21   and groundless lawsuit.   The Trustee had no evidence that we

22   had seen -- certainly not disclosed to us, and it would be

23   impossible to have -- that we had filed to produce documents we

24   had.

25   Q     Now, from the time that you saw -- first read the

Eitel - Direct / By Mr. Rios                              83

1   Trustee's response to the motion for summary judgment and the

2   hearing, did you have any either written or verbal

3   communication with Mr. Phillips regarding the statement that

4   Orix did not produce -- had not produced the Bomar report?

5   A    I did.  I immediately sent Mr. Phillips an email later in

6   the day on the 24th and said, "I want to give you fair warning

7   that this statement is not true, and I," you know, "I expect

8   the Rafizadehs to sign -- to say these kinds of things, but I

9   am just very troubled when the Trustee makes these kinds of

10  representations.  It's false.  You know it's false, and I don't

11  know how you can say that consistent with Article 863."

12  Q    And Article 863 is Louisiana's version of Rule 11?

13  A    Yes.

14  Q    All right.  Let me refer you to Orix Exhibit 15.

15  A    Exhibit 15 is my June 24 email to Louis Phillips and

16  Ashley Green.  Ashley was the associate working with

17  Mr. Phillips on the file.  And I told them that --

18              " -- fair warning, and I find it extremely troubling

19              the Trustee would be so cavalier in accusing Orix of

20              misconduct when he has no factual basis to do so.

21              The Trustee's opposition states Orix has not produced

22              the Bomar report, despite repeated requests to do so.

23              This is false.  I expect this type of baseless

24              accusation from the Rafizadehs.  I am shocked when it

25              comes from the Trustee."

Eitel - Direct / By Mr. Rios                                    84

1        I then go in to explain some additional documents and

2   Bates Numbers and exhibits and how they correlate, and the

3   reason I did that is to show them all the different times the

4   Bomar report had been produced to both the Rafizadehs and the

5   Trustee, and I mentioned some more numbers that were not in our

6   original motion because between -- Mrs. Rafizadeh had filed her

7   opposition a week before the hearing, and in her opposition to

8   Orix's motion for summary judgment, she said, "Oh, we don't

9   want the Bomar report.  That's not what we're talking about

10  that you attached as exhibits or summary judgment motion.  We

11  want the Bomar report that Henry Bomar discussed and the MLMI

12  Trust litigation against UBS Warburg or La Funding (phonetic)

13  that was Exhibit 715 to that deposition.  So to refute that, we

14  went and pulled out Exhibit 715 from the other litigation, the

15  MLMI Trust litigation, and showed -- guess what -- Exhibit 715

16  showed the Bates Number from the underlying foreclosure

17  litigation where it had been used and had yet another set of

18  Bates numbers on it from the MLMI Trust litigation.  Same

19  document.  It's a little bit like playing Whac-A-Mole.  You

20  would provide the documents to Mrs. Rafizadeh, and they said,

21  "Oh, no.  There's something else."  We're like, "Well, no,

22  here.  This is the same thing, and here's the proof it's the

23  same thing."  And so that's why I explained that.

24  Q    The summary judgment hearing, the Louisiana State Court

25  place, then took place the next day, correct?

Eitel - Direct / By Mr. Rios                    85

1   A     Yes, on June 25.

2   Q     What happened at that hearing?

3   A     Well, there was some fancy footwork at first by Mrs.

4   Rafizadeh and Super Future Equities to first intervene and then

5   to get a continuance.  We contested the continuance at the

6   hearing, and the judge actually had a hearing on the motion to

7   continue, and she denied Mrs. Rafizadeh's motion to continue

8   and found that the summary judgment hearing should go forward.

9   At the hearing, it was very clear, based on the judge's

10  questions -- you know, we all -- you live dangerously when you

11  try to read too much into it, but it was very clear that she'd

12  quickly grasped and understood that the Bomar report had been

13  produced and that there were all these other events of default

14  that remained unchallenged by the nullity suit.  So I would say

15  the hearing went very well for the Orix team.

16  Q     What positions did the Trustee take at the hearing?

17  A     The Trustee opposed our motion for summary judgment

18  throughout the hearing that day.  Again, the position taken was

19  consistent with the opposition, which is, "Oh, we need time to

20  do discovery.  We really should not have a motion for summary

21  judgment at this stage of the proceeding, and please deny

22  Orix's motion for summary judgment."

23  Q     But in fairness, the Trustee did withdraw or correct the

24  statement --

25  A     Yes.

Eitel - Direct / By Mr. Rios                                86

1   Q    -- that was made in the prior pleading?

2   A    Ms. Green brought with her to court a corrected opposition

3   brief.  It somehow didn't get -- make it into the state court

4   record, but she provided to the judge and provided to us that

5   corrected that statement that we challenged as being false that

6   particular day.

7   Q    And subsequent to that hearing, did the Trustee then file

8   another -- an additional pleading?

9   A    Yes.  After the hearing on the 25th, Ms. Green, to her

10  credit, came over to counsel table and looked at the Bomar

11  report and looked at the exhibits and asked some follow-up

12  questions.  I don't remember her specific questions, but we

13  talked for a very few brief minutes and showed her how the

14  Bomar report had been produced -- the same thing we'd been

15  telling the Trustee's team for seven months.  I presume, based

16  on subsequent developments, the next day, they told us that the

17  Trustee would be withdrawing his motion for summary judgment --

18  his opposition, excuse me, to our motion for summary judgment.

19  And in fact, the Trustee did withdraw -- file a written

20  withdrawal of the summary judgment opposition on June 26th.

21  Q    Is that Exhibit 16?

22  A    That is, in fact, Exhibit 16.  It -- the Trustee's

23  withdrawal of the opposition.

24  Q    What was the basis for the withdrawal, as stated in

25  Exhibit 16?

Eitel - Direct / By Mr. Rios                                    87

1   A    Well, they said after listening to the arguments of the

2   parties at the hearing on June 25 and, quote, "as a result of

3   information obtained by the Trustee and Trustee's counsel for

4   the first time at the hearing, the Trustee no longer wishes to

5   have his opposition considered."

6   Q    Okay.  Do you have any idea what new evidence might have

7   been -- the Trustee might have been referring to in that

8   pleading?

9   A    No.  It's the same evidence.  It's the Bomar report.  Now,

10  there were different documents with Bates numbers provided in a

11  reply brief because Mrs. Rafizadeh had raised a new issue in

12  her opposition, but our exhibits to the motion for summary

13  judgment, the eight exhibits, were the documents with the Bates

14  label, they're the documents with the production log, and they

15  were the -- Mrs. Rafizadeh's Trial Exhibit 22.  Could have been

16  additional evidence, but it's the same evidence.  The Bomar

17  report was produced in 2002.  So I took issue with that

18  statement.

19  Q    Ms. Eitel, what was the result of the MSJ hearing?

20  A    I think it was the next week -- excuse me.  On July 1st,

21  the Louisiana court granted Orix's motion for summary judgment

22  and dismissed the nullity suit with prejudice, finding both

23  that the Bomar report had been produced as we had said all

24  along, based on the evidence, and making the legal finding that

25  because the other events of default were unchallenged by this

Eitel - Direct / By Mr. Rios                          88

1  default related to the property condition, it was not

2  inequitable or unconscionable to enforce the judgment.  She

3  didn't challenge it, and so the judgment could just stand on

4  these other bases, even if Orix had done the terrible things we

5  have been accused of, which we have not.

6  Q    Let me refer you to Exhibit 17, please.

7  A    Exhibit 17 is the judgment and reasons entered by the

8  Louisiana court in the nullity action on July 1, 2008.

9  Q    All right.  Did -- were there any subsequent proceedings

10 that took place in the nullity suit after the summary judgment

11 was granted?

12 A    There were.  There were three post-judgment motions filed.

13 Mrs. Rafizadeh filed a motion for new trial, which was set for

14 hearing in August.  Orix filed a motion for sanctions against

15 Mrs. Rafizadeh and her counsel, and Orix filed a motion for new

16 trial seeking prevailing party attorney fees from both the

17 Trustee and Mrs. Rafizadeh, and those three motions were all

18 set for the same day in August 2008.

19 Q    And what was the outcome of those hearings?

20 A    Mrs. Rafizadeh's motion for new trial was denied.  Orix

21 was awarded some small amount of sanctions against Mrs.

22 Rafizadeh for having brought the nullity suit, and Orix's

23 motion for prevailing party attorney's fees was denied, based

24 on a finding that the original motion did not encompass a

25 request for attorney's fees.

Eitel - Direct / By Mr. Rios                    89

1  Q    All right.  Did anybody appeal those findings?

2  A    No.

3  Q    Ms. Rafi -- Ms. Eitel -- excuse me --

4  A    Three strikes and you'll be out.

5  Q    Three strikes and I'll be out, I agree.  Were you involved

6  in the calculation process of Orix's objection to the Gordon

7  Arata fee application?

8  A    I was.  I reviewed the invoices provided by Gordon Arata

9  with its final fee application and identified as best as I

10 could which items related to the nullity suit and which items

11 related to the 9019 settlement and tried to isolate those out.

12 And I kind of did it both ways.  I did a chart showing, "Here's

13 everything that we don't object to," and then I marked up

14 everything that we did object to, and that's how it got to the

15 calculation of about 50,000 in fees related to the nullity

16 suit, about 4,000 -- or 4,400 related to the 9019.  Sometimes,

17 there were a lot of things together, and so it's not

18 mathematically precise, but it's as close as I could come based

19 on the information provided.

20 Q    And since Orix filed its objection to the Gordon Arata fee

21 application, have those numbers changed or do we stand on the

22 amounts set forth in the objection?

23 A    It's changed by about $1,100.  When I was preparing for

24 this hearing, I realized I had wrongly -- there were two

25 January 16th entries that related to the funding agreement, and

Eitel - Direct / By Mr. Rios                                90

1  we obviously did not object to amounts related to negotiating

2  the funding agreement, so I added those back in, and so our fee

3  objection, instead of being 55,000 and change is 54,000 and

4  change.

5  Q    Let me ask you --

6  A    So I made an error that was -- that I corrected in

7  Mr. Phillips's favor.

8  Q    Understood.  Let me ask you to refer to Orix Exhibit 18,

9  please.

10  A    Exhibit 18 is the chart that I prepared that I just

11  mentioned, and we isolated out by date the entries to which we

12  did not object, showed who the timekeeper was by initial, how

13  much time was there, and we kind of categorized things by, did

14  it relate to the funding agreement, it's not objectionable; if

15  it related to just the general claim objection but not the

16  nullity suit, not objectionable.  And so that's how we did it.

17  Q    And those -- the entries that are highlighted on the first

18  page of that exhibit, are those the entries that were

19  originally objected to but that --

20  A    Yes.

21  Q    -- we've corrected?

22  A    Yes.  That was my error that I've gone back in and fixed,

23  and so on the second page, you get down and you'll see that

24  everything that's highlighted is different than the Exhibit 18

25  as filed in our objection on May 19th.  And so the amount of

Eitel - Direct / By Mr. Rios                              91

1   Mr. Phillips's time that was objectionable went down by a few

2   hundred dollars and as did the total objectionable fees went

3   down by about a thousand.  So our total objectionable fees on

4   our calculations is $54,433.55.  And also, the objectionable

5   expenses, I don't think that we had categorized those in the

6   prior Exhibit 18, and those break down to $1,118.90.  About

7   half of that's for the 9019, about half of that's for the

8   nullity suit.

9   Q    And again, I think you've already answered this question.

10  I just want to make clear that the -- make sure that the record

11  is clear.  Orix is not objecting to all time entries of Gordon

12  Arata related to the nullity action --

13  A    That's correct.

14  Q    -- correct?

15  A    We did not object to the new trial motion that was -- the

16  fees for the new trial motion that were filed in November, the

17  fees for the motion to intervene, and any work that was done --

18  I guess I had assumed there was work that was done after

19  getting our November letter.  I find out now that maybe I'm

20  wrong, but we did not object to those matters.

21  Q    Let me refer you to Exhibit 23 quickly.

22            THE COURT:  22.

23  BY MR. RIOS:

24  A    22?

25  Q    22, excuse me.

Eitel - Direct / By Mr. Rios                                    92

1    A    Exhibit 22 is the Gordon Arata invoices that were attached

2    as an exhibit to the application for fees, and try to make easy

3    for everyone to review and to show how we made our

4    calculations, the things blocked in red are items we've

5    objected to that relate to the nullity suit.  The matters

6    blocked in sort of a blue or a teal are things we objected to

7    related to the settlement.  And as you can see, the great

8    majority of it is red, related to the nullity suit.

9    Q    Ms. Eitel, why did Orix object to the fees related to --

10   the Gordon Arata fees related to the nullity suit?

11            THE COURT:  Let me go ahead and interrupt you.

12   First, I don't know that I need to know why she did anything.

13   The question should focus on him.  Second, I want to go ahead

14   and call my three o' clock hearing, so let me get you to reword

15   that when we resume.  I don't think this will take very long.

16            MR. RIOS:  Very well.

17        (Proceeding was recessed from 3:04 p.m. to 3:08 p.m.)

18            THE COURT:  Mr. Rios.

19                  DIRECT EXAMINATION (RESUMED)

20   BY MR. RIOS:

21   Q    Ms. Eitel, let me refer you to Exhibit 19.

22   A    Yes.  Exhibit 19 is the March 2006 order granting the

23   motion to compromise between ORIX and the Trustee that related

24   to the sale proceeds of the real estate on which ORIX held a

25   first lien.

Eitel - Direct / By Mr. Rios                          93

1              The settlement was approved and attached to the Order

2    as the unexecuted settlement agreement, and that's where this

3    6.9 million or so on sale proceeds were distributed,

4    5.9 million to ORIX, 1 million to the Trustee and where ORIX

5    also agreed to subordinate its claim to all unsecured creditors

6    in the case and to create an unsecured creditor reserve of

7    about, whatever it was, about $150,000 so that every other

8    unsecured creditor got paid 100 cents on its claim regardless

9    of what ORIX was paid on the claim.

10   Q    And this order also liquidated the secured portion of

11   ORIX's claim; is that correct?

12   A    Yes.  It liquidated and allowed the secured portion of the

13   ORIX claim in the case.  And one of the reasons that ORIX

14   objected was based on this order on compromise with what Gordon

15   Arata has done because there couldn't be any benefit to the

16   estate when every unsecured creditor was going to be paid

17   before ORIX.  The only winner, if there was going to be one, or

18   any benefit to the estate from the nullity suit would be the

19   Debtor, Madonna Rafizadeh, because everybody else was taken

20   care of but ORIX through the creation of the unsecured creditor

21   reserve and the subordination agreement.

22   Q    Does the same reasoning go for the failed 9019 with

23   respect to the fees that Gordon Arata is seeking?

24   A    Right.  I mean, again, ORIX's position was there's just no

25   benefit to the estate when the settlement couldn't be approved.

Eitel - Direct / By Mr. Rios                                  94

1    It was an expensive exercise, very much less so with respect to

2    Gordon Arata; and there was no benefit to the estate, and

3    that's why the objection was filed.

4             **MR. RIOS:**  Pass the witness, your Honor.

5             **THE COURT:**  Thank you.

6             Mr. Phillips.

7             **MR. PHILLIPS:**  One moment, please.

8             **THE COURT:**  Yes, sir.

9             **MR. PHILLIPS:**  No cross.

10            **THE COURT:**  Thank you.

11            Let me try and sort things out a little bit.  The

12   Exhibit 22, I'm trying to reconcile Mr. Phillips' testimony

13   where he breaks out his fees into, I forget, but seven or eight

14   different categories of amounts.  And those amounts are

15   different than your amounts.

16            Have you made any attempt to reconcile the amounts to

17   which he testifies to as to how the 50,000 is comprised versus

18   what you're testifying?

19            **THE WITNESS:**  Your Honor, I heard those amounts

20   broken out today that way for the first time, and so I've not

21   had an opportunity to break it down and to do the comparison

22   that, obviously, needs to be done.

23            **THE COURT:**  Okay.  Are there any further witnesses?

24            **MR. LEE:**  Your Honor --

25            **MR. RIOS:**  Nothing from ORIX, your Honor.

Phillips - Direct / By Mr. Lee                    95

1          **THE COURT:**  Okay.  So ORIX rests.

2          Go ahead.  You can step down.

3          **THE WITNESS:**  Thank you.

4      **(Witness steps down)**

5          **MR. LEE:**  May I put Mr. Phillips back on the stand

6  for a little rebuttal testimony?

7          **THE COURT:**  Thank you.

8      **(Pause)**

9      **(Witness recalled / Previously sworn)**

10                 **DIRECT EXAMINATION (REBUTTAL)**

11  **BY MR. LEE:**

12  Q   Mr. Louis Phillips, could you tell the Court the summary

13  you gave in respect to the breakdown of the fees how that you

14  came to the conclusions you did when you testified to it on

15  direct examination?

16         **THE COURT:**  And let me just -- I think that's also in

17  your reply, right?

18         **THE WITNESS:**  Yes, your Honor.

19         **THE COURT:**  Let me put that on the screen.  I'm going

20  to follow it a little better and maybe everybody else can, too.

21         **THE WITNESS:**  I did -- are you ready, your Honor?

22         **THE COURT:**  No.

23         **THE WITNESS:**  Okay.

24         **THE COURT:**  Let me get it up there to where we can

25  all see it.

Phillips - Direct / By Mr. Lee                    96

1          **(Pause)**

2               Well, now I don't know for sure if it was in your

3     reply today or if it was in your prior reply.  Here it is.

4          **(Pause)**

5               Okay.  Go ahead with your testimony.

6               **THE WITNESS:**  All right.  Your Honor, what I tried to

7     do --

8     **BY MR. LEE:**

9     Q    Do you understand the question, sir?

10    A    Yes, I think so.  I'm not disputing the -- Ms. Eitel

11    advised me that she had found errors in my favor.  I've not

12    really looked at that.  What I tried to do, as opposed to

13    ORIX's approach to my time, which is to say that everything

14    other than what they could pull out regarding the funding

15    agreement and analysis of the judgment and the viability of the

16    judgment claim, is objectionable.  They've come up with a

17    13,000 some-odd dollar number, which is non-objectionable, and

18    it's roughly related to work that ORIX has pulled out that it

19    says relates to my work with the funding agreement and my work

20    analyzing the ORIX judgment claim under state law.

21               So everything else according to ORIX is either

22    nullity or Rule 9019.  What I tried to do in my reply and in my

23    testimony today was to break out the categories of work that we

24    did within those two categories; in other words, the universe

25    is nullity and 9019 that's objectionable to ORIX.  And what I

1  tried to do was break the nullity universe into its subparts.

2  The 9019 itself contained -- and all I did was try to calculate

3  the 9019 time, add it up and come up with 13.2 hours of $4,950.

4  I don't know if ORIX would agree or not, but that was my

5  approach to it.

6          With respect to the nullity action what I tried to do

7  was pull out the discrete components.  Number one, completing

8  the federal court litigation, which was done in January.  I

9  came up with twelve point -- with 23.1 hours.  And I tried to

10  do an analysis of the people who did the work, come up with the

11  hourly rate times that.  Then we came up with --

12  Q    That's on Page 10 of your reply, correct?

13  A    Yes, yes.

14  Q    The 23.1 hours.

15  A    23.1 hours, $4,585.50.  And then what I did was I said

16  there was 12.3 hours from January to March, which amounted to

17  approximately $4,012.  And that, as I pointed out, related to

18  dealing with the way that the nullity action related to the

19  settlement agreement because. Mr. Tow had said stop working on

20  the claim in the nullity action because I've settled back in

21  January.

22          Then I went from March 19th to June 22nd, which was

23  the period of time in which we did our work in connection with

24  the nullity action but also in connection with the ORIX claim

25  analysis.  And I think that any time an application, a time

1  entry has said "nullity," it's been objectionable.  And that's

2  fine, I understand that.

3          But we had 103 hours and I came up with $24,803 for

4  the time spent in investigation and analysis, both of the

5  nullity action and overlapping analysis of the judgment claim,

6  because we thought that the judgment claim needed -- we had to

7  go through and see what could be objectionable, if anything, on

8  an appeal basis if the judgment was good.

9          Given the standard of review in Louisiana, which is

10  roughly the federal court standard, you don't get a fact review

11  but we were looking to see, first, was there any de novo.  I

12  think general counsel, Mr. Hill, had offered some suggestion

13  that the default interest granted might be problematic.  We

14  looked into the -- that was a fact finding that was because of

15  a trigger of a certain kind of default.  So we felt like we had

16  to review, and did, use some search terms and did an extensive

17  analysis of the trial transcript that had happened back in

18  2004, I think, the exhibits, et cetera.

19          And what we tried to do was say, okay, we didn't

20  really do that much analysis in '07.  That's established by our

21  second fee application.  Our real analysis to the extent we did

22  it, and we did we think, came in 2008.  And it came mostly

23  after March 19th when Mr. Tow said no -- well, the Court denied

24  the settlement March 11th and we got back on it around

25  March 19th and started doing our work.

Phillips - Direct / By Mr. Lee                        99

1        June 22nd I call that the day that we quit, I quote

2   "investigation."  That's the day that we met with the

3   Rafizadehs and their lawyer at the request of Mr. Tow.  I

4   believe that Mr. Tow had met with them in Houston and they

5   continued to tell him that we didn't understand the nullity

6   action, and they had volumes of information that they needed to

7   give us.  And I'd like to deal with that in a minute if I

8   could, but we're talking about the break down of time.

9        The summary judgment I've gone -- I've dealt with and

10  I've come up with an amount of time that approximates $7,100,

11  which is 36.35 hours dealing with summary judgment, including

12  the hearing.  The hearing is in New Orleans, my office is in

13  Baton Rouge, so it was an all-day kind of trip down there and

14  getting back.

15       And then last, I've dealt with the prevailing party

16  motion and I brought that out at 35.65 hours, which is roughly

17  $9,570.  I think if you add those amounts and come up with the

18  $4,950 related to the 9019, you reach, roughly, $55,000.

19       What I was trying to do was to give the Court a break

20  down, given that ORIX says in its objection it didn't mind me

21  looking into the nullity claim, and that's why it didn't object

22  to the '07 time.  Well, I didn't do any really looking into it

23  until '08, and I tried to break out the looking into it time as

24  well as the federal court litigation time because I felt like

25  we needed to finish the federal court litigation, which we did.

1   And we did that some in 2008.

2           And those were the ways that I broke out what I

3   understood to be, roughly, $55,000 of objectionable time to

4   give a component by component analysis for the Court in my

5   reply.

6           **THE COURT:**  Anything further?

7           **MR. LEE:**  Yes, your Honor.

8   **BY MR. LEE:**

9   Q    Would you turn to the ORIX exhibits in front of you?  Do

10  you have a set of those?

11  A    Yes.  I think so.

12      **(Voices heard off the record)**

13          Is that what this, (indicating), is?

14      **(Pause / Voices heard off the record)**

15  Q    Why don't you turn to ORIX Exhibit Number 1?

16  A    Yes.

17  Q    After you received this letter of November 26th, 2007,

18  okay, why did you not call up Ms. Eitel and say, "I want more

19  documents, I want to do more discovery of you, I want to find

20  out more"?  What were you doing?

21  A    Well, when I got this I was right maybe one or two days

22  before filing pleadings in the federal district court that I

23  had to file within a Rule 59 timeframe.

24  Q    Forget about that.

25  A    All right.  But you asked me what --

Phillips - Direct / By Mr. Lee                              101

1   Q    Forget about that.  I want to know what it is, why you

2   never made according to them one phone call to get more data

3   from Ms. Eitel or --

4   A    I thought I had what they had.

5   Q    -- ORIX or a bevy of lawyers from ORIX?

6   A    I thought I had what they had.

7   Q    Okay.

8   A    They sent me what they sent.  It was designed to convince

9   me that there was not a nullity action.  It was.  So I had from

10  ORIX what I had.  My problem with the timeframe is that I had

11  that.  Now I had to learn about the rest of it.  Because I

12  didn't know anything about the litigation, I didn't know

13  anything about the discovery, I didn't know anything about the

14  funding litigation, I didn't know anything about the MLMI trust

15  versus UBS Warburg (phonetic) -- I didn't know any of that,

16  nothing.  I had been involved in the precursor to the Texas --

17  to the adversary here, and I had no history with any of that.

18  Q    Okay.  So --

19  A    Everything that we did in the Louisiana litigation

20  presumed a valid judgment, because there was a judgment there.

21  And so from my standpoint I had what ORIX had.  But I've go to

22  tell you, this might as well have been Greek because I didn't

23  know anything about what it related to.  Because we never

24  really analyzed the ORIX judgment in connection with the

25  litigation in Louisiana because it was the judgment, it was the

1    judgment.

2    Q    All right.

3    A    So what I started trying to do in March, or in probably

4    January I started trying to do it because I thought we were

5    going to win at the District Court -- I didn't really know.  I

6    sent out a request, not of ORIX for documents; I knew what its

7    position was.  I sent out a request kind of through the wire to

8    the Rafizadeh side for documents and for their story.  Because

9    I saw the nullity action but, frankly, I wanted to know their

10   whole story.  And I didn't.  And I also needed to learn what

11   the story was about the litigation, which I had to from the

12   starting place; I didn't know anything about it.  I was called

13   off in January because of the settlement, so I didn't get back

14   to it until, in effect, the 19th, 20th of March.

15   Q    Did you find the data gathering from the Rafizadeh side

16   very economical, efficient?

17   A    No.

18   Q    Okay.  Tell the Court the process you went through to try

19   to get data from the Rafizadehs in connection with your

20   investigation.

21   A    Well, I tried to get data from their Texas people, their

22   Texas counsel.  They had Louisiana counsel.  I got the feeling

23   that the Louisiana counsel weren't talking to the Texas

24   counsel, the Texas counsel were telling you guys what a great

25   case they had but as far as I could tell weren't communicating

Phillips - Direct / By Mr. Lee                                    103

1   with Louisiana.  Louisiana was telling me what a great case

2   they had but weren't sending me anything.  And so what I tried

3   to do -- and at the same time -- and I kind of keep pointing

4   this out -- it meant something to me because I didn't

5   understand what was going on.

6          There was a joint prosecution directive that was

7   issued back in November of '07 that had not been followed

8   through with.  In other words, there had not been a joint

9   prosecution order.  There had been some motions filed seeking

10  an extension of the deadline.  And through all of that I kind

11  of had the idea that I was supposed to be jointly prosecuting

12  something with the debtor side, and to do it I needed to know

13  what they had.

14  Q    And tell us what you eventually got from the Rafizadehs,

15  if anything at all.

16  A    I got stacks and boxes and boxes of paper and documents.

17  And I met with the lawyers at least twice.  Ms. Eitel's

18  recitation of the filing of the motion for summary judgment is

19  correct.  A couple of things she left off but I think are in

20  the email she pointed out, is I told her I was not going to be

21  around, I was not available, I was going to have to have

22  somebody stand in.  And what I didn't tell her is I had to have

23  somebody stand in kind of for the whole week before, because I

24  was involved in something that was a very big thing that only I

25  could do.

Phillips - Direct / By Mr. Lee                          104

1          But we worked to try to get documents March to April,

2    April to May, May to June.  And in June Mr. Tow contacted me

3    and said, "I want you to meet with the Rafizadehs."  I got the

4    feeling they didn't want to send us anything because they

5    didn't trust Mr. Tow.  But I finally sent them -- I did send

6    them in April, I sent them an analysis of the nullity action

7    that I had done on my own because I hadn't been able to get

8    anything from them.  And it was basically that I thought they

9    were going to lose it.

10   Q    When you say "they," who is "they"?

11   A    The Rafizadehs were going to lose the nullity action.

12   Q    Okay.

13   A    I did not send that to ORIX.  I sent ORIX the piece of

14   information, the memo that Ms. Eitel pointed out.

15   Q    And why did you not resort to using official discovery

16   against them?

17   A    They were my co-parties.  And at some point I sent them my

18   evaluation of the nullity action based on my independent review

19   of everything, but I kept hearing they had all this stuff.  And

20   even after I sent them my memo about that, they were very

21   inefficient in getting me the stuff.  I met with them on

22   June 22nd and they brought a foot of documents, you know.  I

23   did what I thought I was supposed to do.

24   Q    Okay.  Let's go back to the MSJ that was discussed in

25   direct examination of Ms. Eitel.

Phillips - Direct / By Mr. Lee                          105

1  A     Yes.

2  Q     Do you recall when you determined that there was an issue

3  regarding the exhibits attached to the ORIX MSJ in Louisiana

4  state court?

5  A     Well, I know that Ms. Eitel -- I listened to her

6  testimony, and she knows this stuff a lot better than I ever

7  will.  She lived it, she breathed it, et cetera.  When I met

8  with them on the 22nd they pointed out --

9  Q     What is the "they"?  Who is "they"?

10  A     Okay.  The Rafizadeh group.

11  Q     Okay.

12  A     And counsel.  They pointed out that one of the -- that the

13  Bomar, '99 Bomar report, was initially referred to in

14  litigation that was not the Louisiana state litigation and it

15  was attached to a deposition and it had a deposition number.

16  And none of the things that they showed me had the deposition

17  number.  My associate and I were in this meeting.  We listened

18  to it.  She had to review all the documents because our

19  response was due on the 24th.

20         Up until then I didn't even think there was an issue.

21  When they showed me that there was a different number floating

22  around somewhere that I had not seen, I didn't know what the

23  exhibit looked like.  When they showed me that, I thought,

24  well, let's see if we can run this to ground and what we had.

25  We couldn't and so we filed the response to the summary

1    judgment.

2           And the reason that we filed the response -- and I'll

3    get to what we actually filed and how I tried to fix it in a

4    second -- is that I thought that at that point I had something

5    to go to ORIX with.  But I filed a response.  I was

6    Co-Plaintiff.  I couldn't pull out of the litigation because

7    the prosecution order -- that was not objected to by ORIX --

8    had been entered on May 8th.  I couldn't get a hearing before

9    the bankruptcy court before the summary judgment response was

10   filed.  It had to be filed before the hearing.

11          And so if that was the only issue and the judge

12   didn't want to see it or ORIX presented something that showed

13   that the deposition exhibit was the same as the Bomar reports

14   that they had shown -- because they did show Bomar reports.

15   They had 2001 entries, they had 2000 entries.  I didn't know if

16   it was the same report.

17   Q    Okay.

18   A    She's right, Ms. Eitel, that there were all kind of other

19   grounds upon which the judgment could be based.  But in

20   Louisiana state court I've tried a lot of summary judgments

21   that I thought I would win, and they'd give me five seconds and

22   they'd say, "No, try it on the merits."  Why?  They're elected;

23   they don't have to rule on summary judgment.  That's my

24   experience.

25          So what I thought at that time we could go back -- I

1   told my associate to do a response.  I looked at it.  I don't

2   remember the sentence that was the offensive sentence.  A

3   sentence that I fixed was incorrect.  There had not been

4   repeated attempts to find information.  It was just wrong.  It

5   was a piece of a brief that was wrong and I didn't write it,

6   but it's my responsibility.  And when it was brought to my

7   attention by Ms. Eitel, I fixed it.

8   Q    Would you look at Exhibit Number 1 of ORIX's exhibit book

9   and tell me whether or not the issues that are set out there,

10  in your view, are simple or complex?

11  A    Well, they were complex to me.

12  Q    Okay.  And have you ever known you or counsel for a

13  trustee to take at face value what is sent by the other side

14  and put (phonetic) the analysis?

15  A    No.  And I couldn't hear either.

16  Q    All right.  And was there anything extraordinary you had

17  to do in connection with the review of the allegations here

18  than what you have done in the pleadings set out in the final

19  fee application?

20  A    Anything extraordinary?  Uh.

21  Q    What I'm asking you is did you do your standard analysis

22  that you would do for a legal problem that comes into your

23  door?

24  A    Yeah, I guess.  Except that I got called off of it.  Then

25  we had to start over.  And I had other things to do.  I wasn't

Phillips - Direct / By Mr. Lee                    108

1   ORIXing ten hours a day.  The other thing I had to do was

2   because I had no history I thought that I had to learn about

3   this myself.  And it might have taken me longer certainly than

4   it would have taken Ms. Eitel to do this.  But I have to say

5   that I didn't get a lot of help from the parties with whom I

6   was to jointly prosecute the action.

7   Q    Not with the Rafizadehs.

8   A    Yes.

9   Q    All right.  Finally, this notion of the plum, are you

10  aware of what I'm talking about when I say "the plum"?

11  A    I heard a reference to the plum.

12  Q    Okay.  Did the trustee ever tell you or direct you to hold

13  off on your investigation so that he could use the claims

14  against ORIX as a plum to get a settlement from the Rafizadehs?

15  A    He never told me to hold off of anything until I heard

16  from him in January to hold off because he had a settlement.

17  So, no, I never heard that from the trustee.  The trustee never

18  directed me to hold off finishing up, no.

19          **MR. LEE:**  Pass the witness, your Honor.

20          **THE WITNESS:**  Because of the -- can you ask me a

21  question about my response to the summary judgment?

22          **MS. EITEL:**  Your Honor, that's fine.  I'm not going

23  to object.  I know that I should but I want to be fair.  Nobody

24  likes doing these objections.

25          **THE COURT:**  What do you want to say?

6

1          THE WITNESS:  Your Honor --

2          MR. LEE:  Thank you, your Honor.

3          THE WITNESS:  -- I would like for you to look at

4    Exhibit 33.

5          THE COURT:  Yours or hers?

6          THE WITNESS:  Mine.  Page 4.

7      (Pause)

8          You'll see a red line.

9          THE COURT:  Right.

10         THE WITNESS:  I just wanted to point out to the Court

11   that when I got Ms. Eitel's email about the -- she said false,

12   I think, but it was certainly inaccurate -- statement on

13   Page 4, I went and found it and it was immediately clear to me

14   that it was wrong.  And so I think I went up to the office at

15   1:00 or 2:00 o'clock in the morning, re-did it, sent this

16   redlined with my associate who was handling the hearing down

17   there so that she could give it to the Court and to counsel.

18   So I apologize for the statement.  It's my fault.  I'm the

19   partner.  I just could not give it the attention that it needed

20   to have because we held the hearing date.  We kept the 25th

21   hearing date even though I was in another court in an

22   unavoidable problem.

23         THE COURT:  All right.  Anything else?

24         MR. LEE:  No, your Honor.

25         THE COURT:  Anything else?  Go ahead.

Phillips - Cross / By Ms. Eitel              110

1          **MS. EITEL:**  Two questions, your Honor.

2                      **CROSS EXAMINATION**

3     **BY MS. EITEL:**

4     Q   Mr. Phillips, I think I heard you say that you cannot take

5     ORIX's word for it or something like that with respect to the

6     November 26th, 2007 letter.

7          **THE COURT:**  I think what he said --

8     **BY MS. EITEL:**

9     Q    Is that a fair characterization?

10         **THE COURT:**  What he said was --

11         **THE WITNESS:**  I don't think that's a fair

12    characterization.

13         **THE COURT:**  -- that he didn't -- I don't think he was

14    accusing you-all of --

15         **MS. EITEL:**  I understand.  He didn't want to --

16         **THE COURT:**  -- he wouldn't take your word --

17    **BY MS. EITEL:**

18    Q    You didn't want to rely.

19         **THE COURT:**  What he said was he couldn't take what

20    one side said at face value.

21    **BY MS. EITEL:**

22    Q    You didn't want to rely at face value what you were

23    presented in the November 26th, 2007 letter.  Is that a fair

24    characterization?

25    A    That's a fair characterization.

**EXCEPTIONAL REPORTING SERVICES, INC**

Phillips - Cross / By Ms. Eitel                          111

1   Q    But after the summary judgment hearing on June 25,

2   Ms. Green reported back to you based on the evidence ORIX

3   presented that the Trustee should withdraw his motion to the --

4   his opposition to the summary judgment.

5   A    Yes.  But it's my understanding that Ms. Green -- and you

6   I think corrected it, you mentioned this today, that you sent

7   the thing with the exhibit sticker on it.  It was the same

8   thing.  That's all -- you can grill me all day, but that's the

9   thing that I found out about on the 22nd.  It was the same

10  thing.

11  Q    But until June 22nd the Exhibit Bomar 715 had not even

12  been an issue on your radar screen.

13  A    That's right.  That's right.

14  Q    So until June 22nd you didn't think there was an issue

15  with --

16  A    I didn't know about it.

17  Q    -- respect to the nullity suit.

18  A    I told -- I've testified here today that in April I sent

19  the Rafizadehs a memo based on what I had then that I didn't

20  think they were going to win the nullity suit.  It was not

21  until the 22nd when I met with them that they mentioned

22  the 715.  I must have missed it.  I missed it.

23  Q    And that's the first time they mentioned it to you,

24  correct?

25  A    Yes.

Phillips - Cross / By Ms. Eitel                    112

1  Q    And on my email to you of June 24th I explained Bomar

2  Exhibit 715 and showed, did I not, that it was the same

3  document previously provided?

4  A    Yes.  And I will tell you that I've heard your testimony

5  about what went on.  My recollection of what I was told by my

6  associate was that once you presented what you presented, she

7  talked to you and she said -- and I thought it was during the

8  hearing.  I thought she had advised the judge we were going to

9  withdraw.  But she came back to me and said, "They produced it,

10  it's the one, they showed it to the court, we lose."  I said,

11  "Then if we lose, we withdraw."

12           MS. EITEL:  No further questions, your Honor.

13           THE COURT:  Thank you.  Anything else?

14           MR. LEE:  No, your Honor.

15           THE COURT:  Thank you.  You can go ahead and step

16  down.

17           THE WITNESS:  Thank you, your Honor.

18      (Witness steps down)

19           THE COURT:  Both sides rest as to this particular fee

20  app?

21           MR. LEE:  We do, your Honor.

22           THE COURT:  Do I have the nullity action, the nullity

23  complaint before me in the exhibits?

24           MS. EITEL:  I don't think we gave it to you, your

25  Honor.

113

1          **MR. UNIDENTIFIED:**  I don't think so.

2          **THE COURT:**  I need it.  Can I get the parties --

3          **MS. EITEL:**  I can get it for you.

4          **THE COURT:**  First of all, is there any objection to

5    including it as part of the record?

6          **MR. LEE:**  No.

7          **MS. EITEL:**  No, your Honor.  We can provide that and

8    we'll do so.

9          **THE COURT:**  Let me get the nullity suit.

10         Let me tell you-all the general path I'm going to

11   follow, although I need to read the nullity suit to really

12   decide the substance of what I'm going to do.  I mean as you-

13   all know, I am constrained by the *Pro-Snax* decision, which I

14   will be following, at 157 F.3d 414, *Andrews & Kurth versus*

15   *Family Snacks, Inc.*

16         We have a fee application here over which we have

17   jurisdiction under 28 U.S.C., Section 1334.  It's a core matter

18   under 157.  Here's the way that I read *Pro-Snax*.  And I'm just

19   going to read you-all what I think are the relevant sections of

20   the case.

21              "Andrews & Kurth argues that a reasonableness test is

22              appropriate whether the services were objectively

23              beneficial toward the completion of the case at the

24              time they were performed.  The petitioning creditors,

25              by contrast, advocate a more stringent test, whether

**EXCEPTIONAL REPORTING SERVICES, INC**

114

1               Andrews & Kurth's services resulted in an

2               identifiable, tangible and material benefit to the

3               bankruptcy estate.  We determine today that the

4               stricter test is the appropriate measure."

5          A lot of people quit reading the case at that point.

6     But I think there's more to the case.  In the last paragraph,

7     the Fifth Circuit goes on to say:

8               "The district court's instruction to the bankruptcy

9               court, to consider strongly the debtor's lack of

10              success in obtaining confirmation of the Chapter 11

11              plan, is consistent with the standards identified by

12              Congress in Section 330, which requires that at the

13              time the services are performed the chances of

14              success must outweigh the costs of pursuing the

15              action.  Even though the bankruptcy court found

16              support for the Chapter 11 plan among creditors other

17              than the petitioning creditors, and if the plan had

18              been confirmed, the estate would have been brought to

19              a swifter conclusion than if the case were brought

20              under Chapter 7, we find that Andrews & Kurth should

21              have known from the outset that the debtor's

22              prosecution of a Chapter 11 plan would fail, given

23              that the petitioning creditors who collectively held

24              more than 50 percent of the indebtedness in this

25              case, filed an involuntary Chapter 7 case against the

115

1           debtor and repeatedly informed the debtor and the

2           bankruptcy court that they believed the case should

3           be administered under Chapter 7."

4           The way that I read their conclusions altogether

5    doesn't mean that we do an economic measure at the end of the

6    case.  What it means is we have to figure out whether or not

7    there were identifiable, tangible and material benefits to the

8    bankruptcy estate, which may come about from resolution of

9    matters with which in a Chapter 7 case the Chapter 7 trustee is

10   charged.

11          To me that says that some of the things that the

12   Phillips Arata firm did were unquestionably compensable, and

13   the time that I've seen on it so far it looks reasonable to me.

14   For example, I think that defending against the prevailing

15   party motion not only was reasonable and necessary but also had

16   an economic benefit.  If that hadn't been defended against,

17   then the prior conduct even if it was wrong, and it may have

18   been, saved the Trustee from having to bear ORIX's attorneys'

19   fees.  That's compensable time.  Analyzing the ORIX claim not

20   with respect to the nullity action is compensable time.

21          The 9019 -- and I'm making this finding very narrowly

22   as to the Gordon Arata firm -- was necessary because they were

23   called in as witnesses.  And we had to figure out whether or

24   not to approve the 9019.  That was not brought by the Gordon

25   Arata firm.  It was brought by somebody else.  They were

1    necessary witnesses.  Their testimony was required to the

2    resolution of it.

3          And I'm keeping this narrow because I know that we're

4    going to have that fight on Mr. Lee's, and I don't know what

5    I'm going to do about that fight yet.  But as to this one,

6    their testimony was necessary for us to decide not to approve

7    the compromise.  And there was a benefit to the estate in not

8    approving it, in my mind.

9          Here's the hard question for me.  I don't think

10   there's any question but that the Gordon Arata firm had to

11   evaluate the nullity action to figure out whether or not

12   pursuit of the nullity action was necessary to the estate.

13   Determining what claims are allowed against the estate is an

14   essential function of the Chapter 7 trustee, prosecuting

15   actions to disallow claims against the estate, a necessary part

16   of what a Chapter 7 trustee does.  He has to do it win or lose.

17         A tangible benefit is finding out what the right

18   claims against the estate are.  It isn't getting the

19   disallowance of a claim.  It isn't the trustee's job to get

20   claims disallowed that ought to be allowed, but it is his job

21   to evaluate, with the assistance of legal counsel if necessary,

22   what claims ought to be allowed.

23         For example, the trustee might review a claim, need

24   legal counsel to assist him and never file an objection.  That

25   is compensable time because it is, in fact, an identifiable,

1    tangible and material benefit to the bankruptcy estate to

2    figure out what the right claims are to be paid.

3         Here's why I want to read the lawsuit, and this is

4    where this is all going.  I've got to figure out by putting

5    myself in Mr. Phillips' shoes just how complicated was it once

6    he got the November 26th, 2007 email.  And I have to do that in

7    the context of what was the nullity suit.  That's why I want to

8    read it.

9         I know looking back today what happened and I know

10   looking back today that the Rafizadeh sponsored nullity action

11   was frivolous.  But I don't think I'm supposed to look back

12   today to see that the Rafizadehs filed something frivolous

13   against ORIX and then say:  Okay, well since that was filed

14   frivolously, any work the trustee did on it is non-compensable;

15   because I do think there is an identifiable, tangible and

16   material benefit to the estate to figuring that question out.

17   And in this case it was very helpful to figure it out.  If that

18   nullity suit had kept going forever and never gotten resolved,

19   we would have never ever gotten to the end of this case and

20   there would have never been funds that were distributable.

21        The issue now is sort of crystallized, you know.  Was

22   the Bomar document produced by ORIX?  Absolutely, it was.  And

23   the November letter shows that it was.  But what I don't know

24   is whether reading the November letter in the context of what

25   was alleged in the Complaint was enough such that Mr. Phillips

1   should have read it and said immediately, "I'm not going to

2   pursue getting rid of the federal judgment," for example.

3          I've got to say that I'm not really persuaded by the

4   whole federal judgment testimony that Mr. Phillips gave;

5   because if the federal court made an error but, nevertheless,

6   the error was harmless because the nullity suit was frivolous,

7   why are we spending estate money to do it?  The initial money

8   had to be spent, and I think everybody agrees the initial money

9   had to be spent because there needed to be enough time to get

10  Mr. Phillips' feet on the ground to review it.  And this isn't

11  his only case.

12         But I don't know whether reviewing that material

13  along with the lawsuit is a one-hour task or is a 150-hour

14  task.  And I can't tell that without sitting down and reading

15  all of that.

16         What I am going to do is figure out when I think he

17  should have figured it out.  And if I think he should have

18  figured it out in November, then I'm not going to allow the

19  time after November, not that pertained to the nullity suit.

20         If I think he should have figured it out -- to make

21  up a date because I don't know this answer yet; I'm going to go

22  read the time entries carefully in the context of reading the

23  nullity suit -- January 15th, that's going to be the cut-off

24  date.  And things that are pure nullity after that date I'm not

25  going to compensate him for.

1          What I really haven't figured out yet is if I think

2   it should have taken him eight hours to figure it out -- and

3   again that's hypothetical because I haven't read the lawsuit --

4   but he spent that eight hours in June, I'm probably still going

5   to compensate that because he needs to read it long enough to

6   figure it out.  But if he put everything in the wrong order and

7   a reasonable person would not have, then it's not compensable.

8   I just need to see how difficult it was.

9          If figuring out what the nullity suit was about was

10  so difficult that it was reasonable to wait and he needed to

11  pursue the federal court action in order to preserve his

12  ability to review it, I'm going to compensate for the federal

13  court action.

14         So without reading that and putting it into context I

15  can't decide.  That's why I want it, that's how I'm going to

16  divide up the time and that's going to be the decision.  And I

17  have not yet gone through, and I will, as unpleasant as it will

18  be, you know, the red boxes entry by entry in order to figure

19  out which portion of each entry is properly classified as

20  nullity and which portion of each entry is properly classified

21  as reviewing the claim, for example, for unallowed interest and

22  things of that nature, all of which is compensable.

23         So it's going to take me more time to figure it out.

24  I don't know how long it will take.  That's what I'm going to

25  look at.  That's, basically, going to be the basis of the

1    decision.  And I'll, obviously, supplement these oral findings.

2    But I wanted everybody to know what I was going to do, how I

3    was going to go about it.

4            Is there anything else I need to do on that?

5            **MR. LEE:**  Thank you, your Honor.  Nothing else.

6            **THE COURT:**  Let's talk about then the other two fee

7    applications.  How long do you think it's realistically going

8    to take you to present the case on that?

9            **MR. LEE:**  I think with respect to the Diamond

10   McCarthy fee application on direct it should be about

11   45 minutes to an hour.  And then with respect to Mr. Tow's fee

12   application I think it's driven off by --

13           **THE COURT:**  Yeah, his is --

14           **MR. LEE:**  -- a percentage calculation.

15           **THE COURT:**  Yeah.

16           **MR. LEE:**  And I don't think ORIX has objected to it

17   other than to say that the calculation needs to be corrected.

18           **THE COURT:**  And how long do you think it's going to

19   take for you-all to present your anti-Kyung Lee --

20       **(Laughter)**

21           **MR. RIOS:**  Your Honor, Mr. May has been so busy the

22   last couple of weeks I haven't really had the opportunity to

23   discuss the presentation with him.  My gut tells me it's

24   probably about an hour.

25           **THE COURT:**  Does he need to be here for the direct

1  case and the cross examination?

2      MR. RIOS:  Your Honor, I would like him to be.  But I

3  know that everybody's schedules are crazy right now.  So to the

4  extent that we're trying to get this in sooner rather than

5  later, I'm fine with him not being here.

6      THE COURT:  Well, I've got that question.  The other

7  sort of sub-question to that is whether we're going to take a

8  while.  And these may take a while.  The same thing is true on

9  the Gordon Arata one, whether we ought to approve the unopposed

10 ones and then leave the opposed ones while I try and figure it

11 all out and write opinions so that people aren't waiting on

12 money.

13     MR. RIOS:  It's certainly okay with me, your Honor.

14 However, I'm not certain that you can approve the trustee's

15 motion because it's keyed off distributions that are to be made

16 to the professionals whose fees we've objected to.  Although I

17 guess there is a certain --

18     THE COURT:  He could just take some sort of a

19 pro-ration of whatever he actually pays out, because he only

20 gets it on what he pays out.

21     MR. HILL:  That's easy enough, Judge, to apply the

22 percentage --

23     THE COURT:  I mean I think these may take a while to

24 get decisions out on.  Because if it's going to be anything

25 like this hearing where I've got to go through every day's

1    entries and figure out what I want to do with them, I mean if

2    I've got to through $400,000 worth of entries one by one, you

3    know I don't know what year I'll finish.  And I'm serious.

4    It's just going to take a long time.

5         **MR. RIOS:**  I understand.

6         **THE COURT:**  I don't want to hold up anybody while I

7    try and reach conclusions about all that stuff.  Now, I don't

8    know that I'll have to go through line by line, but I'm

9    guessing I will.

10        **MR. LEE:**  Your Honor, as a method to this process I

11   would propose that we submit another interim order allowing the

12   unopposed amounts and we'll take the numbers off ORIX's

13   objection, the larger number.  And then I don't know what --

14        **THE COURT:**  The larger number?

15        **MR. LEE:**  Well, in other words, the biggest number

16   that they've objected to, which is --

17        **THE COURT:**  You'll disallow the biggest number.

18        **MR. LEE:**  Correct.

19        **THE COURT:**  Yeah.

20        **MR. LEE:**  For interim basis.

21        **MR. RIOS:**  That's works.

22        **MR. LEE:**  And then the only problem is -- and then I

23   think Mr. Tow can make the calculation off that.  The only

24   problem that I have is with Mr. Phillips.  They've objected

25   to -- his fee seeks 68,000 and they've objected to 55.  And so

123

1    I guess --

2            **THE COURT:**  Well, I've just told you what I'm going

3    to do though --

4            **MR. LEE:**  Right.

5            **THE COURT:**  -- on the prevailing party motion.  I've

6    told you what I'm going to do on the 9019.  And so at least a

7    little of that will get added back in based on these

8    preliminary announcements unless there's going to be some

9    attempt to --

10           Can we just get a stipulation that if there's an

11   appeal there will be disgorgement in the event that I'm

12   reversed on any of this?  Mr. Phillips, is that --

13           **MR. PHILLIPS:**  Sure.

14           **THE COURT:**  Does that work for you-all?

15           **MR. RIOS:**  Yes, your Honor.

16           **THE COURT:**  Just put that in the order.

17           **MR. LEE:**  May I propose this, then?  That

18   Mr. Phillips go back in and add back in the amounts that you

19   were discussing and --

20           **THE COURT:**  Get Ms. Eitel to sign off.

21           **MR. LEE:**  And get with Ms. Eitel --

22           **THE COURT:**  It's still going to be though -- I don't

23   know the number, but there's going to be a $40,000 or so amount

24   that remains in contest --

25           **MR. LEE:**  Correct.

124

1          THE COURT:  -- while I try to reach a decision.  And

2   that can't be paid until I reach a decision about it.  And on

3   you-all's --

4          MR. LEE:  That's fine.

5          THE COURT:  -- it's going to be 300 and something

6   thousand.  It will be 300 and something thousand on the Diamond

7   McCarthy application.

8          MR. LEE:  No, your Honor.  It will be 420 thousand.

9          THE COURT:  That would be fine.

10          MR. LEE:  Yes, your Honor.  It's the larger amount.

11          THE COURT:  Okay.

12          MR. LEE:  And I have no problems with that, your

13   Honor.  Thank you.

14          THE COURT:  Well, let's just try and do it then on --

15   we'll try and do it all when you've got your client here.

16          MR. RIOS:  June 4th.

17          THE COURT:  Whatever date that was we said.

18          MR. HILL:  Your Honor, the section on commission is

19   330(a)(7).  They stuck in there as 326.

20          THE COURT:  And does it --

21          MR. HILL:  330(a)(7).  It just simply says that it

22   will be treated as a -- it shall be treated as a commission

23   computed under 326, and 326 says that's a maximum amount.

24   That's where the argument comes in.

25          THE COURT:  So they didn't solve the problem.

125

1      **MR. HILL:**  They didn't say it's a flat commission and

2   that's it.  They just said it was to be treated as a

3   commission, whatever that means.

4          **THE COURT:**  I'm showing it on my calendar on June

5   the 4th.

6          **MR. LEE:**  What time, your Honor?

7          **THE COURT:**  Well, I'd said before 3:30.  And I've

8   reserved two hours for this hearing.  I mean you-all know that

9   a lot of times when we reserve two hours people settle and so

10  there's more time.  So if you-all want I'll schedule you

11  earlier and just make you wait 'til 3:30 or else I'll schedule

12  you for 3:30.  I know you-all don't want to come back multiple

13  times, but it's up to you-all.

14         **MR. LEE:**  My preference would be to be scheduled

15  earlier and take the risk and be here ready for you, your

16  Honor.

17         **MR. RIOS:**  Same.  I'd rather get it -- start earlier

18  than later.

19         **THE COURT:**  Do you-all want to schedule yourselves

20  for 1:30 and it'll basically be a docket call at 1:30 and I'll

21  tell you whether to come back at 2:30 or 3:30 based on the

22  announcement?

23         **MR. LEE:**  That will be terrific.

24         **THE COURT:**  Because they may just settled and --

25         **MR. RIOS:**  That sounds fine.

1          **MR. LEE:**  June 4th, your Honor.

2          **THE COURT:**  Let me just see who the -- Osyka is

3   Mr. Stroube?

4          **MR. RIOS:**  Yes, your Honor.

5          **THE COURT:**  And let me see who is representing

6   Mr. Huff (phonetic).  I think that's Mr. Kirkendall but I'm not

7   sure.

8      **(Pause / Voices heard off the record)**

9          **MR. LEE:**  Thank you, your Honor.  1:30 works for this

10  side of the table.

11         **THE COURT:**  Hold on.  Let me just tell you who we've

12  got.  So you-all can probably make some phone calls and figure

13  out what you're doing.  Yeah, it's *Kirkendall versus Stroube*.

14  So they ought to be able to give you some better forecasts.

15         But we'll set it at 1:30 but you-all are going to

16  wait.  And that will basically be a docket call.

17         Anything else we need to get done?

18         **MR. RIOS:**  One last thing, your Honor.  The nullity

19  suit, can we just deliver a copy to chambers under cover

20  letter, a copy to Mr. --

21         **THE COURT:**  I'd rather have it as part of the --

22         **MS. EITEL:**  I can upload it as Exhibit 23.

23         **THE COURT:**  -- appellate record.  Just upload it

24  and --

25         **MR. RIOS:**  Okay.

1      **THE COURT:** -- we'll admit it.  Yeah, that way

2  there's no question on an appeal what it is.  And I think that

3  given how various courts have interpreted, you know, *Pro-Snax,*

4  this could easily get appealed and I want to be sure that we

5  have a full and complete appellate record.

6      **MR. RIOS:**  Very well.

7      **THE COURT:**  Let's get it on up there.  If you'll just

8  file it.  Ms. Eitel, if you'll file within the next week and

9  then --

10      **MS. EITEL:**  I'll get it filed today, your Honor.

11      **THE COURT:**  You'll have a week after she files it to

12  file something that tells me it's not the right lawsuit or

13  something but --

14      **MR. LEE:**  Your Honor --

15      **THE COURT:**  Well, I mean you know if she makes a

16  mistake.

17      **MR. LEE:**  I do want you to know it is my intent one

18  day to bring you a case where we don't have the issue go up on

19  appeal (laughs).

20      **THE COURT:**  You know, it's okay.

21      **MS. EITEL:**  Always a problem --

22      **MR. LEE:**  Thank you, your Honor.

23      **THE COURT:**  Thank you.

24      **(This proceeding was adjourned at 3:58 p.m.)**

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>May 29, 2009</u>

            Signed                                Dated


            *TONI HUDSON, TRANSCRIBER*