**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**09/01/2009**

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 05-39857** |
| **CYRUS II PARTNERSHIP** | § | **Chapter 7** |
| **and** | § | |
| **MONDONA RAFIZADEH,** | § | |
| | § | |
| **BAHAR DEVELOPMENT, INC.** | § | **CASE NO: 05-39858** |
| | § | |
| **MONDONA RAFIZADEH** | § | **CASE NO: 05-39859** |
| | § | **Jointly Administered Order** |
| Debtor(s). | § | **Judge Isgur** |

**MEMORANDUM OPINION**

The Court must decide the amount, if any, of fees to award to the Trustee's Special Louisiana

Litigation Counsel (the law firm of Gordon, Arata, McCollam, Duplantis & Eagan, L.L.P.).

The Estate's largest creditor, Orix Capital Markets, L.L.C., challenges two categories of

fees.  For the reasons set forth below, the Court sustains Orix's objection with respect to certain

fees allocable to the prosecution of a Louisiana lawsuit and overrules Orix's objection with

respect to fees allocable to a failed Motion to Compromise.

**Background**

This is a complex chapter 7 bankruptcy case.  Although it now appears to be nearing

conclusion, the case was characterized by bitter litigation between the Debtor's family, the

Estate's largest creditor, and the chapter 7 Trustee.

The background of the case has been fully explained in the Court's prior opinions and

will not be repeated here. *See In re Cyrus II P'ship*, 2008 WL 5479108 (Bankr. S.D. Tex. Nov.

24, 2008); *In re Cyrus II P'ship*, 2008 WL 4371670 (Bankr. S.D. Tex. Sept. 11, 2008); *In re

Cyrus II P'ship*, 2008 WL 3003824 (Bankr. S.D. Tex. July 31, 2008); *In re Cyrus II P'ship*, 2007

WL 4105961 (Bankr. S.D. Tex. Nov. 16, 2007).  To best understand the present dispute,

however, a minimal amount of background is required.

Cyrus II Partnership and Bahar Development, Inc. financed the acquisition of an apartment property with funds borrowed from a loan pool serviced by Orix. Mondona Rafizadeh guaranteed repayment of the debt under limited circumstances, such as fraud in the initiation of the transaction. Prior to bankruptcy, a Louisiana state court issued a judgment in favor of Orix and against Mondona Rafizadeh, Cyrus II Partnership and Bahar Development arising out of alleged fraud in the initiation of the loan transaction. All appeals of the judgment failed. That judgment, in an amount well in excess of $10 million, triggered the filing of the bankruptcy petitions in these cases.

## Applicable Law

The parties focus primarily on *In re Pro-Snax Distrib., Inc.,* 157 F.3d 414 (5th Cir. 1998). *Pro-Snax* held that the Bankruptcy Code does not allow the recovery of fees from an estate for work done by debtor's counsel after the appointment of a chapter 11 trustee. *Id.* at 425. It also established the standards to be applied to debtor's counsel's compensation prior to the appointment of a chapter 11 trustee. *Id.* at 426.

Compensation of a chapter 11 debtor's counsel is governed by § 330 of the Bankruptcy Code. Section 330(a)(3) provides that in determining the amount of "reasonable compensation" to be awarded, the court:

> shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or *beneficial at the time at which the service was rendered* toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3) (emphasis added).

*Pro-Snax* teaches that these factors should not be given equal weight. If the services provided by debtor's counsel did not result in an "identifiable, tangible and material benefit to the bankruptcy estate," then the services are not compensable at all. *Pro-Snax*, 157 F.3d at 426.

*Pro-Snax* involved an involuntary chapter 7 bankruptcy brought by creditors (who collectively held more than 50% of the indebtedness) against the debtor. *Id.* at 416. The case was converted to a chapter 11, and a trustee was appointed shortly thereafter. *Id.* Although the debtor proposed a plan of reorganization, the plan was never confirmed due to objections raised by the creditors who had initiated the involuntary bankruptcy petition. *Id.* at 416-17. The case was then converted back to chapter 7. *Id.* at 417.

In the portion of the opinion relevant here, the Fifth Circuit addressed competing standards governing the award of legal fees to the debtor's counsel before the appointment of the chapter 11 trustee. *Id.* at 426. The Court rejected debtor's counsel's argument that the Court should consider a "reasonableness standard . . . [of] whether the services rendered were objectively beneficial toward the completion of the case at the time they were performed." *Id.* Instead, the Court adopted the "more stringent test-whether [counsel's] services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate." *Id.*; *see also Id.* ("[I]t is

important to stress that any work performed by legal counsel on behalf of a debtor must be of

material benefit to the estate.")  The Fifth Circuit then affirmed the district court's decision[1]:

> The district court's instruction to the bankruptcy court, to consider strongly the
> debtor's lack of success in obtaining confirmation of the Chapter 11 plan, is
> consistent with the standards identified by Congress in § 330, which require that-
> at the time the services are performed-the chances of success must outweigh the
> costs of pursuing the action. Even though the bankruptcy court found support for
> the Chapter 11 plan among creditors other than the Petitioning Creditors, and, if
> the plan had been confirmed, the estate could have been brought to a swifter
> conclusion than if the case were brought under Chapter 7, we find that A&K
> should have known from the outset that the Debtor's prosecution of a Chapter 11
> plan would fail, given that the Petitioning Creditors-who collectively held more
> than 50% of the indebtedness in this case-filed an involuntary *Chapter 7* case
> against the Debtor and repeatedly informed the Debtor and the bankruptcy court
> that they believed the case should be administered under Chapter 7.

*Id.* at 426 (emphasis in original).

One lingering question after *Pro-Snax* was whether courts should conduct the "material

benefit" inquiry from a hindsight or "at the time the service was rendered" perspective.  *See In re*

*Spillman Development Group, LTD.*, 376 B.R. 543, 548 (Bankr. W.D. Tex. 2007) ("Up until the

Fifth Circuit decision in *Pro-Snax*, it was abundantly clear that bankruptcy courts were to make

the analysis and determination of benefit of the professional's services 'at the time at which the

service was rendered' . . . . *Pro-Snax* clouded the issue . . . ."); *In re Gadzooks, Inc.* 352 B.R.

796, 810 (Bankr. N.D. Tex. 2006), *rev'd* 2007 WL 2059724 (N.D. Tex. 2007) ("While, as

indicated by the Fifth Circuit in *Pro Snax*, a court must look to the benefit to the estate in

determining whether professional fees are reasonable . . ., under the express language of the

statute, the analysis is made 'at the time at which the service was rendered' and not in

hindsight."); *In re Weaver*, 336 B.R. 115, 119 (W.D. Tex. 2005) ("Applicant Borsheim argues

that *Pro-Snax* is at odds with the statute and misinterprets it since the statute plainly authorizes

---

[1] The district court had previously reversed and remanded (for a recalculation of the fee award) the decision of the
bankruptcy court, which awarded the legal costs requested by debtor's counsel. *Id.* at 417.

fees 'for . . . services . . . reasonably likely to benefit the debtor's estate' . . . . Even if such be

true, this Court is constrained to follow the 5th Circuit's interpretation.").

On one hand, *Pro-Snax* requires that the professional services "*result . . . in a . . . material*

*benefit*" to the estate. *Pro Snax*, 157 F.3d at 426 (emphasis added).  This points in favor of the

hindsight perspective.  Additional support for this perspective is also found in the Fifth Circuit's

affirmation of the "district court's instruction to the bankruptcy court, to consider strongly the

debtor's *lack of success* in obtaining confirmation of the Chapter 11 plan." *Id.* (emphasis added).

Clearly, it is impossible to consider "results" or the debtor's "lack of success" at the "time the

services were rendered."   Finally, the Court's rejection of a "reasonableness test" based on

whether "the services were objectively beneficial . . . at the time they were performed" favors a

hindsight viewpoint.[2] *Id.*

On the other hand, *Pro-Snax* acknowledged that "at the time the services are

performed . . . the chances of success must outweigh the costs of pursuing the action." *Id.*  And

*Pro-Snax* "[found] that A&K *should have known from the outset* that the Debtor's prosecution of

a Chapter 11 plan would fail." *Id.*  These statements—as well as § 330(a)(3)(C)'s unambiguous

consideration of "whether the services were necessary . . . or beneficial *at the time . . . the service*

*was rendered*"—favor a prospective (i.e. "at the time the service was rendered") approach. *See*

11 U.S.C. § 330(a)(3)(C) (emphasis added); *see also United States v. Ron Pair Enters., Inc.,* 489

U.S. 235, 242, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1984) ("[C]ourt[s] . . . must give effect to the

unambiguously expressed intent of Congress.").    Unlike the view from hindsight, this

perspective does not ask whether the success *actually achieved* outweighed the costs associated

with the effort.  Instead, it asks whether, at the time the services were rendered, the *probability of*

---

[2] However, it is important not to overstate the significance of the Fifth Circuit's rejection of the "reasonableness test."  As discussed below, a pure hindsight standard does not necessarily follow.

*achieving* future success outweighed the anticipated costs of undertaking an action.

Further, *Pro-Snax* never explicitly stated that a "hindsight" approach applies. The Fifth Circuit rejected debtor's counsel's "reasonableness" test, which included a prospective viewpoint. But it does not necessarily follow that all prospective viewpoints are banned under *Pro-Snax*. *Pro-Snax* never outwardly proclaimed that the "more stringent test" adopted by the Court cannot include a prospective viewpoint. To the contrary, portions of the opinion— discussed directly above—outwardly acknowledge the role of a prospective viewpoint in a fee application inquiry. Moreover, as discussed below, interpreting the *Pro-Snax* standard strictly from a hindsight perspective would unwarrantedly convert every professional fee into a contingency fee.

Before proceeding further, it is worth noting that in some cases, including *Pro-Snax*, the outcome is unaffected by the whether the court takes a prospective or hindsight viewpoint. *See Pro-Snax*, 157 F.3d at 426 n.17 ("We believe that these facts necessarily should have led [debtor's counsel] to the conclusion that its services were futile, meaning that we would find against [debtor's counsel] even if we today adopted the reasonableness [prospective] standard that it suggests."). In *Quisenberry*, for example, the debtor's attorney sought payment from the estate for prosecuting an adversary under § 522(h). *In re Quisenberry*, 295 B.R. 855, 865 (Bankr. N.D. Tex. 2003). The Court denied the attorney's request because, by definition, all of funds recovered under § 522(h) are exempt and belong to the debtor. *Id.* Since the debtor got to keep all of the recovered funds, the Court held that there was no "material benefit to the bankruptcy estate." *Id.* Although the Court applied a hindsight perspective, the outcome would have been the same if the Court had taken a prospective approach. At the outset, the debtor's attorney was aware that any funds recovered under § 522(h) would become the debtor's exempt property;

thus, it was clear at the beginning of the adversary proceeding that the estate would not materially benefit from the action.

In other, arguably less common situations, the amount of fees awarded may depend, at least in part, upon whether the court evaluates the benefit of the services from a prospective or hindsight viewpoint. It then becomes necessary to ascertain the true meaning of *Pro-Snax*. It should not come as a surprise that courts have failed to interpret the decision in a consistent manner.

The Court has found at least three different, yet related, ways courts have applied *Pro-Snax*. First, some courts have taken a strict hindsight approach when determining whether services benefited the estate. *See Weaver*, 336 B.R. at 119; *Quisenberry*, 295 B.R. at 865. In *Weaver*, for example, the Court denied the attorney's fee request for his work on the post-petition appeal of a pre-petition judgment against the debtor. *Weaver*, 336 B.R. at 119. The Court reasoned that since the appeal had not yet been ruled upon, it was impossible to determine whether the appeal resulted in a material benefit to the estate. *Id.* ("Under the *Pro-Snax* decision, it is premature to grant fees in this regard. We simply do not know whether or to what extent there will be an 'identifiable, tangible, and material benefit to the estate' from these services. The fees should be denied without prejudice to being re-urged at the right time."). Similarly, in *Quisenberry*, the Court refused to consider anything but a hindsight perspective: "the test is an objective after-the-fact test: 'whether [ ] services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate,' regardless of the reasonableness of such services at the time they were rendered." *Quisenberry*, 295 B.R. at 865.

Second, at least two courts have stated they were applying a pure hindsight approach but then included a prospective viewpoint in their analysis. *See PriceWaterHouseCoopers, LLP v.*

7 / 18

*Litzler (In re Harbor Financial Group, Inc.)*, 2001 WL 1041785, at *3-4 (N.D. Tex. Sept. 5, 2001); *In re JNS Aviation, LLC*, 2009 WL 80202, at *8 (Bankr. N.D. Tex. Jan. 9, 2009). In *Litzler*, the Court stated that *Pro-Snax* "employed a hindsight standard." *Litzler*, 2001 WL 1041785, at *2. However, *Litzler* did not completely base its decision upon hindsight. The Court stated, for example, "[a]ppellant is further burdened by the fact that its Chapter 11 business plan was never adopted. While this itself does not preclude all fees, it does hurt Appellant's ability to show that *at the time the business plan was being produced, the chances of its success outweighed the costs of putting it together*." *Id.* at 3. If *Pro-Snax* required a pure hindsight approach, the Court had no need to discuss the professionals' ability to show its prospects for success at the time the services were rendered.

Similarly, in *JNS Aviation*, after stating that *Pro-Snax* requires a hindsight viewpoint, the Court conceded that it "does not second guess every decision and position taken by the Trustee. The Court does not construe the benefits analysis to require that each expenditure of time result in a quantifiable benefit to the estate." *JNS Aviation*, 2009 WL 80202, at *8. Although it requires some parsing, the Court's statement implicitly permits a prospective viewpoint to influence its fee award. Under a strict hindsight approach, the only way a fee is awarded is if the time resulted in a benefit to the estate. It is a simple, straightforward inquiry. *JNS Aviation* implicitly rejected this strict hindsight viewpoint when it (i) decided not to second-guess the trustee, and (ii) broke with the requirement that each service, to be compensable, must result in a material benefit to the estate. This standard permits compensation for actions that, although they failed to produce a material benefit, made sense and were proper at the time they were undertaken.[3]

---

[3] This is consistent with the prospective fee analysis under § 330(a)(3)(C).

Third, other courts have applied a hybrid approach that explicitly includes prospective and hindsight viewpoints. *See Spillman*, 376 B.R. at 550-54; *In re Energy Partners, LTD*, 2009 WL 2366104, at \*14 (Bankr. S.D. Tex. July 28, 2009).  In *Spillman*, the Court merged the hindsight and prospective viewpoints into a two prong inquiry: "the services must both be beneficial toward completion of the case at the time they are rendered and they must produce an identifiable, tangible, and material benefit to the estate." *Spillman*, 376 B.R. at 550.  The Court recognized that the dual standard could, at times, be unnecessary[4] but, nevertheless, adopted it in order to remain consistent with both *Pro-Snax* and the plain language of § 330(a)(3)(C). *Id.*

After considering the case-law, the Court determines that the hybrid approach—which considers prospective and retrospective viewpoints—is the best possible inquiry given the language of § 330(a)(3)(C) and the *Pro-Snax* decision.  Prospectively, this Court will require that Gordon Arata's services "were necessary to the administration of, or beneficial at the time at which the services were rendered toward the completion of, a case" under Title 11 of the United States Code. 11 U.S.C. § 330(a)(3)(C).  Retrospectively, this Court will require that the services resulted in "identifiable, tangible and material benefit to the estate[5]." *Pro-Snax*, 157 F.3d at 426.

### First Fee Dispute

The first fee dispute concerns whether the Gordon Arata firm should be allowed to charge fees for work on behalf of the Trustee on a Louisiana Petition to Annul Judgment after the date on which the Grodon Arata firm should have realized that the petition was frivolous.

---

[4]  "In this combined state it seems the latter consumes the former as it is hard to imagine any situation where the latter exists and the former does not.  However, the former clearly could exist without the latter." *Id.*

[5] Like *JNS Aviation*, this Court recognizes that a service may "benefit the estate" under *Pro-Snax* even though the service did not directly result in a quantifiable or monetary benefit. *See JNS Aviation*, 2009 WL 80202, at \*8 ("The Court does not construe the benefits analysis to require that each expenditure of time result in a quantifiable benefit to the estate.").

In August of 2007, Mondona Rafizadeh filed a Petition to Annul Judgment in the 24th Judicial District Court for Jefferson Parish. The gravamen of the petition was that Orix had withheld an extensive report that had been compiled by Mr. Henry Bomar. Rafizadeh alleged that the judgment should be annulled because the Bomar report was material to the outcome of the litigation, but was withheld by Orix in discovery.

The Gordon Arata firm was retained by the Trustee as Special Louisiana Litigation counsel to determine whether the Trustee should intervene and how the Trustee should handle the Petition to Annul Judgment. After the Grodon Arata firm was retained, Orix's counsel sent a detailed letter to the Trustee. The Gordon Arata firm received it by e-mail on November 26, 2007.

The November 26, 2007 e-mail contains detailed attachments. The attachments demonstrated that the Bomar Report was provided to Rafizadeh *and that it was actually introduced by her as an exhibit at the trial of the original Louisiana lawsuit.* Unless the attachments were forged—and the Court has not received evidence bringing their validity into doubt—they make clear that Rafizadeh's Louisiana Petition to Annul Judgment was frivolous.

The sole issue of dispute with respect to the Gordon Arata firm concerns whether its fees should be allowed for work on the Petition to Annual Judgment after it received the November 26, 2007 e-mail. Orix acknowledges that Gordon Arata needed a reasonable amount of time after the email was received to review its contents; it therefore does not challenge the fees requested for the month of December, 2007. However, Orix contests the fees incurred beginning on January 1, 2008 for work on the Petition to Annul Judgment.

Following the evidentiary hearing on this fee application, the Court read the complete Petition to Annul the Judgment. The Court then read the complete November 26, 2007 e-mail

from Orix's counsel.  As the Court indicated following the close of evidence, the key issue for

the Court was whether the Gordon Arata firm spent unnecessary time and effort with respect to

the Petition to Annul the Judgment after its receipt of the November 26, 2007 e-mail.

This Court concludes that the Petition to Annul Judgment was a simple lawsuit, with

easily understood factual allegations.  The Court further concludes that the November 26, 2007

e-mail clearly demonstrated that the alleged facts in the Petition to Annul Judgment were false.

Finally, the Court concludes that—at most—Gordon Arata should have determined not later than

December 31, 2007[6] that the Trustee should take no action to further the efforts set forth in the

Petition to Annul Judgment.

*Pro-Snax* holds, among other things, that counsel's work may not be compensated if

counsel should have concluded that "its services were futile."  *Pro-Snax*, 157 F.3d at 426 n.17;

*see also JNS Aviation*, 2009 WL 80202, at *3 ("Section 330(a) of the Bankruptcy Code provides

that the court may award reasonable compensation to a professional person so long as the

services rendered were actual and *necessary*.") (emphasis added).  By December 31, 2007,

Gordon Arata should have recognized that its services on the Petition to Annul Judgment were

unnecessary and would not benefit the Estate.  Further, it is clear that Gordon Arata's fees after

December 31, 2007 did not, in fact, provide any sort of identifiable, tangible and material benefit

to the Estate.  Thus, under both retrospective and prospective viewpoints, the services provided

post-December 31, 2007 on the Petition to Annul Judgment are not compensable.

---

[6] The Court selects the December 31, 2007 date for two reasons.  First, Orix does not challenge the fees requested on
or before December 31, 2007.  Second, the Court believes that 34 days (even given the Holiday Season) was more
than adequate to review the simple pleadings and attachments and to contact Rafizadeh's counsel for a response.  If
Rafizadeh's counsel had no response, then the Trustee should have ceased spending funds on a losing and frivolous
lawsuit.  The Court fully recognizes that counsel has multiple matters and that full time cannot be devoted to this
one case.  But, the fact that counsel has other work cannot excuse a lack of attention to this case or a waste of estate
money.  If the petition or the e-mail were complex, perhaps a longer period of time for evaluation would have been
necessary.  But the straightforward petition and direct rebuttal should not have taken a material amount of time and
counsel should have ceased work by the end of 2007.

With respect to the factors set forth in § 330(a)(3), the Court finds as follows:

| Section 330(a)(3) Factor | Conclusion |
|---|---|
| (A)      the time spent on such services; | The application contains detailed time records that reflect that the firm did, in fact, spend the time for which it seeks compensation. |
| (B)      the rates charged for such services; | The rates charged by the firm are reasonable. No challenge has been raised to the hourly rates of the professionals and the rates appear reasonable based on the Court's experience with professionals undertaking similar work. |
| (C)      whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; | As set forth above, the post December 31 services were not necessary to the administration of the case and were not beneficial to the estate. The services would not have been performed if Gordon Arata had spent a minimal amount of time reviewing the November 26 e-mail and its attachments. |
| (D)      whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; | The services eventually included the review of the November 26 e-mail and its attachments. This service was not performed within a reasonable period of time commensurate with the complexity of the required review. |
| (E)      with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; | Lead counsel for Gordon Arata is a former bankruptcy judge, eminently qualified to perform the work. |
| (F)      whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title. | The compensation would have been reasonable, if necessary. However, a comparably skilled practitioner would have terminated the estate's expenditure with a proper review of the November 26 e-mail and its attachments. |

Accordingly, the Court will disallow fees for the unnecessary work performed on or after January 1, 2008. Orix's trial exhibit 22 highlights with red boxes the time that Orix alleges was expended on the Petition to Annul Judgment after December 31, 2007. The Court has reviewed the time entries and largely agrees with Orix's characterizations. Taken as a whole, Orix seeks a disallowance of 215.7 hours of billable time. Following a review of all of the time entries, the Court concludes that some time entries are for multiple projects, some of which are allowable

time.  The Court makes a 15% allowance for these time entries and therefore disallows 183 of Gordon Arata's billable hours as being unnecessary.  The bulk of the time spent on other matters was spent by Mr. Phillips; the 15% allowed time is allocated to Mr. Phillips.  This results in a disallowance of $29,069.38 in legal fees.  $500.00 of expenses will also be disallowed.

### Second Fee Dispute

The second fee dispute concerns whether the Gordon Arata firm should be awarded fees billed in connection with the Trustee's failed Motion to Compromise with the Rafizadeh entities. This is a more nuanced issue, for which some additional background is required.

Following years of wrangling between the Trustee, Orix and the Rafizadehs, the Trustee reached a proposed compromise with the Rafizadehs.  The Compromise was opposed by Orix, the estate's largest creditor, holding well over 95% of all allowed claims against the Estate. Following a lengthy hearing, the Court held that the Compromise would not be approved over Orix's objections, primarily because the Trustee had negotiated the Compromise without taking into consideration "the paramount interest of creditors with proper deference to their reasonable views."  *See Connecticut Gen. Life. Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995).

Nevertheless, although the Court denied the Motion to Compromise, the actions of the parties in pursuit of the Motion eventually led to a substantially enhanced settlement for the Estate.  Thus, although the Compromise failed, the efforts in support thereof were far from futile.

The Gordon Arata firm, and the lawyers employed by it, were minor players in the ordeal over whether to approve the Compromise.  There was substantial discovery concerning the Compromise and members of the Gordon Arata firm were witnesses in the contested matter regarding the Motion to Compromise.  Some of the time billed by the Gordon Arata firm was in

support of the trustee's Motion, but a greater amount of the time was spent by them in responding to discovery in their capacity as witnesses.

Before applying the hybrid standard, it is important to recognize that, unlike the attorneys in *Pro-Snax*, Gordon Arata was special counsel.  The very nature of a special counsel gives special counsel more limited knowledge of the case as a whole and less participation in strategic decisions such as whether to compromise major issues in the case.  This is especially true here since most of the time billed by Gordon Arata lawyers on the Motion to Compromise was for work performed in their capacity as witnesses.  Thus, the Court will conduct the hybrid analysis with the unique nature of Gordon Arata's limited involvement in the case in mind.

The Court finds that Gordon Arata's services were beneficial at the time the services were rendered.  Although the Motion to Compromise ultimately failed, the benefit of Gordon Arata's services outweighed the costs when the decision to pursue the Motion to Compromise was made. *See Pro-Snax*, 157 F.3d at 426 ("[A]t the time the services are performed . . . the chances of success must outweigh the costs of pursuing the action.").  A compromise was possible and, had a compromise been reached, the additional costs associated with resolving the complex dispute would have been avoided.

Gordon Arata's services also resulted in a tangible, identifiable and material benefit to the Estate.  It was imperative for the parties to learn where lines were to be drawn, what amount would be an acceptable compromise and how the case must proceed.  Gordon Arata's services helped to provide answers to these questions.  This case was ultimately settled—with the agreement of the Rafizadehs, the Trustee and Orix.  Without the hearing on the Motion to Compromise (and its attendant legal fees), the Court doubts that the ultimate compromise would

have been reached. Sometimes, as in this case, the failure of a motion to compromise teaches lessons that lead to an ultimate resolution.

Furthermore, the Court does not read *Pro-Snax* to hold that a trustee's counsel can only be compensated for litigation in which the estate succeeds. *Pro-Snax*, 157 F.3d at 426 ("[A]t the time the services are performed . . . the *chances of success* must outweigh the costs of pursuing the action.") (emphasis added); *See also Litzler*, 2001 WL 1041785, at *3 (Acknowledging that failure to adopt a chapter 11 plan does not necessarily preclude the award of fees).

Such a holding would also be inconsistent with other Fifth Circuit opinions dealing with § 328 of the Bankruptcy Code and contingent fee arrangements. Section 328 "allows an attorney seeking to represent a bankruptcy estate to obtain prior court approval of her compensation plan." *In re Barron*, 325 F.3d 690, 692 (5th Cir. 2003). Prior to the enactment of § 328, "able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done." *In re National Gypsum Co.*, 123 F.3d 861, 862 (5th Cir. 1997). Section 328 enables professionals to "avoid that uncertainty by obtaining court approval of [the] representation and fee arrangement prior to performing the contemplated services." *Barron*, 325 F.3d at 693. Once the fees are approved, they may not be altered by courts unless "after the conclusion of such employment . . . such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a).[7]

---

[7] *See also In re Coho Energy Inc.*, 395 F.3d 198, 204 (5th Cir. 2004) ("The bankruptcy code manifests a strong policy of maintaining jurisdiction and control over the payment of professionals' fees. *E.g.,* 11 U.S.C. § 330 (setting forth the factors for "reasonable compensation" of professionals). When this fee discretion began to dissuade professionals from offering their services to debtors, Congress passed section 328(a) of the bankruptcy code, which allowed professionals to have greater certainty as to their eventual payment. *In re Nat'l Gypsum Co.*, 123 F.3d 861, 862 (5th Cir. 1997). Under section 328(a), a fee agreement approved by the bankruptcy court could be reduced only

Sections 328 and 330 are mutually exclusive of one another. *See National Gypsum*, 123

F.3d at 862 ("[Courts] must . . . set the compensation award either according to § 328 or

§ 330."). "Once the bankruptcy court has approved a rate or means of payment, such as a

contingent fee, the court cannot on the submission of the final fee application instead approve a

'reasonable' fee under § 330, unless the bankruptcy court finds that the original arrangement was

improvident due to unanticipated circumstances as required by § 328." *In re Texas Sec., Inc.*, 218

F.3d 443, 445 (5th Cir. 2000); *see also National Gypsum*, 123 F.3d at 862 ("[I]f prior approval is

given to a certain compensation, § 328 controls and the court starts with that approved

compensation, modifying it only for developments unforeseen when originally approved.").

In *Texas Securities*, the Fifth Circuit considered an appeal from a bankruptcy court's final

fee award based on the "lodestar" formula provided in § 330(a)(1). *Texas Sec.*, 218 F.3d at 445.

Previously, the bankruptcy court had approved a hybrid contingency fee/hourly rate formula

under § 328(a). *Id.* at 446.   The bankruptcy court then departed from the pre-approved fee

agreement when it issued its final fee order, which was based upon the "lodestar" formula. *Id* at

445.  The Fifth Circuit reversed this decision:

> [T]he [bankruptcy] court approved a contingent fee arrangement in the original
> Employment Order and in the modifying Order of October 20, 1995 approved the
> contingent fee basis for work performed prior to September 8, 1995 and an hourly
> rate for work performed thereafter. The modifying Order establishes a mode of
> compensation governed by § 328(a), and the bankruptcy court could not alter that
> compensation on Peele's submission of the final fee application without making a
> finding that the modifying Order was improvident due to unanticipated
> circumstances. Since the bankruptcy court made no such finding, the court could
> not shift any part of Peele's compensation to the lodestar formula of § 330(a)(1).

*Id.* at 446.

---

if the terms of the contract were "improvident in light of developments not capable of being anticipated at the time
of the fixing of such terms and conditions." 11U.S.C. § 328(a).")

*Texas Securities* teaches that after a court has approved fees in accordance with § 328, the court may not later engraft a § 330 lodestar requirement onto the fee application. For example, if the court approves a 40% contingency fee under § 328, the Court may not later use § 330 as a basis for modifying the fee award to provide for hourly instead of contingent fees, even if hourly fees are more "reasonable."

In this case, the converse is also true. If the Court were to read *Pro-Snax* to limit Trustee's counsel's fee awards to matters in which the Trustee was the prevailing party, then the Court would be impermissibly converting hourly lodestar fees to contingent fees. Just as courts may not convert a contingency fee approved pursuant to § 328 into an hourly fee, the Court here may not convert the pre-approved hourly fee into a contingency fee.

Against that backdrop, the Court now analyzes the § 330(a)(3) factors with respect to the Motion to Compromise:

| Section 330(a)(3) Factor | Conclusion |
|---|---|
| (A)   the time spent on such services; | The application contains detailed time records that reflect that the firm did, in fact, spend the time for which it seeks compensation. |
| (B)   the rates charged for such services; | The rates charged by the firm are reasonable. No challenge has been raised to the hourly rates of the professionals and the rates appear reasonable based on the Court's experience with professionals undertaking similar work. |
| (C)   whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; | As set forth above, the services were necessary to the estate and beneficial at the time that they were rendered by fostering the ultimate resolution of the case. |
| (D)   whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; | The services were timely performed and allowed the Court to conduct a full and timely evidentiary hearing on the Motion to Compromise. |
| (E)   with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; | Lead counsel for Gordon Arata is a former bankruptcy judge, eminently qualified to perform the work. |

| (F)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title. | Gordon Arata served as Special Counsel.  The fees are equal to or less than what the Court would have expected from comparably skilled special counsel in a similar situation. |
|---|---|

Accordingly, the Court allows the fees sought by Gordon Arata for work on the Motion to Compromise.

## Conclusion

Gordon Arata seeks $68,299.50 in its final application for compensation.  Those amounts are reduced by $29,569.38.  The balance of the requested fees are allowed.  All fees awarded in prior interim applications are confirmed as final.  A separate order will be issued.

SIGNED **September 1, 2009.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE